1

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF NORTH DAKOTA
2                 WESTERN DIVISION

3   ------------------------------------------------------
                        )
4   Cary Jurgens,       )           CONDENSED
                        )           TRANSCRIPT
5          Plaintiff,   )
                        )
6    V.                 )      Civil No.:
                        )   1:17-cv-00179-DLH-CSM
7   BNSF Railway Company, )
    a corporation,       )
8                        )
         Defendant.      )
9   ------------------------------

10

11

12

13                D E P O S I T I O N

14                       OF

15                 MICHAEL FINK

16                October 9, 2018

17                9:00 O'clock A.M.

18

19

20

21   Job No. CS3018972

22   TAKEN AT:            Radisson Hotel
                          605 East Broadway
23                        Bismarck, ND 58501

24   REPORTER:            JESSE L. ANDERS

25                  (PURSUANT TO NOTICE)



**2**

```
 1        A P P E A R A N C E S
 2   PATRICK J. SWEENEY
          Attorney at Law
 3          Of
          Sweeney Law Firm, P.A.
 4        First National Bank Building
          Suite 1410
 5        St. Paul, Minnesota 55101
          sweeney@slfirm.net
 6   Counsel For Defendant BNSF Railway Company
 7   MICHAEL F. TELLO
          Attorney at Law
 8          Of
          Tello Law Firm
 9        2150 Third Avenue N
          Suite 10
10        Anoka, MN 55303
          mftello@tellolegal.com
11   Counsel for Plaintiff
12        ALSO PRESENT:
          CARY JURGENS
13        Plaintiff
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1            INDEX
 2   WITNESS:                      PAGE
     MICHAEL FINK
 3     Direct Exam by PATRICK J. SWEENEY      4
       Cross Exam by MICHAEL F. TELLO       112
 4     Redirect Exam by PATRICK J. SWEENEY   144
       Recross Exam by MICHAEL F. TELLO      155
 5     Redirect Exam by PATRICK J. SWEENEY   156
 6
 7        *    *    *    *
 8
 9        EXHIBITS AND/OR REFERRED-TO EXHIBITS
     EX. NUMBER - DESCRIPTION           PAGE
10
     Ex. No. 1 - (Work Orders)             64
11   Ex. No. 2 - (Michael Fink's Incident Statement)   66
     Ex. No. 3 - (Radio Transcript)        74
12   Ex. No. 4 - (Photo DSC00158)          74
     Ex. No. 5 - (Photo DSC00162)          74
13   Ex. No. 6 - (Photo DSC00163)          74
     Ex. No. 7 - (Photo DSC00164)          74
14   Ex. No. 8 - (Blown Up Photo of Track)  94
     Ex. No. 9 - (BNSF Safety Action Plan)  108
15   Ex. No. 10- (Employee Personal Injury/Occupational
     Illness Report)                      112
16   Ex. No. 11- (Note from Tony Freidig)   115
     Ex. No. 12- (Michael Fink's Deposition Notice)  115
17   Ex. No. 13- (Photograph)             129
     Ex. No. 14- (Photograph)             129
18   Ex. No. 15- (Photograph)             129
     Ex. No. 16- (Photograph)             129
19   Ex. No. 17- (Photograph)             129
20
21        *    *    *    *
22
23
24
25
```

**4**

```
 1        MICHAEL FINK, a witness, called by the
 2   Defendant, being first duly sworn, testified on his oath
 3   as follows:
 4   BY MR. SWEENEY            DIRECT EXAMINATION
 5     Q. Would you please state your full legal name for
 6   the record.
 7     A. Michael Stephen Fink.  It's M-i-c-h-a-e-l,
 8   S-t-e-p-h-e-n, F-i-n-k.
 9     Q. Have you ever had your deposition taken before?
10     A. No, not that I recall.
11     Q. Did you review any documents to prepare for this
12   deposition?
13     A. No.
14     Q. Did you have any discussions or communications
15   with anyone regarding this deposition?
16     A. Yes.
17     Q. With whom did you have discussions or
18   communications?
19     A. I had discussions with you and I had discussions
20   with Mr. Tello.
21     Q. Let me just take those in order.
22     A. Okay.
23     Q. I first met you this morning.  Correct?
24     A. Weren't you at the interview in, weren't you the
25   attorney that was at the interview in, I forgot his name
```

**5**

```
 1   now, the claims agent's office, at the office.
 2     Q. No.
 3     A. Oh, okay.  Well, I had a, a, a meeting with
 4   another BNSF attorney then, I, I'm not sure who exactly
 5   that was, regarding the same thing.
 6     Q. All right.  And you --
 7     A. That would be maybe a couple weeks ago.  I don't
 8   know the exact date.  I could look it up but...
 9     Q. You also mentioned that you spoke with Mr. Tello.
10     A. I spoke with Mr. Tello on the telephone, yes.
11     Q. And when did you do that?
12     A. That would have been a few days ago.
13     Q. And --
14        MR. TELLO:  Just for the record, could that
15   have been Scott Rauser, does that ring a bell?  That's
16   the only other --
17        MR. FINK:  I suppose it --
18        MR. TELLO:  -- attorney on the case.  Isn't
19   it, Mr. Sweeney?
20        MR. FINK:  Oh, the BNSF attorney?
21        MR. TELLO:  Yeah.  Tall, real tall guy.
22     Q. Do you, do you know the name of the attorney that
23   you met with a couple weeks ago as per your best
24   estimate?
25     A. I don't.  I thought it was, to be honest, I
```

2 (Pages 2 to 5)

6

1  thought it was you.
2  Q. That, that's that's okay.
3  A. He said he, it was in, Tony Freidig was there as
4  well, the claims agent and, and, and just kind of went
5  over, you know, the, my statement and what I recall from
6  that day.
7  Q. Thank you.  When you spoke to Mr. Tello a few
8  days ago --
9  A. Yes.
10  Q. -- did you call him or did he call you?
11  A. I called him.
12  Q. And do you remember what you discussed at that
13  time?
14  A. We just talked about this deposition and kind of
15  the guidelines of what it would be, and he told me that,
16  you know, that if I wanted to that I could have an
17  attorney present which I guess I didn't realize, but I
18  didn't think it was necessary either, and that was
19  pretty much just a, kind of a basic overview of, if I
20  needed a copy of my statement or anything then that was
21  kind of it.
22  Q. Did you discuss the August 7, 2017 incident at
23  all during that telephone conversation?
24  A. Just we discussed that he had a copy of my
25  statement and that, and that I was in the cab of the

7

1  engine when the incident happened.
2  Q. Is that consistent with your recollection that at
3  the time of the August 7, 2017 incident you were in the
4  cab of the locomotive?
5  A. That's correct.
6  Q. Have you had any other communications with anyone
7  else regarding the deposition other than you've
8  indicated?
9  A. The only other person I've talked to is Tony
10  Freidig, the claims agent, and we haven't discussed
11  specifics other than the day of the incident.
12  Q. Have you only given one statement as it pertains
13  to this matter?
14  A. That's correct.
15  Q. Have you had any conversations with Mr. Jurgens?
16  A. Not since that day.
17  Q. Other than this morning?
18  A. Other than --
19  Q. And, and you --
20  A. -- this morning.  Right.
21  Q. -- can see that Mr. -- okay.  Hold on one second.
22  Let, let me just --
23  A. Yep.
24  Q. -- go over a few ground rules, and --
25  A. Okay.

8

1  Q. -- then I'll get back to that.  It's very
2  difficult on the court reporter if you and I both talk
3  at the same time, and I understand that this is a
4  foreign process and that it's really easy to get into
5  talking over each other.  We will drive the court
6  reporter nuts if we do that, so if you could try and
7  remember to wait until I completely ask my question and
8  then you can provide your response, and I'll afford you
9  the courtesy of allowing you to completely answer a
10  question before I start in with my next question.  Is
11  that fair?
12  A. Fair enough, yep.
13  Q. Because it's somewhat unusual, I anticipate that
14  either I or the court reporter may need to remind you of
15  that.  We're not speaking down to you or doing anything
16  other than trying to make the record as clear as
17  possible.  Does that make sense?
18  A. Yes.
19  Q. While we're talking about ground rules, do you
20  understand that you've been placed under oath today and
21  you're duty bound to tell the truth?
22  A. I do.
23  Q. Will you do that?
24  A. Yes.
25  Q. If you don't understand one of my questions I

9

1  would ask that you please not answer it.  Okay?
2  A. Okay.
3  Q. Please ask me to rephrase or to clarify any
4  question that you don't understand.
5  A. Okay.
6  Q. I'm going to assume that if you do answer a
7  question that you have indeed understood it.  Is that
8  fair?
9  A. Yes.
10  Q. Please provide your best estimate or best
11  recollection today.  Will you do that?
12  A. Yes.
13  Q. If you need to take a break at any time will you
14  please just notify me of that, and that's something that
15  can be easily accommodated.
16  A. Okay.
17  Q. Do you have any questions about this deposition
18  process before we move on?
19  A. No.
20  Q. The --
21  MR. SWEENEY: What was the last question
22  that I asked him?  I got it.
23  Q. Just before we went over the ground rules I was
24  asking you about communications with Mr. Jurgens, and
25  you did see him arrive at your deposition this morning.

3 (Pages 6 to 9)

10

1  Correct?
2  **A. Correct.**
3  Q. When was the last time you communicated with him
4  prior to this morning?
5  **A. The day of the incident.**
6  Q. Who was the locomotive engineer on your crew on
7  August 7, 2017?
8  **A. Phil Miller.**
9  Q. When was the last time you spoke to Phil Miller
10  about the August 7, 2017 incident?
11  **A. We worked together several months ago, probably**
12  **came up in conversation.  It was, when you're on a train**
13  **that long --**
14  Q. Do you remember what the --
15  **A. -- you got to talk about something.  Sorry.**
16  Q. Do you, do you remember what the two of you
17  discussed at that time?
18  **A. Just that he had asked if I had been called in to**
19  **do a deposition.  He said other people had been, and I**
20  **told him at that time I hadn't been contacted by anybody**
21  **to do that, and it was probably a week after that that**
22  **Tony Freidig, Freidig, excuse me, contacted me to set up**
23  **an interview at the, the office in Mandan, and he had**
24  **indicated at the time that the, the timing of that was**
25  **because I took a temporary transfer position in**

11

1  **Galesburg, Illinois, so I was in Galesburg for most of**
2  **the summer.**
3  Q. The summer of 2018?
4  **A. This summer, yes.**
5  MR. TELLO:  Mr., a good time now, Mr.
6  Sweeney, if there was any statement, apparently there's
7  been a conversation, possible statement, that I haven't
8  been given any in discovery, and I wrote a letter to Mr.
9  Rauser requesting any, referencing any statement in my
10  interrogatories that I have not had a response of that,
11  so, just for the record, I, I, I was un, unaware of a
12  lot of this stuff that's going on early in the
13  statements and things, so I'm just making a record of it
14  now.  That's all.
15  Q. Do you have any documentation regarding the
16  events that occurred on August 7, 2017?
17  **A. I do not.**
18  Q. Did you take any photographs on August 7, 2017?
19  **A. I did not.**
20  Q. Have you ever taken any photographs at Strata,
21  S-t-r-a-t-a, in Jamestown?
22  **A. No.**
23  Q. Have you ever taken any photographs of the
24  Jamestown yard?
25  **A. No.**

12

1  Q. What I'd like to do next is just get some basic
2  background information from you.  Can you tell me your
3  date of birth?
4  **A. 3-17-1976.**
5  Q. How old does that make you today?
6  **A. 42 years old.**
7  Q. Where were you born?
8  **A. Naperville, Illinois.**
9  Q. Where do you currently reside?
10  **A. Bismarck, North Dakota.**
11  Q. Can you provide, provide me with your address,
12  please.
13  **A. Sure.  It's 2636 Ithica Drive, I-t-h-i-c-a, in**
14  **Bismarck, B-i-s-m-a-r-c-k, North Dakota, 58503.**
15  Q. Do you have any plans to move from that
16  residence?
17  **A. No.**
18  Q. And, aside from yourself, who lives there with
19  you?
20  **A. My wife and three children and my mother in law**
21  **during the summer.**
22  Q. Are you a high school graduate?
23  **A. I am.**
24  Q. Can you tell me where you attended high school an
25  when you graduated.

13

1  **A. I graduated from West Fargo High School in 1994.**
2  Q. Since graduating from high school, have you
3  attended any colleges, universities or trade schools?
4  **A. I have.  I went to North Dakota State University,**
5  **and then I went to the University of Mary as well.**
6  Q. Did you graduate from either of those two
7  institutions?
8  **A. I did not.**
9  Q. What did you study at NDSU?
10  **A. Business.**
11  Q. And when did you attend NDSU?
12  **A. Maybe -- I don't remember exactly, '95 to '97.**
13  Q. And then when did you attend the University of
14  Mary in Bismarck?
15  **A. It was actually the University of Marie in, in**
16  **Fargo, and I attended evening classes there for, I**
17  **couldn't tell you exactly what year that was.  It was,**
18  **it was probably over the course of two additional years,**
19  **right around or maybe a year and a half.**
20  Q. Was that after you attended NDSU?
21  **A. It was but it was further after.  It wasn't**
22  **immediately after.**
23  Q. Do you have any other college university or trade
24  school in your past other than you've indicated?
25  **A. No.**

---

**14**

1    Q. And what did you study at the University of Mary?
2    A. Business as well.
3    Q. What is your date of service with the BNSF
4    Railway Company?
5    A. August 19, 2013.
6    Q. What I'd like to do is just ask you briefly
7    basically what you did in terms of employment from your
8    graduation from high school up until the time you
9    started with BNSF.
10   A. Okay.
11   Q. Can you provide me with that information?
12   A. I can provide you with as much as I remember.
13   That's a long timeframe. I was working for First
14   National Bank when I graduated high school which later
15   became Alerus Financial, A-l-e-r-u-s, and let's see,
16   after that --
17   Q. How long were you there?
18   A. I started when I was in school, in high school,
19   and I stayed, I was probably there maybe three years,
20   four years, something like that. I, I, I don't remember
21   exactly. Then I guess I -- do you need it all in a
22   timeline, or you need it just whatever random work I've
23   done.
24   Q. Just your best recollection.
25   A. Okay.

---

**15**

1    Q. Whatever you can provide.
2    A. Okay. I, I drove taxi for Doyle's Cab when I was
3    21. I also bar tended at the Elks Club in Fargo. I
4    worked for RDO Equipment Company for 10 years.
5    Q. How do you spell that?
6    A. RDO.
7    Q. What did you do there?
8    A. I, when I left there I was the finance manager
9    for the Southwest Construction Division.
10   Q. And was that out of Fargo?
11   A. That was in Fargo, yes.
12   Q. Okay. Continue on please.
13   A. I worked for Pitney Bowes.
14   Q. What did you do there?
15   A. P, P-i-t-n-e-y B-o-w-e-s. I was a, an account
16   manager I believe was the title, senior account
17   representative, something like that, and then when I
18   left there I went to Integra Telecommunications. They
19   are a, well, provide internet and phone lines for small
20   businesses.
21   Q. What did you do there?
22   A. I was an account manager.
23   Q. Okay. Continue on please.
24   A. When I left there I worked for Corporate
25   Technologies in Fargo. They're an IT service provider.

---

**16**

1    Q. What did you do there?
2    A. I was a sales rep. I don't remember the exact
3    title. I also had my insurance license, sold insurance.
4    I had a couple of businesses after that, National
5    Capitol Solutions Corporation and Rental Solutions LLC,
6    and I did taxes one year for Liberty Tax Service. I'm
7    sure I'm forgetting something. Worked for Magnum
8    Transportation as a logistics coordinator.
9    Q. Do you recall any others?
10   A. Not off the top of my head. It's been quite a
11   few over the years.
12   Q. What led you to apply for a job for BNSF?
13   A. At the time I was looking for something totally
14   different than what I had been doing before and got a
15   call from my uncle, Mark Goodson, who was a dispatcher
16   for BNSF. He is now retired and, at the time, they were
17   doing a referral bonus, and he asked if I knew anybody
18   in, in North Dakota that was looking for a job because
19   he lived in Texas, so I asked him about, about the job a
20   little bit, and then I decided to apply myself.
21   Q. And what job did you apply for then?
22   A. I applied for a conductor position.
23   Q. And you eventually got that position?
24   A. Yes.
25   Q. And where did you hire on with BNSF?

---

**17**

1    A. Mandan, North Dakota.
2    Q. Have you always worked out of Mandan, North
3    Dakota as your base?
4    A. No.
5    Q. What other places have you worked out of?
6    A. I worked out of Minot, North Dakota. I took a
7    temporary transfer to Harve, Montana, H-a-r-v-e, I
8    believe, and I took a temporary transfer, temporary
9    transfer to Galesburg, Illinois, G-a-l-e-s-b-u-r-g.
10   Q. And you told me that you took the temporary
11   transfer to Galesburg in the summer of 2018. Correct?
12   A. That's correct.
13   Q. And how long were you there?
14   A. About 90 to a hundred days, right around.
15   Q. And why did you do that?
16   A. Change of pace, see additional track and
17   additional challenges and they paid me more. In 2017 I
18   was on the temporary transfer to Harve, Montana.
19   Q. When in 2017?
20   A. It would have been summer. I don't remember
21   exactly but I was only there for 30 days.
22   Q. All right. And then you also indicated that you
23   worked out of Minot. When was that?
24   A. I've worked out of Minot a couple different times
25   when I can't hold in Mandan. I also took the, the

---

5 (Pages 14 to 17)

18

1  **engine program out of Minot, North Dakota.**
2  Q. To be a locomotive engineer?
3  **A. That's correct.**
4  Q. And do you work as a locomotive engineer from
5  time to time?
6  **A. Yes.**
7  Q. And when did you get your locomotive engineer
8  date then?
9  **A. I think it was, I think it was in June. I don't**
10 **remember exactly. It's been, I think the actual date is**
11 **June, it'd be '14 maybe.**
12 Q. Of what year?
13 **A. Of 2014 maybe. I've been an engineer**
14 **approximately four years.**
15 Q. Did you go through the BNSF conductor training
16 program then when you hired out of Mandan on August 19,
17 2013?
18 **A. Yes.**
19 Q. And was that the 15 or 16 week program?
20 **A. Yes.**
21 Q. And then, after completing that, did you become
22 certified as a conductor by passing the required
23 testing?
24 **A. I did.**
25 Q. Have you ever held a position in a union?

19

1  **A. No.**
2  Q. What union do you currently belong to?
3  **A. The BLET.**
4  Q. And is that a local out of Mandan?
5  **A. Yeah. I don't know the local number, but yes**
6  **it's based in, well, our division is based in Mandan.**
7  Q. When you became a conductor, did you belong to a
8  different union at that time?
9  **A. Yes. At the time that I, when I originally hired**
10 **out, I was a member of the UTU which became SMART TD**
11 **around a similar timeframe. I don't remember exactly**
12 **when, and I stayed in that union until I went into the**
13 **engine program.**
14 Q. So is it fair to say that you were with the UTU,
15 SMART TD for about a year?
16 **A. Roughly, yes.**
17 Q. And then thereafter you went into the BLET?
18 **A. Correct.**
19 Q. And who is your local chairman in the BLET?
20 **A. Cordell Booke, C-o-r-d-e-l-l, B-o-o-k-e.**
21 Q. And has he been your local chairman for the last
22 few years then?
23 **A. Yes.**
24 Q. And is it true, I just want to make sure of this,
25 that you've never held a union position either with the

20

1  UTU or SMART TD or with the BLET?
2  **A. Correct.**
3  Q. Do you regularly attend union meetings?
4  **A. When I'm in town.**
5  Q. And are the BLET and UTU, SMART TD union meetings
6  separate from each other?
7  **A. Yes, they are.**
8  Q. Is it fair to say, if you know, that you and Mr.
9  Jurgens have been in different unions for the last few
10 years?
11 **A. I --**
12      MR. TELLO: Foundation.
13 **A. I don't know.**
14 Q. Do you know what union he belongs to?
15 **A. I don't.**
16 Q. And, and, again, just so we're clear on this in
17 terms of ground rules, if you don't know the response to
18 a question I ask you, please tell me you don't know.
19 **A. Okay.**
20 Q. I'm just looking for your best most accurate and
21 honest response. Have you held any other positions at
22 BNSF other than conductor and locomotive engineer?
23 **A. No.**
24 Q. And, currently, what job are you working? Are
25 you working off an extra board, or do you have a regular

21

1  assignment?
2  **A. Yep. I'm on Board 201 which is the Mandan**
3  **unassigned pool working as an engineer.**
4  Q. And how long have you been doing that?
5  **A. How long have I been on that board?**
6  Q. Correct.
7  **A. I've been on that board since Monday which was**
8  **yesterday. Prior to that I was on the Mandan engineer's**
9  **extra board and which would be Board 30, and I was on**
10 **that for, I think since, for about a week, and prior to**
11 **that I was on Mandan Board 601 which was the engineer**
12 **grand pool board, predictive work schedule.**
13 Q. When was it, when was the last time you worked in
14 a capacity other than as a locomotive engineer?
15 **A. September, end of September.**
16 Q. Of 2018?
17 **A. Yes.**
18 Q. And did you work as a conductor at that time?
19 **A. Yes.**
20 Q. And was that simply because there were no
21 locomotive engineer jobs available or...
22 **A. That questions isn't as easy as that. There,**
23 **there would need to be a position that I could hold**
24 **based on my seniority, and I would also have to bid for**
25 **that position, so there are times that there are**

22

1 engineers with lower seniority than I am that are
2 holding engineers spots when I'm working as a conductor
3 because I hadn't bid for an engineer's spot because I
4 didn't think it would become available or for whatever
5 reason, but I don't remember the initial question.
6    Q. Let, let me ask you a different question.
7    A. Okay.
8    Q. In 2018 have you primarily worked as a locomotive
9 engineer?
10   A. I would say the majority of the time I worked as
11 a conductor in 2018. Part of the reason for that was
12 when I went down to Galesburg there were three months
13 there that I was only allowed to work as a conductor
14 because that was what the temporary transfer agreement
15 called for.
16   Q. And when you were in Harve was that also as a
17 conductor?
18   A. That's correct.
19   Q. As a conductor or locomotive engineer, are you
20 required to be rules qualified?
21   A. Yes.
22   Q. And do you take the book of rules test with any
23 frequency?
24   A. Every year.
25   Q. Is it required that you pass it as either a

23

1 locomotive engineer or a conductor?
2    A. Yes. It's the, the same rules test for both.
3    Q. Both conductor and engineer?
4    A. Both conductor and engineer, yes.
5    Q. What type of training requirement do you have
6 over and above being rules qualified on an annual basis?
7    A. There are online classes that you take on, in one
8 year, and then the next year you do classroom led
9 training. In addition to that, there's enhanced safety
10 training and safety briefings, safety marathons, I
11 guess, they call them, that they talk about different
12 changes to rules or clarifications on rules and
13 different things like that. There's general notices
14 that come out on a daily basis to keep up with, and,
15 and, and then there, I guess there could be some general
16 changes in GTBs, but they're usually less dramatic, I
17 guess.
18   Q. GTBs are general track bulletins?
19   A. That's correct.
20   Q. Are the online courses also known as CBT or
21 computer based training?
22   A. Yes.
23   Q. And as I understand your answer, one year you
24 would do the online CBT training, and then the following
25 year there would be classroom training; is that correct?

24

1    A. That's correct.
2    Q. And has that been consistent throughout your
3 career with the railroad?
4    A. It's been consistent as long as I've been on the
5 railroad. I know there are some recent changes that
6 they're going to do classroom training every year going
7 forward is the direction that the company's taking.
8    Q. Is that a good thing to you?
9    A. I, indifferent. I mean, I, I try to keep up on
10 the rules and review the rules regularly anyway, so it
11 doesn't, it doesn't sneak up on me.
12   Q. You mentioned enhanced safety training. What
13 is --
14   A. Yes.
15   Q. -- that?
16   A. It's a one day class. It goes over some of the,
17 some of the things that are going on in the railroad
18 just from a safety perspective, different things that
19 you can do in order to maintain a safe work place, I
20 guess.
21   Q. You also mentioned safety marathons. What are
22 those?
23   A. Safety marathon is a, it's a, roughly monthly
24 group briefing, I guess you would say, group job safety
25 briefing about rules or changes or things that other

25

1 people have seen and, and the best ways to handle those,
2 I guess. I was going to say, you asked other, you asked
3 before if I had held any other positions. I, I was a,
4 part of the BAPP process, B-A-P-P. I don't know what it
5 exactly stands for. It's behavioral something
6 procedure. It's a peer to peer safety group, and I was
7 a, I was an observer for that group.
8    Q. What did you do in that regard?
9    A. It was observing peers in their working
10 environment and helping them with questions or, or just
11 things that they didn't notice that they were doing in a
12 day to day basis. We looked for safe and at risk
13 behaviors and things like that and then briefed with
14 the, the people that we were observing to, to help them
15 work in safe manners as a group.
16   Q. When did you do this?
17   A. It would have been 2017 I was part of that. I
18 know the BLET union pulled out of detached service, at
19 which point I could no longer participate in the
20 program.
21   Q. Do you recall when that was?
22   A. I don't. It would have been late summer of 2017
23 maybe, best guess.
24   Q. Thank you. And what do you mean when you say
25 that the BLE pulled out of detached service?

7 (Pages 22 to 25)

26

1    A.  Okay.  Detach, detached service is any service
2    you're providing to the railroad that is outside your
3    normal conductor, engineer, or your craft job training,
4    so it would be there, you know, are various different
5    things that you could be doing that if I happen to be
6    part of the BAPP program, and it was about one, it was
7    one to two days a month that I would observe people in
8    the yard or on the road or potentially have outlining
9    points.  Although I never observed outlying points per
10   se, others did.
11       Q.  How long were you involved in this BAPP process,
12   just your best guess?
13       A.  About a year.
14       Q.  And were you involved with the BAPP process on
15   August 7 of 2017?
16       A.  I wasn't an observer that day.  I, I couldn't,
17   it, I couldn't tell you if it was before or after they
18   pulled everybody out of, or that pulled everyone from
19   the BLE out of, BLET out of detached service.  I, I
20   don't know the date.
21       Q.  Who would have that information, if you know?
22       A.  I -- Cordell Booke.
23       Q.  Okay.  And, when you say that on August 7 of 2017
24   you were not a BAPP observer --
25       A.  Correct.

27

1    Q.  -- what do you mean by that?
2    A.  That day I was working as a conductor.  If I was
3    working as a observer that day then I would have a
4    different set of guidelines for, you know, for the day.
5    Q.  Describe those guidelines you would have as an
6    observer.
7    A.  Well, as, as an observer, you're not actually
8    performing train service work.  You're watching other
9    people perform service and helping with anything that
10   might, you're observing behaviors, and, and I don't know
11   if, coaching isn't really the right word but coaching
12   them if there's an at risk behavior that you notice.
13   Q.  Even though you would not be working as an
14   observer on a given date, if you saw something as an
15   employee of the BNSF Railway Company were you the kind
16   of person that would bring that up to the employee's
17   attention or, if necessary, even a supervisor's
18   attention?
19   A.  Yes.
20   Q.  And is that something you had done in the past?
21   A.  Yes.
22   Q.  And had you worked as an observer at any point in
23   time during your career other than the approximate one
24   year period around 2017?
25   A.  No.

28

1    Q.  Who was your supervisor or your contact for the
2    BAPP process?
3    A.  Mike McGelky.
4    Q.  Can you spell his last name, please?
5    A.  I, it would be a guess.  I, I don't know how to
6    spell it.
7    Q.  Who is Mike McGelky in terms of his position with
8    the railroad?
9    A.  Okay.  He is an engineer in the railroad now.  At
10   the time, he was the BAPP or MERIT facilitator, I
11   believe he was called.
12   Q.  What was the word you used after BAPP?
13   A.  Facilitator.
14   Q.  BAPP?
15   A.  Facilitator or MERIT.  The local group is called
16   MERIT, Mandan Employees Reducing Incidents Together.
17   Q.  And were all of the employees part of that BAPP
18   Merit group?
19   A.  No.
20   Q.  How did you to become part of that?
21   A.  You had to request to join, and then they had a
22   class to train you as an observer, and then you went for
23   about two months, two or three month, you observed with
24   a seasoned observer, and then, at that point, they just
25   placed you with whomever was available.  It's usually

29

1    two observers on a particular day.
2    Q.  To your knowledge, was Phil Miller ever part of
3    the BAPP program?
4    A.  Not that I'm aware of.
5       MR. TELLO:  Mr. Sweeney, for a second, my
6    hearing, BAPP, how are you spelling that?
7       MR. FINK:  B-A-P-P.
8       MR. TELLO:  Thank you.
9    Q.  Can you provide me with names of any other
10   employees out of Mandan who were part of the BAPP
11   program in 2017?
12   A.  Yes.
13   Q.  Would you do that?
14   A.  Well, it's a pretty extensive list.  I know I
15   have a list of names and phone numbers at home.
16   Q.  Can you, let, let's approach it this way then.
17   A.  Okay.
18   Q.  And I'm sorry.  I just --
19   A.  Yep.
20   Q.  -- interrupted you.  Were you done answering?
21   A.  Go ahead.  Ask your question.
22   Q.  Can you give me an approximate number of people
23   involved as observers in the BAPP program?
24   A.  I don't know that.  It's about three sheets on a
25   spreadsheet worth of names, if that helps.

8 (Pages 26 to 29)

30

1   · Q. And other than going through the class as an
2   observer and working with a mentor, if you will, was
3   there any other training for that such as testing, to
4   your recollection?
5   **A. I don't believe there was a test, no.**
6   Q. All right. We've talked about some of the safety
7   programs thus far.
8   **A. Okay.**
9   Q. Are you aware of any other safety programs that
10  were in effect as of 2017?
11          MR. TELLO: Objection as to scope.
12          MR. FINK: Yeah.
13          MR. TELLO: I don't think that -- in his
14  union, every union, the whole railroad, Counsel?
15          MR. SWEENEY: For the TY&E crews.
16  **A. I, I suppose there were. I mean, I --**
17  Q. Would you like me to break it down?
18  **A. Sure. Okay.**
19  Q. Were, were there safety committees, to your
20  knowledge?
21  **A. Yes.**
22  Q. Were there site safety teams?
23  **A. Yes.**
24  Q. Were there site safety team members?
25  **A. Yes.**

31

1   Q. Do you know who was the chair or cochair of the
2   safety committee out of Mandan in 2017?
3   **A. I have no idea.**
4   Q. Were you ever a member of a BNSF safety
5   committee?
6   **A. Only BAPP.**
7   Q. Do you know any members of the Mandan site safety
8   team?
9   **A. Today? The, I know Brian Kazurik is on it and**
10  **Corey, I can't think of his last name, and Ross**
11  **Ihringer, I-r-i-n-g-e-e-r.**
12          THE COURT REPORTER: Any of those?
13  **A. I don't know how the spell the other ones. I**
14  **know those three are. I believe Les Marquart may be**
15  **part or maybe he's an alternate. I don't --**
16  Q. Who is Les Marquart?
17  **A. He is an engineer on the railroad as well.**
18  Q. Are you aware of any other BNSF safety programs
19  other than those that we've talked about thus far?
20  **A. The enhance safety would be the only other one**
21  **that I can think of off the top of my head.**
22  Q. Did we talk about that earlier?
23  **A. Yes.**
24  Q. And was it required in 2017 that BNSF TY&E
25  employees all wear personal protective equipment?

32

1   **A. Yes.**
2   Q. And did that include lace up steel toed boots?
3   **A. Yes.**
4   Q. What is an SIRP?
5   **A. It's a, I don't know what it actually sands for,**
6   **but it's a, you would SIRP a safety hazard and fill out**
7   **a form and present it or, I mean, in, in Mandan the**
8   **general employees didn't really fill out SERPs very**
9   **often. You'd bring it to the attention of somebody on**
10  **the safety team at a safety marathon, and they would**
11  **typically put it in the SIRPs.**
12  Q. Have you ever submitted a SIRP in your career?
13  **A. I've never submitted the form, no.**
14  Q. Have you ever brought a SIRP condition to the
15  attention of a supervisor?
16  **A. Yes, on several occasions.**
17  Q. And when you've done that, who have you directed
18  the matter to?
19  **A. I have discussed certain safety issues with**
20  **trainmasters or site safety team members or union**
21  **representatives.**
22  Q. And have you followed up to see whether those
23  conditions that you've brought to the attention of
24  safety members, trainmasters or union reps have been
25  handled?

33

1   **A. No.**
2   Q. Do you know as you sit here today whether
3   conditions that you've brought to the attention of these
4   individuals at BNSF have been remedied or not?
5   **A. I suppose some of them have. I haven't followed**
6   **up on them.**
7   Q. I'm going to switch focus here --
8   **A. Okay.**
9   Q. -- to the events of August 7 of 2017.
10  **A. Okay.**
11  Q. On that day, were you working a road switch job?
12  **A. Yes.**
13  Q. And who were your crew members?
14  **A. Phil Miller was the engineer. I was working as**
15  **the conductor, and Cary Jurgens was working as a**
16  **brakeman.**
17  Q. Had you ever worked that Jamestown road switch
18  job prior to August 7 of 2017?
19  **A. Yes.**
20  Q. With what frequency had you worked it before that
21  day?
22  **A. Occasionally. I probably work it maybe two or**
23  **three times a year at most.**
24  Q. And generally under what circumstances would you
25  work that job two or three times a year?

9 (Pages 30 to 33)

## Page 34

1   A. Okay. I would, I, I should, I should clarify.
2   Two or three times a year I would get called for that
3   job off the extra board. I might be there for more than
4   one day at a time. You could be there up to five days
5   depending on when you get called and when the person
6   you're replacing is, comes back to work for whatever
7   layoff they have in. I have worked it as an engineer.
8   I have worked it as a conductor, and I have worked it as
9   a brakeman.
10   Q. When was the last time you worked that job?
11   A. The last time I remember working it was August of
12   2017. I don't believe I've worked it since then.
13   Q. Had you worked that job the day before August 7,
14   2017, if you recall?
15   A. No.
16   Q. So, basically, is it fair to say in August of
17   2017 you worked that job on one day and that was
18   August 7, 2017?
19   A. I'd have to look back to make sure but probably.
20   Q. Do you recall when you had last worked that job
21   prior to August 7, 2017?
22   A. No.
23   Q. Had you ever worked with Mr. Jurgens prior to
24   August 7, 2017?
25   A. I think it's --

## Page 35

1       MR. TELLO: Is that anywhere, Counsel, or
2   just in Jamestown, just for clarification?
3       MR. SWEENEY: Anywhere.
4   A. It's possible that I worked with him either in
5   Dickinson or Jamestown previously. I don't recall
6   specifically being on the same crew as him. I did work
7   in James, in, rather, Dickinson on the night local job
8   while he was working a road switch job during the same
9   timeframe.
10   Q. If I'm understanding what you're saying, you
11   don't recall ever working with him together on a crew
12   prior to August 7 of 2017; is that correct?
13   A. I, it's possible. I, I, I mean, maybe once or
14   twice. I, I, I don't remember being on the same crew
15   with him.
16   Q. Had you ever been to Strata prior to August 7,
17   2017, and I'm referring to Strata in Jamestown?
18   A. Yes, I have.
19   Q. On how many occasions?
20   A. Maybe half a dozen at most.
21   Q. And, again, would that be as a brakeman,
22   conductor or engineer?
23   A. Yes.
24   Q. And does anything stick out in your mind about
25   those prior occasions when you worked at Strata in

## Page 36

1   Jamestown?
2   A. No.
3   Q. Was there anything eventful that occurred during
4   those trip to your recollection?
5   A. During the other trips?
6   Q. Correct.
7   A. Well, one day when I was working as a brakeman I
8   slipped on the rocks and fell down but I was not
9   injured.
10   Q. When was that?
11   A. That would have been the, most likely the time
12   before that, so it probably would have been either
13   earlier that summer or the year before. At the time,
14   Kyle Robinson was the conductor on the job, and it was
15   actually, I can pinpoint it too, it was the last day
16   George Rennick worked as an engineer. He was a, he
17   retired that day. That was his last day.
18   Q. How do we spell George's name?
19   A. His last name is R-e-n-n-i-c-k, maybe. I, I
20   don't know for sure.
21   Q. And then where were you when working as a
22   brakeman around Strata when you slipped on rocks but
23   were not injured?
24   A. I was about, I was just west of the, the tower
25   that they use to --

## Page 37

1   Q. The shaker?
2   A. Yeah.
3       MR. TELLO: Tipple?
4       MR. FINK: Yeah.
5   Q. Do you know which one it is? Is it called a
6   shaker, a tipple or both?
7   A. I've heard it all, called all kinds of different
8   things.
9       MR. TELLO: Just for clarification, it seems
10   tipple had been, been used in most of the deposition,
11   Counsel, that you, you weren't at, but call it whatever
12   you want.
13   Q. I'll show you a picture later so we'll --
14   A. Okay.
15   Q. -- identify that.
16   A. Yep.
17   Q. I agree with Mr. Tello that I think we're talking
18   about the same thing, but I just want to --
19   A. Yes.
20   Q. -- ask you some questions about that, so when you
21   say just west of either the shaker or the tipple at
22   Strata, is it your understanding that the track
23   basically runs north, south there?
24   A. Okay. I, west to me, the, our whole railroad
25   runs east to west, so it'd be, it would be between there

38

1  and the Jamestown yard, between that, the tipple or
2  shaker and the Jamestown yard.
3   Q. Okay. So you weren't walking then between where
4  Strata was located and the shaker or tipple. You were
5  actually walking on the other side of the shaker and
6  tipple towards the Jamestown yard; is that true?
7   A. That is true.
8   Q. And when you were there at that time describe
9  what happened to you in terms of this event where you
10  slipped on rocks.
11   A. Okay. I took a step and the rocks underneath my
12  boots gave way, and I slid and landed on my backside,
13  and Kyle Robinson was working as the conductor, and he
14  had said over, the over the radio that, he, he asked if
15  I was okay, and I told him only my pride was hurt.
16   Q. And what did you mean by that?
17   A. Just it was embarrassing to have fallen --
18   Q. Did you --
19   A. -- I guess.
20   Q. -- report that event to anyone?
21   A. No. If I reported every time I fell on the
22  railroad that's all I'd do.
23   Q. Have you ever reported a condition in or about
24  the area of Strata or Jamestown during your career?
25   A. No.

39

1   Q. And I think you and I know what we're talking
2  about when we say reported, but let me be more specific.
3   A. Okay.
4   Q. Did you ever fill out an incident form or any
5  injury form for anything that happened on the other side
6  of this shaker or tipple?
7   A. No.
8   Q. Did you ever notify a supervisor at BNSF that
9  this had occurred?
10   A. No.
11   Q. And do you know whether George Rennick saw this
12  occurrence?
13   A. I don't know. I don't know where he was looking
14  at the time.
15   Q. Do you recall whether you were spotting cars at
16  that time or picking, picking cars up?
17   A. We were spotting or picking them up but I don't
18  remember which.
19   Q. Can you think of anything else unusual or
20  eventful that has occurred in connection with work that
21  you've done in Strata at Jamestown other than as you
22  just mentioned about slipping on rocks?
23   A. Just that and then the incident in August of '17.
24   Q. In terms of the rocks that you slipped on, did
25  you ever look at them to see if there was something

40

1  wrong with them or what may have caused you to slip?
2   A. They're rocks, they slip all the time. There's,
3  I mean there's no way you can look at a rock and
4  determine if it's going to hold you or not. It's blind
5  faith.
6   Q. And when you say -- strike that. When you say
7  rocks are you referring --
8   A. Ballast.
9   Q. -- to ballast?
10   A. Ballast, yes.
11   Q. And do you know what kind of ballast this was,
12  whether large, small, mainline, yard, fines or any other
13  descriptive way you want to describe them?
14   A. No. I don't typically, I guess I had never
15  thought about classifying ballast before.
16   Q. And did you think there was anything wrong or
17  defective with the rocks that you slipped on, or was it
18  just a situation where you slipped on a rock?
19       MR. TELLO: Asked and answered.
20   Q. You can go ahead and answer.
21   A. Okay. They were just rocks.
22   Q. All right. Had you ever worked with Phil Miller
23  before August 7 of 2017?
24   A. Yes.
25   Q. With what frequency?

41

1   A. Rarely. I worked with him as a conductor on a
2  few occasions, the day in question, and since then I
3  worked with him one day or a Spiritwood empty, and I
4  worked with him on a dog catch of a coal load we picked
5  up at Hebron one day. It's possible that we've worked
6  other times. Those are just the three that come to
7  mind, so I, I, obviously, I'd only work with him if I
8  was working as a conductor.
9   Q. Do you know why you were working as a conductor
10  on August 7 of 2017 and not Mr. Jurgens?
11   A. He was a regular on the job. He was working as a
12  brakeman.
13   Q. And do you know whether Mr. Jurgens had been on
14  vacation for any period of time prior to August 7, 2017?
15   A. I have no idea.
16   Q. As you sit here today, and having already told us
17  that you did not see the incident, do you know what
18  caused Mr. Jurgens to fall?
19   A. No.
20   Q. Do you know how he fell?
21   A. No.
22   Q. Do you know whether he fell to the ground or not?
23   A. No.
24   Q. Do you know whether or not he fell on a rail, a
25  tie or went down an embankment?

11 (Pages 38 to 41)

42

1    A.  I have no -- no.
2    Q.  Do you know of anyone who witnessed the incident
3    other than Mr. Jurgens himself?
4    A.  No.
5    Q.  During further questioning of you, I'm going to
6    be referring to a truck stop in the area.  I just want
7    to ask you, do you know if there was a truck stop in
8    this area?
9    A.  No.
10   Q.  All right.  And when I refer to Strata,
11   S-t-r-a-t-a, are you familiar with that facility there?
12   A.  Yes.
13   Q.  All right.
14        MR. SWEENEY:  Let's go off the record.
15        (Recess taken 10:16 a.m.)
16        MR. SWEENEY:  Let's go back on the record.
17   Q.  All right.  So let's focus on August 7 of 2017.
18   Do you know what your shift hours were on that day?
19   A.  I got called, I think it was 2:30 in the morning,
20   to deadhead to Jamestown at 6:00 for an, or at
21   4:00 rather for an on duty time of 6:00 a.m., I believe.
22   Q.  And where did you deadhead from?
23   A.  From Mandan, North Dakota to Jamestown, North
24   Dakota.  We're allowed a two hour deadhead time.
25   Q.  And is it your recollection then that you arrived

43

1    at the, the yard office in Jamestown around 6:00 a.m.,
2    if you recall?
3    A.  You know, I might be off an hour.  I don't
4    remember if it, that job stated at 6:00 a.m. or if it
5    started at 7:00 a.m., but I, I arrived about ten minutes
6    prior to the shift start.  I would have gotten called an
7    hour and half prior to the deadhead time and been
8    allowed two hours to deadhead and then been on duty at
9    the top of the hour, 6:00 a.m. or 7:00 a.m. I don't
10   remember.  I don't recall what the start time was.
11   Q.  And did you deadhead with anyone else from Mandan
12   to Jamestown?
13   A.  No.  I drove myself.
14   Q.  And had you been told what job you would be
15   working on that day?
16   A.  Yes.
17   Q.  Had you been provided with any paperwork at that
18   time?
19   A.  Not until I arrived.
20   Q.  And, when you arrived, where did you report to
21   work?
22   A.  The Jamestown yard Office.
23   Q.  Who was there when you arrived?
24   A.  I was the first one there.
25   Q.  Who arrived next?

44

1    A.  I don't remember.
2    Q.  But, obviously, Mr. Miller and Mr. Jurgens did
3    arrive.
4    A.  Yes.
5    Q.  Correct?
6    A.  That's correct.
7    Q.  After they arrived, what did you do?
8    A.  I immediately got a, a minute after the hour I
9    got a call from Trainmaster Sean Schneider,
10   S-c-h-n-e-i-d-e-r, I believe.
11   Q.  So either 6:01 or 7:01?
12   A.  Right.  Wanting to know what the plan was for the
13   day.  I told him that I had just arrived and that the
14   computer hadn't even booted up yet and to call me back
15   in 15 minutes.
16   Q.  Did you discuss anything else with Trainmaster
17   Sean Schneider other than that during that call?
18   A.  Not that I recall.
19   Q.  What happened next?
20   A.  I loaded up the computer, or the hammerhead
21   computer and looked at what we had for work for that
22   day, and general good mornings and the normal, and then
23   Trainmaster Schneider called back at exactly 15 minutes
24   after the hour.
25   Q.  Before we get to that conversation with Mr.

45

1    Schneider, the second one that morning that you had with
2    him, what type of work was shown in the hammerhead
3    computer?
4    A.  It was the industries that we had to service that
5    day.  I believe it was Cargill and Strata.  I don't
6    remember if there was anything else showing on the
7    hammerhead that morning.
8    Q.  Did you print -- it looks like you want to add --
9    A.  Yeah.  One --
10   Q.  -- more to that.
11   A.  We typically put together the, I think the buff
12   turn, or one of the other jobs we put a train together
13   for them too is the usual course of business.
14   Q.  So would you be doing work in the Jamestown yard
15   then?
16   A.  That's correct.
17   Q.  Up to this point in time, and by that I mean the
18   second telephone call from Mr. Schneider, had you done
19   any work in the yard yet?
20   A.  No.
21   Q.  Had you taken a look at the vehicle that was out
22   in the yard?
23   A.  No.
24   Q.  Had you taken a look at the caboose at all?
25   A.  No.

12 (Pages 42 to 45)

46

1    Q. When Mr. Schneider called back at 15 minutes
2  after the hour, what did the two of you discuss?
3    **A. It was on speaker phone, and he said that the**
4  **Strata move was a hot move for the day which means that**
5  **that was the most urgent priority which is unusual for**
6  **the job. Typically the Cargill stuff has the priority,**
7  **but I guess that was the, the initial conversation.**
8    Q. Do you recall anything else being discussed
9  during that telephone call other, Mr., other than Mr.
10  Schneider indicating that the Strata move was the
11  priority move that day?
12    **A. There, there was a conversation that was brought**
13  **up about the utility vehicle still being out of service.**
14  **It still had warning lights. I guess it had been**
15  **reported on Friday, and Mr. Schneider had indicated that**
16  **he had sent somebody to look at it, and that morning it**
17  **sill had the, I believe it was a Monday, still had the**
18  **same issues.**
19    Q. Did you ever look at that vehicle on August 7,
20  2017?
21    **A. No.**
22    Q. And what is the source of the information where
23  you say that you guessed it was reported on Friday?
24    **A. The conversation between Mr. Schneider and, I**
25  **believe it was Mr. Jurgens was that it was reported on**

47

1  **Friday. They both agreed that it was, that it was a**
2  **known issue.**
3    MR. TELLO: I'm sorry. What did you say?
4    MR. FINK: A known issue.
5    MR. TELLO: Known. Sorry. Okay.
6    Q. All right. You told me that this conversation
7  was on speaker phone. Correct?
8    **A. That's correct.**
9    Q. Were both Mr. Miller and Mr. Jurgens in the area
10  and listening to this speaker phone conversation?
11    **A. That's correct.**
12    Q. And you said that it was Mr. Schneider and Mr.
13  Jurgens discussed that it was reported on Friday; is
14  that correct?
15    **A. That's correct.**
16    Q. Did this information, based on what you heard,
17  come from Mr. Schneider or did it come from Mr. Jurgens
18  that this had been reported on Friday?
19    **A. They both agreed that it had been recorded on**
20  **Friday. Mr. Schneider said that he had somebody that**
21  **was supposed to have gone out and fixed it, and it still**
22  **had the same issue.**
23    Q. Do you know if someone had reported it on Friday?
24    **A. I was not there Friday. I do not know.**
25    Q. And other than this speaker phone conversation

48

1  with Mr. Schneider, are you aware of any other
2  information about this utility vehicle over and above
3  what you've indicated thus far?
4    **A. No.**
5    Q. And at any point in time on August 7, 2017 did
6  you ever personally look at that vehicle?
7    **A. No.**
8    Q. You had mentioned that the vehicle had warning
9  lights. What did you mean by that?
10    **A. That's just the conversation I heard.**
11    Q. Do you know what type of lights were displayed,
12  if any, in that utility vehicle?
13    **A. I don't know.**
14    Q. Do you know whether Mr. Jurgens did any work for
15  BNSF in the two weeks prior to August 7, 2017?
16    **A. I don't know.**
17    Q. And do you know what was reported on that prior
18  Friday regarding the utility vehicle?
19    **A. No.**
20    Q. Have you told me everything you know about that
21  utility vehicle?
22    **A. Yes.**
23    Q. Have you ever used that utility vehicle prior to
24  August 7, 2017?
25    **A. Yes.**

49

1    Q. For what reason had you used that utility vehicle
2  before that date?
3    **A. The utility vehicle is usually used to transport**
4  **the crew to the, to the train or in, specifically for**
5  **Strata one of the crew members typically drives over to**
6  **line switches and protect the shove.**
7    Q. Had you ever driven that vehicle before?
8    **A. I don't know if I've driven it. I've been a**
9  **passenger in it. It's possible that I've driven it. It**
10  **doesn't stand out.**
11    Q. Have you driven that vehicle since August 7,
12  2017?
13    **A. No.**
14    Q. And when was the last time you either rode in or
15  drove that utility vehicle prior to August 7, 2017?
16    **A. The last time I worked there. I, I don't know**
17  **the date.**
18    Q. Other than on August 7, 2017 had you ever had any
19  prior complaints regarding that utility vehicle?
20    **A. Had I personally?**
21    Q. Correct.
22    **A. No.**
23    Q. Who was it who brought up the condition of the
24  utility vehicle then during this call with Mr.
25  Schneider?

13 (Pages 46 to 49)

50

1    A. I believe it was Mr. Jurgens that brought it up,
2    but I couldn't tell you with a hundred percent
3    certainty.
4    Q. Do you know whether Mr. Jurgens had seen that
5    utility vehicle prior to this speak phone call with Mr.
6    Schneider?
7        MR. TELLO: Objection. Foundation.
8    Q. Just tell me what you know.
9    A. He said he looked at it.
10   Q. And did you hear him say that?
11   A. Yes.
12   Q. And do you know when Mr. Jurgens had looked at
13   that utility vehicle?
14   A. Well, sometime in that first 15 minutes we were
15   there.
16   Q. Do you know whether Phil Miller ever looked at
17   that utility vehicle?
18   A. I don't know.
19   Q. Was there anyone else present at the Jamestown
20   yard Office that morning other than yourself, Mr. Miller
21   and Mr. Jurgens?
22   A. Not that I recall. There could have been a
23   maintenance guy or something on the other side, but
24   nobody else was in that room at that time.
25   Q. Did anyone ever indicate, on August 7, 2017, who

51

1    had last used that utility vehicle?
2    A. No.
3    Q. All right. Having obtained this information
4    during this call with Mr. Schneider on August 7, 2017,
5    what did you, if anything else, regarding the utility
6    vehicle?
7    A. I didn't do anything with the utility vehicle.
8    Q. During this communication, was there ever any
9    indication that someone was going to come out and look
10   at the vehicle or anything like that?
11   A. Trainmaster Schneider asked if the vehicle could
12   be driven to a repair facility, and Mr. Miller asked him
13   if he was asking us to drive an unsafe vehicle and then
14   he said no, and that was, the question disappeared. It
15   was pulled back, I guess, or whatever, however you want
16   to say it.
17   Q. Did Mr. Schneider ever indicate that someone
18   would come out and look at the vehicle, to your
19   recollection?
20   A. He said he had a contractor or somebody that did
21   work on the vehicle, but they, I don't remember if he
22   said they were in Valley City or they were somewhere
23   near by but not in Jamestown proper.
24   Q. Did you ever have any other communications with
25   Mr. Schneider that day regarding this utility vehicle?

52

1    A. Not that I recall.
2    Q. Did you take any notes of any communications you
3    had on August 7, 2017?
4    A. No.
5    Q. So is it your best recollection as you sit here
6    today that you spoke to Mr. Schneider on the occasions
7    mentioned that is that he initially called you before
8    your computer was up and running?
9    A. Mm-hmm.
10   Q. That he then called you back 15 minutes later?
11   A. Mm-hmm.
12   Q. And you had a speakerphone conversation but
13   thereafter you did not have any other communications
14   with him about the utility vehicle?
15   A. Not that I recall.
16   Q. So that is true then?
17   A. No. That's true.
18   Q. Just want to be sure that's --
19   A. Yep.
20   Q. -- correct. As it pertains to the utility
21   vehicle, have you told me all of the communications
22   you've had with Trainmaster Sean Schneider?
23   A. Yes.
24   Q. Did you have any other communications with him
25   that day prior to Mr. Jurgens' incident?

53

1    A. Well, that wasn't the only thing discussed on the
2    phone call at 15 after the hour.
3    Q. Please, please tell me what else was --
4    A. Okay.
5    Q. -- discussed.
6    A. A question was brought up about, the general
7    practice on that job is to ride the cars back to spot
8    Strata, and Mr. Schneider said that they didn't want to
9    pay that claim anymore, so they didn't want them to ride
10   the cars or anybody to ride the cars, not, I guess it
11   would have been us to ride the cars that day.
12   Q. How did this conversation come up?
13   A. I, I think. I, I don't remember. It, I don't
14   remember exactly. It was, they were talking about the
15   claim had gotten declined previously or something.
16   Q. Are you guessing now?
17   A. Yeah. I, I don't, I don't really remember.
18   Q. Okay. You mentioned that the general practice
19   was to ride cars to spot Strata. Correct?
20   A. That's correct.
21   Q. Had that been your experience prior August 7,
22   2017?
23   A. Yes. I've ridden cars back to spot Strata on
24   previous occasions. I've also had, depending on the
25   situation, the other member, the other ground member of

14 (Pages 50 to 53)

54

1  the crew has ridden the cars back depending on who's
2  working what job that day.
3      Q. Had you ever used a caboose or a shoving platform
4  to do this job prior to August 7, 2017?
5      A. I have not.
6      Q. Do you know of anyone at the BNSF Railway Company
7  who had ever used the caboose or a shoving platform to
8  do this job at Strata prior to August 7, 2017?
9      A. I wouldn't have any way to know that. I've only
10  done the job a handful of times.
11     Q. Do you recall anything else being discussed
12  during this telephone conference with Mr. Schneider that
13  was on the speakerphone at 15 minutes after the hour?
14     A. There was also a discuss about ordering a PTI van
15  to assist us, and that idea was nixed fairly early.
16     Q. Who brought that up?
17     A. I don't remember who brought it up.
18     Q. Who nixed it?
19     A. I, I'd, it'd be a guess. I don't remember.
20     Q. What, was it either Mr. Schneider or was it
21  someone else who nixed it?
22     A. I believe it was Mr. Schneider but I'm not sure.
23     Q. Why did you say it was nixed then?
24     A. He said he wasn't going to order a van.
25     Q. Mr. Schneider did?

55

1      A. Well, there wasn't a van ordered.
2      Q. And do you know the reason a van was not ordered?
3      A. I don't.
4      Q. Had you ever done a job where a van was ordered
5  from PTI to assist the crew?
6      A. Absolutely.
7      Q. Do you know whether PTI has vans in Jamestown or
8  in the area of Jamestown?
9      A. They service the Jamestown Sub. I imagine they
10  do. I, I don't have any idea how they, where they place
11  vans or anything like that.
12     Q. You indicated earlier that you were deadheaded
13  down from Mandan to Jamestown that day. Correct?
14     A. I drove myself on a deadhead ticket.
15     Q. So there wasn't a PTI van then?
16     A. No.
17     Q. So your vehicle was down there?
18     A. Correct.
19     Q. Was it possible to use your vehicle in connection
20  with work that was being done on August 7, 2017?
21     A. That's generally not the practice. I don't know
22  how the, I've never asked that question before if I
23  could use my own personal vehicle. I would imagine that
24  there'd be some concerns about that, and, even if there
25  weren't, I don't know that I would want to have used my

56

1  personal vehicle to drive through the yard and drive
2  over ballast and there's, you know, spikes and different
3  things that you could pick up and, you know, additional
4  hazards that you typically wouldn't experience with
5  your, with your personal vehicle.
6      Q. Did either Mr. Miller or Mr. Jurgens have a
7  vehicle at the Jamestown depot, to your recollection?
8      A. I don't know what either of them drive, but I
9  would imagine that they did, or, I mean, it's possible
10  they got dropped off but I don't know.
11     Q. Do you recall anything else that was discussed in
12  the speakerphone conversation with Mr. Schneider about
13  15 minutes after the hour over and above what you've
14  indicated?
15     A. The other suggestion was the shoving platform and
16  --
17     Q. Go ahead.
18     A. -- and Mr. Schneider asked how we would use that,
19  and I believe it was Mr. Miller that explained, you
20  know, what we would do, that we would just put them on
21  the rear of the cars and we'd shove them in there and,
22  and leave it there with our set out, our spot, and then
23  when we'd go to pick up the cars that we'd bring it
24  back.
25     Q. Do you recall Mr. Jurgens addressing this at all

57

1  during this speakerphone conversations at 15 minutes
2  after the hour?
3      A. Not specifically.
4      Q. Did you address it at all, or was it solely Mr.
5  Miller who did?
6      A. I don't remember.
7      Q. Who made the suggestion to use the caboose, AKA
8  shoving platform in terms of doing the job?
9      A. It wasn't my suggestion. It would have been
10  either Mr. Jurgens or Mr. Miller.
11     Q. And after that suggestion was made you told me
12  that Mr. Schneider said, well, how would you use it.
13  Correct?
14     A. Yes.
15     Q. Mr. Miller responded to that --
16     A. Yes.
17     Q. -- correct? What was said after that?
18     A. He said that he didn't want us to leave it over
19  there, that we'd have to have some way to bring it back
20  with us.
21     Q. Did anyone respond to that?
22     A. I don't remember. I know that the idea of doing
23  that is a little unrealistic.
24     Q. Why do you say that?
25     A. Well, it would, it would have prevented the use

15 (Pages 54 to 57)

58

1   of, I mean, the whole point of using the shoving
2   platform would have been to shove it down into the
3   Strata Track, and if you're spotting it somewhere to,
4   where you could bring it back, you wouldn't be able to
5   utilized it on the track that your, you need it for.
6      Q. Was that discussed with Mr. Schneider then?
7      A. Yes.
8      Q. And what was the outcome of those communications
9   that you just mentioned?
10     A. Well, I, I think that, generally speaking, that
11  they were going to try to do that and then somebody went
12  out to look where the shoving platform was in the yard,
13  and there was maintenance equipment parked in front of
14  it, so I don't remember if it was a separate phone call
15  or in the same phone call we asked Mr. Schneider if he
16  could get somebody from maintenance to unlock the locks
17  so that we could get in there and get access to the
18  shoving platform.
19     Q. And --
20     A. At which point he said that he would look into it
21  and get right back to us, and within a minute or two he
22  was, he called us back and said that he couldn't get a
23  hold of anybody, literally a minute or two or... yes.
24  Yes. A very short period of time.
25     Q. Was anything else discussed at that time?

59

1      A. The question was raised as to how he wanted us to
2   do the work then. If we weren't going to ride the car,
3   we weren't going to use a shoving platform. We didn't
4   have assess to a utility vehicle, and he wasn't going to
5   order a PTI van, and he said, well, can't you walk it.
6   The response was something along the lines that it would
7   take an awfully long time to do that because it was a
8   long distance, and he said, well, that's okay, he didn't
9   care how long it took, so that's what the plan was.
10     Q. Did Mr. Schneider ever indicate, at any point in
11  time that morning, that you could wait until either the
12  vehicle was serviced or that the shoving platform was
13  somehow made available?
14     A. No.
15     Q. Did anyone ask if they could wait until one of
16  those things occurred?
17     A. The question was asked as to how long it would
18  take to service the vehicle, but there wasn't a
19  timeframe, I don't believe, ever specified.
20     Q. Do you recall any other communications with Mr.
21  Schneider then prior to the time of the incident on
22  August 7, 2017?
23     A. No.
24     Q. Had you spoken with any other supervisors at BNSF
25  that morning other than Mr. Schneider?

60

1      A. No. Well, I guess a crew caller called me to
2   tell me that I was on the job but other than that, no.
3      Q. So what did you do after these communications
4   then?
5      A. We planned out how we were going to put our cars
6   together to take them over to Strata as our first move.
7   Then we went over to the power and Mr. Miller walked
8   through the power, made everything, made sure everything
9   was working correctly, and, and then we, I don't
10  remember if we had to switch out cars to get to the cars
11  we needed or if they were on a specific track already.
12  I, I don't recall. And then we got the power on the
13  west end of the cars and permission from the, or
14  authority or whatever to enter the main line and shove
15  down there, and Mr. Jurgens walked from Jamestown yard
16  all the way down to Strata --
17     Q. The whole way?
18     A. -- protecting, the entire way protecting the
19  shove.
20     Q. Do you know what distance that is?
21     A. I don't. If I had to guess, I'd say it's
22  probably maybe three, three and a half miles one way.
23  I --
24     Q. That's a guess?
25     A. Round about.

61

1      MR. TELLO: Object. Speculation.
2      Q. Do you know the distance between the Jamestown
3   yard and Strata?
4      A. No.
5      Q. But you are certain that, for the cars that you
6   were bringing to Strata that Mr. Jurgens walked from the
7   Jamestown yard all the way to Strata; is that correct?
8      A. Yes.
9      Q. Is that --
10     A. Well, I, I couldn't see him from where I was but
11  yes, I, that's my understanding.
12     Q. You had mentioned earlier that you may have done
13  some other work in the Jamestown yard that morning; is
14  that correct?
15     A. Yes.
16     Q. And what other work was that?
17     A. I don't know, I, I don't remember if we had to,
18  you know, if our cars were buried or if we had to switch
19  anything out prior to going over there. The worst case
20  scenario, we would have at least had to run the power
21  around to the west end, so we would have done some work
22  in Jamestown. I just don't know, I don't remember what
23  extent of work was done.
24     Q. Did you ever look at the caboose or the shoving
25  platform that was in the Jamestown yard?

16 (Pages 58 to 61)

62

1    A. I did not.
2    Q. Do you know anyone who ever did look at it?
3    A. I don't know who looked where, when.
4    Q. And did you have a radio on August 7, 2017?
5    A. Yes.
6    Q. Did Mr. Jurgens have a radio?
7    A. Yes.
8    Q. Do you know if Mr. Jurgens ever reported his
9    incident over the radio?
10   A. I don't believe so.
11   Q. And why do you say that?
12   A. I, I don't remember.
13   Q. To your recollection, did Trainmaster Sean
14   Schneider ever indicate that morning that the crew could
15   wait to have either the vehicle looked at or the caboose
16   made available to use?
17        MR. TELLO: I'm going to object. Asked and
18   answered twice now.
19   Q. You can go ahead and answer it?
20   A. Okay. The, I don't recall him ever saying that
21   he could wait, or that we could wait to do the work. In
22   fact, if anything it would, it was the opposite that he
23   said Strata was a hot move and needed to be done right
24   away that morning.
25   Q. When you said that Mr. Jurgens protected the

63

1    shove and walked from the Jamestown yard to Strata, what
2    does it mean when you say protecting the shove?
3    A. A conductor or brakeman that's protecting a shove
4    would, protecting a shove from the ground would tell the
5    engineer, in this case, brakeman on the ground
6    protecting, you have room for 50 cars, bring them back,
7    engineer would repeat that over the radio including the
8    engine number, the, who was protecting the shove, where
9    they were protecting the shove and how many cars.
10   Q. Have you ever heard the radio transmissions from
11   August 7, 2017?
12   A. No.
13   Q. Did you get work orders that morning?
14   A. We would have printed work orders from the, from
15   the hammerhead.
16   Q. Let me just show you discovery Exhibit 133 and
17   ask you if that exhibit is the work orders for that
18   Jamestown road switch job that you were working on
19   August 7, 2017.
20   A. Probably, yeah. It looks like it.
21   Q. Okay. You said probably --
22   A. Yes.
23   Q. -- and you -- let, let me just make sure we're
24   clear, are those the work orders for August 7, 2017?
25   A. Yes.

64

1    Q. And how can you tell that?
2    A. It's indicated RTWI8291-07I. It shows M. Fink as
3    the conductor and C.B. Jurgens as the brakeman.
4    Q. Okay. I'm going to have the court reporter mark
5    that as Exhibit 1 to your deposition. Would you go head
6    and do that?
7         MR. TELLO: Do you have a copy for counsel?
8         MR. SWEENEY: Let me see.
9         MR. TELLO: This counsel.
10   (Defendant's Exhibit #1 was marked for identification.)
11        MR. SWEENEY: And I apologize ahead of time,
12   Mike. I may not have an extra copy of everything. I do
13   of that. Keep asking me if I have it. I'll give it to
14   you.
15   Q. All right. So you have before you Exhibit 1 to
16   your deposition. Correct?
17   A. Correct.
18   Q. Can you tell me how many cars you were bringing
19   to Strata on August 7, 2017?
20   A. No. Because this was a hammerhead job so --
21   Q. Is hammerhead the same as a renegade?
22   A. Yes.
23   Q. And what does it mean when you say this was a
24   hammerhead job?
25   A. Oh, I guess there is a work event summary. It's

65

1    a hammerhead job, so, and actually if you look at Page 9
2    of 24 it says right there that it, we'll use the
3    renegade to report all work performed.
4    Q. And you as the conductor, what did you do in
5    using the renegade to report all work performed?
6    A. I would have been the one that did all the
7    reporting of the work as the conductor.
8    Q. Does Exhibit 1 indicate that you brought 20 cars
9    to Strata and that you then pulled 20 cars from Strata?
10   A. It, it shows that, in the work summary, Page 8 of
11   24, that we were asked to pull 20 cars from Strata and
12   spot 20 cars to Strata.
13   Q. To your knowledge, is that what you did?
14   A. Yes.
15   Q. All right. Was Exhibit 1 printed then from the
16   hammerhead or the renegade?
17   A. Yes.
18   Q. And is that what you did yourself?
19   A. When you, as, as part of the process it prints
20   them, yes.
21   Q. In general, again, when you went to Strata, did
22   you pull the cars from Strata first, or did you spot the
23   cars first?
24   A. We would have pulled the cars first.
25   Q. And when you went in to pull them would you have

Veritext Legal Solutions

800-567-8658                                                                 973-410-4098

66

1 gone in light engine, or would you have gone in with the
2 cars that you brought from Jamestown yard which would
3 have been loads. Wouldn't they?
4 **A. I don't remember which, I don't remember which**
5 **ones go out and which ones come back. Hold on a second.**
6 **Yeah. You need spot loads and pick up empties, so we**
7 **would have set over our loads on a spur track and then**
8 **gone and pulled the empties and then used the empties as**
9 **a, as a handle and put our loads behind the empties and**
10 **then spot at the loads at that location.**
11   Q. Thank you.
12     MR. SWEENEY: Will you mark this as
13 Exhibit 2 to Mr. Fink's deposition.
14 (Defendant's Exhibit #2 was marked for identification.)
15     MR. TELLO: Thank you.
16   Q. I've handed you Exhibit 2 which I believe is a
17 copy of your handwritten statement; is that correct?
18   **A. Yes.**
19   Q. And is this a document that you prepared?
20   **A. Yes.**
21   Q. Is this the only statement that you have given
22 regarding the August 7, 2017 incident?
23   **A. Yes.**
24   Q. Who asked you to prepare this statement?
25   **A. The claims agent and trainmasters, trainmaster**

67

1 **and claims agent.**
2   Q. Is that Mr. Freidig?
3   **A. Yes.**
4   Q. F-r-i-e-d-i-g?
5   **A. Correct.**
6   Q. And where were you when you prepared this
7 statement?
8   **A. At the Jamestown yard Office.**
9   Q. Did anyone from BNSF suggest what you should
10 write on your handwritten statement?
11   **A. No.**
12   Q. Is this all from you based on your observations
13 and experience?
14   **A. Yes.**
15   Q. Had you ever given a handwritten statement in
16 connection with an accident or event prior to August 7,
17 2017?
18   **A. Yes.**
19   Q. And on those occasions did you provide the
20 information that you had or were aware of regarding
21 whatever had occurred?
22   **A. Yes.**
23   Q. Do you know whether Mr. Miller also prepared a
24 handwritten statement?
25   **A. I believe so.**

68

1   Q. Did the two of you work on the statements
2 together, or did you do them separately?
3   **A. Separately.**
4   Q. Do you know whether Mr. Jurgens prepared a
5 handwritten statement or not?
6   **A. I imagine. I don't know.**
7   Q. The two of you did not work together?
8   **A. No.**
9   Q. Okay. Let's just go over this handwritten
10 statement, and then we'll take a short break after that.
11   **A. Okay.**
12   Q. It says, "Called to work, RTWI829107I. We had a
13 spot and pull at Strata." Is that correct?
14   **A. Yes.**
15   Q. "We completed the spot and pull, and I was
16 sitting in the cab with the engineer waiting for the
17 brakeman to walk to the head end of the train." Is that
18 correct?
19   **A. Yes.**
20   Q. As the brakeman was walking up the engineer
21 commented that he was walking more slowly." Do you
22 recall that being true?
23   **A. Yes.**
24   Q. On which side of the track was Mr. Jurgens
25 walking at that time, if you know?

69

1   **A. I believe he was on the engineer's side.**
2   Q. Would that be the Strata side of the track?
3   **A. I, it would have been the side closest to the**
4 **mainline.**
5   Q. Thank you. Your statement continues on, "I
6 looked out the engineer's window and observed him
7 walking slowly." Did I read that correctly?
8   **A. Yes.**
9   Q. When you say he was walking slowly, can you
10 describe that in any more detail?
11   **A. Not, not really.**
12   Q. Let --
13   **A. He, he typically, you know, walks with a fairly**
14 **brisk pace to, you know, to get the work done, and when**
15 **he was walking back up he was walking more slowly.**
16   Q. Did you notice anything else about the way he
17 walked or the way he appeared at that time other than
18 that he was walking slowly?
19   **A. No.**
20   Q. Your statement continues on, "When he climbed up
21 the engineer's stairs he was visibly straining."
22   **A. Yes.**
23   Q. What did you observe in that regard?
24   **A. When he went up the stairs, instead of climbing**
25 **up the stairs one leg and then the other leg and then**

18 (Pages 66 to 69)

70

1 the other leg, he went up, or he came up with the same
2 foot every time.
3   Q. Which foot was that?
4   A. I don't, I don't remember.
5   Q. And when you say he came up with the same foot
6 each team, was he hopping?
7   A. No.
8   Q. Just describe it better for me so I can get a
9 picture of --
10   A. Well --
11   Q. -- what you're saying.
12   A. As, typically, when you'd walk up a set of stairs
13 you'd go right foot, left foot, right foot, left foot,
14 and I don't remember which foot it was, but he stepped
15 up with one foot and then brought the other one up there
16 and then stepped up with the same foot and brought the
17 other one up there which was, it was more deliberate.
18   Q. Thank you for that clarification. So he was more
19 deliberate in going up the stairs. Correct?
20   A. Yes.
21   Q. Did you see anything else other than that, that
22 led you to believe that he was visibly strained?
23   A. Well, the look on his face was visibly strained.
24   Q. And what did you see in that regard?
25   A. Well, he didn't look like normal. He looked like

71

1 he was straining to go up the stairs.
2   Q. He wasn't --
3   A. Like it --
4   Q. He wasn't --
5   A. Like it was exert, like he was exerting
6 additional effort, like if you were lifting weights or
7 something.
8   Q. He wasn't crying.
9   A. No.
10   Q. Correct?
11   A. He was not crying.
12   Q. And was he showing any type of emotion that you
13 can recall?
14   A. Not that I recall, no.
15   Q. Your statement continues on that, "Mr. Jurgens
16 entered the cab and stated he had fallen and he had knee
17 pain." Did I read that correctly?
18   A. Yes.
19   Q. Did he ever indicate to you where he had fallen?
20   A. No.
21   Q. At any point in time during that trip did he
22 provide any information about where he had fallen?
23   A. No.
24   Q. Did you ever go out and look at the area that day
25 where he fell or may have fallen?

72

1   A. No.
2   Q. To your knowledge, even today, do you know where
3 he fell?
4   A. No.
5   Q. Do you know how he fell?
6   A. No.
7   Q. Do you know how he landed?
8   A. No.
9   Q. When he said he had knee pain, do you recall
10 whether it was one knee or the other, both knees or --
11   A. I don't, I didn't pay attention to which knee it
12 was. I was more concerned with, you know, general,
13 overall wellbeing than, than specifics at the time.
14   Q. Did you see any evidence on his clothing that he
15 had fallen?
16   A. No. But I didn't look for it either so...
17   Q. All right. Was there any talk while in the
18 locomotive cab about reporting this over the radio?
19   A. No.
20   Q. And is it true that your first knowledge that
21 something had happened to Mr. Jurgens came when you
22 observed him walking more slowly and walking up the
23 engine stairs?
24   A. Yes.
25   Q. In light of that, are you fairly certain that he

73

1 never radioed to you that here had been some sort of
2 incident?
3   A. I don't recall him saying that, no, over the
4 radio.
5   Q. All right. It then indicates that, "We headed
6 back to Jamestown, put our cars away, secured the train
7 and contacted the trainmaster." Did I read that
8 correctly?
9   A. Yes.
10   Q. On the way back to Jamestown, did Mr. Jurgens get
11 out of the locomotive cab at all?
12   A. I don't remember.
13   Q. As you sit here today, do you recall what work
14 you did in terms of switches or being on the ground
15 versus Mr. Jurgens on the way back?
16   A. No.
17   Q. And in terms of the cars that were put away,
18 would those have been the 20, 20 cars that you pulled
19 from Strata?
20   A. Yes.
21   Q. Who was it who secured the train then?
22   A. I, I don't know.
23   Q. Do you know how the train was secured?
24   A. We would have tied brakes and, on the cars and
25 engine or engines, is the general practice.

19 (Pages 70 to 73)

74

1     Q. Do you know who applied the handbrakes on those
2  cars that were put in a track or tracks in the Jamestown
3  yard?
4     **A. I don't remember.**
5     Q. Who was it then who contacted the trainmaster as
6  indicated at the end of your handwritten statement?
7     **A. We called him again on the office phone I**
8  **believe, or I guess it could have been my cellphone as**
9  **well, one of those two phones, and I believe it was on**
10  **speakerphone again, so it was probably the office phone.**
11     Q. And who was present during that speaker telephone
12  conversation?
13     **A. It was myself and, it was myself and Phil Miller**
14  **and Cary Jurgens.**
15     Q. Okay.
16        MR. SWEENEY: Let's go off the record.
17        (Recess taken at 11:00 a.m.)
18  (Defendant's Exhibits #3, 4, 5, 6 and 7 were marked
19  for identification.)
20        MR. SWEENEY: All right. Let's go back on
21  the record.
22     Q. We've marked as Exhibit 3 the radio transcript.
23  While we were off the record, did you have a chance to
24  look over it?
25     **A. I did.**

75

1     Q. Did it assist you in refreshing your recollection
2  at all?
3        MR. TELLO: Object to foundation because it,
4  yeah, it's just a transcription. I have, don't know
5  where it came from. I don't know the accuracy of it.
6  We don't have the original recording to compare it to,
7  so with that in mind I don't have any reason to trust
8  its accuracy, so we'll proceed according with the
9  objection.
10        MR. SWEENEY: That's fine. Objection is
11  noted.
12     **A. One point you have listed here, BNSF 1788, BNSF**
13  **1687 operating locomotive, or loco, August 7, 2017. If**
14  **has Mike Fink listed as the engineer. I was the**
15  **conductor that day, not the engineer.**
16     Q. Would you just take and line out engineer and put
17  conductor in there?
18     **A. Okay.**
19     Q. And then, and then I assume that next to the name
20  Phil Miller that should say engineer.
21     **A. Correct.**
22     Q. All right. Did you notice any other errors or
23  inaccuracies in this other than that?
24     **A. I don't remember all the words that were spoken**
25  **that day, but I didn't see anything else, no.**

76

1     Q. Okay. Does Exhibit -- strike that. Did
2  Exhibit 3 help to refresh your recollection in terms of
3  moves that were made on August 7, 2017?
4     **A. To, to some extent, yes.**
5     Q. For instance, it references there that an air
6  test was performed in the Jamestown yard. You saw that.
7  Correct?
8     **A. Yes.**
9     Q. Can you describe for us what was done in terms of
10  air test that was performed in the Jamestown yard.
11     **A. Well, I, I guess I don't remember. I, or we, I**
12  **would imagine we did a transfer test that day. That's**
13  **all that would have been required.**
14     Q. What is that?
15     **A. It would have been verifying that all the brakes**
16  **set so...**
17     Q. Is that something that the engineer does from the
18  locomotive?
19     **A. The engineer would set the brakes, and then**
20  **someone on the ground, either the brakeman or the**
21  **conductor would walk all the cars and make sure that the**
22  **brakes did set up.**
23     Q. To your recollection, were there any problems or
24  issues with air tests that were performed on August 7,
25  2017?

77

1     **A. No.**
2     Q. To your recollection, were there any defects with
3  the locomotives that were used on August 7, 2017?
4     **A. Not that I remember.**
5     Q. Were there any defects with any of the cars that
6  were either spotted or pulled from Strata on August 7,
7  2017?
8     **A. No.**
9     Q. All right. There is reference on Exhibit 3 to a
10  scale track switch. Are you familiar with that switch?
11     **A. Yes.**
12     Q. And, if shown a Google overhead of the area,
13  would you be able to identify these scale track switch
14  if it's shown on that overhead?
15     **A. Probably.**
16     Q. That's a fair answer because you would need to
17  see it. Correct?
18     **A. Right. Correct.**
19     Q. Before this deposition began or maybe even during
20  a break, I did shown you a large overhead of a Google
21  map. Correct?
22     **A. Correct.**
23     Q. And do you know whether on that large exhibit you
24  can see the scale track switch?
25     **A. I didn't look specifically for it at that time**

20 (Pages 74 to 77)

78

1   so...
2     Q. That large exhibit does show the Jamestown yard.
3   Correct?
4     **A. Yes.**
5     Q. It does show Strata as well?
6     **A. Yes.**
7     Q. Would you be able to show me on that large
8   exhibit the general moves that were made including where
9   you set out the cars before going into Strata to pull
10  out those cars?
11    **A. As much as I remember.**
12    Q. Okay. We'll, we'll get to that in just a moment
13  then. Was there anything else that you saw in Exhibit 3
14  that was either unusual or was noteworthy that you can
15  bring up now?
16         MR. TELLO: Objection to form.
17    **A. No.**
18    Q. Is it your understanding that both you and Mr.
19  Miller were in the locomotive at the time the August 7,
20  2017 incident occurred?
21    **A. Yes.**
22    Q. Do you know approximately how many car lengths
23  you were away from Mr. Jurgens at the time the incident
24  happened?
25    **A. Between 1 and 20. I don't know beyond that.**

79

1     Q. If you had 20 cars that you were holding onto
2   with the locomotives, does --
3     **A. Well, I guess it, well, I guess it could have**
4   **been between 1 and 40 then.**
5     Q. All right. Do you know what time the incident
6   occurred?
7     **A. No.**
8     Q. And do you know if the incident happened while
9   you were in the process of shoving cars into Strata?
10    **A. No.**
11    Q. Do you know whether or not Mr. Jurgens was ahead
12  of the cars that is towards Strata at the time the
13  incident happened?
14    **A. I don't know what time the incident happened.**
15    Q. Based on your experience, did it appear that
16  anyone was in a rush or a hurry that day?
17    **A. No.**
18    Q. If Mr. Jurgens walked all the way from Jamestown
19  to Strata, that sounds like this move may have taken
20  some time; is that fair?
21    **A. Yes.**
22    Q. It sounds like it took a lot longer than it
23  normally would in your experience; is that fair?
24         MR. TELLO: Object to the form.
25  Speculation.

80

1     Q. You can go ahead and answer.
2     **A. Yes.**
3     Q. Do you have any estimate as to how long it took
4   Mr. Jurgens to walk that distance from the Jamestown
5   yard to Strata?
6     **A. No.**
7     Q. In terms of the pace that he had -- well, strike
8   that. Are you familiar with walking pace in general,
9   how fast that is?
10    **A. In, in general, yes.**
11    Q. And what is your understanding?
12         MR. TELLO: Objection to speculation as to
13  time, place, location, circumstances. Go ahead.
14    **A. Well, I, are you talking about like miles per**
15  **hour or something?**
16    Q. Yeah. Anything. For instance, maybe it's a
17  treadmill estimate or something like that, what are you
18  aware of?
19    **A. I --**
20         MR. TELLO: Foundation.
21    **A. Just that people walk at a certain pace depending**
22  **on the, you know, what they're doing. If you're,**
23  **example, if you were hiking up a hill you would walk at**
24  **a slower pace than if you were hiking on flat ground.**
25    Q. You earlier described Mr. Jurgens pace prior to

81

1   the fall; do you recall that?
2     **A. Yes.**
3     Q. In terms of miles per hour or how he walked, can
4   you give us any descriptive information?
5     **A. I would say that he typically, I mean, typically**
6   **walks with a brisk pace.**
7     Q. Okay. And are you able to equate that to miles
8   per hour?
9     **A. No.**
10    Q. Do you know whether there were any cars on the
11  track that you were pulling or spotting cars in at the
12  time of the incident?
13    **A. Well, there were a couple different tracks in**
14  **question. The, there were the 20 cars that we picked up**
15  **from Strata, so there, to my knowledge, there wasn't**
16  **anything in there after we picked up the cars, but I**
17  **don't know that for a fact. I wasn't on that end of the**
18  **train. I was on the front side of the train, and Mr.**
19  **Jurgens was on the rear of the Train.**
20    Q. Do you know what track it was that you pulled the
21  20 cars from?
22    **A. In the yard or --**
23    Q. At Strata.
24    **A. -- at Strata? I don't what know the track**
25  **number, no.**

21 (Pages 78 to 81)

82

1    Q. Did you put the 20 loads then in that same track
2  after pulling the 20 empties out?
3    A. That's correct.
4    Q. So, basically, for, for the, for the pull and
5  shoving the cars in, you used the same track; is that
6  fair?
7    A. Yes.
8    Q. Then do you know, does Strata have a track
9  designation?
10   A. I'm sure it does. I don't know what it is off
11 the top of my head.
12   Q. There's more than one track there. Isn't there?
13   A. I believe there's only one that we spot to for
14 Strata.
15   Q. Okay. I'm going to show you Exhibit 4.
16   A. Okay.
17   Q. And ask you, does that show either the shaker or
18 tipple that were described earlier?
19   A. Yes.
20   Q. And have you ever seen that photograph before?
21   A. At the interview at the yard office with the
22 other BNSF attorney and Mr. Freidig.
23   Q. Do you know if that photograph shows the area
24 were the incident happened?
25   A. It's the general area.

83

1    Q. And what is the basis for your understanding in
2  that regard?
3    A. That's where the train was.
4    Q. Do you know, at the time of the incident, where,
5  whether there were any cars on the, well, on this side
6  of the shaker or tipple?
7      MR. TELLO: Objection to this side, Counsel.
8  It won't show up too well on transcript.
9    Q. Okay. Let me rephrase it then. Do you mind if I
10 come over --
11   A. Yep.
12   Q. -- towards that photograph?
13   A. That's fine.
14   Q. Do you know on which side of the track Mr.
15 Jurgens was walking at the time the incident occurred?
16   A. No.
17     MR. TELLO: Counsel, just for the record,
18 there's a building on the right hand side that's white
19 with a red roof I believe belongs to Strata and is that
20 reference that your, be on the right?
21     MR. SWEENEY: Yeah.
22   Q. I'm going to just generally say --
23     MR. TELLO: I believe that's Strata.
24   Q. -- that this is the east side of the track. This
25 is --

84

1    A. Okay.
2    Q. -- the west side.
3    A. Okay.
4    Q. And I'm just going to put a "W" for west and an
5  "E" for east just so that we're both on the same --
6    A. Okay.
7    Q. -- page.
8      MR. TELLO: And not to interrupt you,
9  Counsel, but in, in references, we have to use the left
10 side as the side where the truck stop it too in prior
11 depositions. Would that help you?
12     MR. FINK: Okay.
13     MR. SWEENEY: Yeah. No. That's --
14     MR. TELLO: Okay. Okay.
15     MR. SWEENEY: -- that's fair.
16   Q. So, based on Exhibit 4, do you know whether Mr.
17 Jurgens fell on the east or the west side of that track?
18   A. I do not.
19   Q. This is the track where you were pulling and
20 shoving cars into Strata. Correct?
21   A. That's correct.
22   Q. And this is the tipple or the shaker shown in
23 Exhibit 4. Correct?
24   A. Yes.
25   Q. Prior to the incident, had you ever walked in

85

1  this area on the east or west side of that track?
2    A. Yes.
3    Q. Had you ever noticed any problems or issues in
4  this area shown in Exhibit 4?
5    A. The sides are very steep. When you have a train
6  parked on the track, the, the, well, you can't see my
7  hands, but the ballast is very steep.
8    Q. And how about if there aren't any cars on the
9  track?
10   A. Well, then --
11   Q. Do you believe that -- well, strike -- are, are
12 you done answering?
13   A. Yes.
14   Q. If there were no cars on the track at the time of
15 the incident, does Exhibit 4 appear to show that there
16 are walkways that a trainman could walk on?
17     MR. TELLO: Objection. Leading.
18   A. The, the ballast is steep, the walking conditions
19 there, the ballast is angled and steep, so when you're
20 walking you have one foot higher than the other which
21 tends to put you more at risk for, for, if the ballast
22 slips out under your feet.
23   Q. In the general area, say a foot or two off of the
24 ties on the west side of the track, do you see any weeds
25 in the, that that area?

22 (Pages 82 to 85)

86

1    A. I, I guess I don't know what's the actual scale
2  here, but I mean there are, there are weeds along the
3  side of the track.
4    Q. How, how far out from the ties would you
5  estimate?
6    A. I, I don't know.  There are some weeds that
7  actually appear to kind of but up against the side of
8  the ties up here, and it's probably another, whatever
9  the distance is of the tie that's sticking out.  It
10  looks like it's about that much distance again to weeds
11  on the west side.
12    Q. Had you had any problems that day walking in this
13  area prior to the incident?
14    A. No.
15      MR. TELLO: Objection.  Foundation.
16    A. I didn't walk in that area.
17    Q. On August 7, 2017, did you walk in the area of
18  the tipple or shaker, to your recollection?
19    A. I -- not, I don't believe I walked passed the,
20  maybe a car or two passed the, the tipple.
21    Q. And when you say, a car or two passed the tipple,
22  would that be --
23    A. To the south.
24    Q. -- to the south side?
25    A. Yes.

87

1    Q. And did you have any problems when walking in the
2  area a car or two to the south side of the tipple, to
3  your recollection, and on August 7, 2017?
4    A. Not that I remember.
5    Q. Did you notice any problems with weeds in the
6  area where you walked on that day, again, within a car
7  or two to the south of the tipple?
8    A. Well, I mean, there are weeds, but I didn't have
9  any problems with them.
10    Q. I'm going to just show you a few other
11  photographs, next is Exhibit 5.  Have you seen that
12  photograph before?
13    A. Looks very similar to the other photograph, so I,
14  if I would have seen it before I would have seen it at
15  the interview with the other BNSF attorney and Tony
16  Freidig.
17    Q. All right.  Let me next show you Exhibit 6.  Do
18  you see the truck stop --
19    A. Okay. Yes.
20    Q. -- in that photograph?  And then, lastly,
21  Exhibit 7, does that, again, appear to show the general
22  area that we've been looking at in these photographs?
23    A. Yes.
24    Q. Had you ever walked in the area shown in Exhibits
25  4 through 7 prior to August 7, 2017?

88

1    A. Yes.
2    Q. Had you ever had any problems in that area to the
3  south of the shaker or tipple?
4    A. Well, nothing that stands out in my mind, but in
5  a general basis walking in that area the ballast is
6  steep and has a tenancy to slide so...
7    Q. You had mentioned previously slipping, and that
8  was on the north side of the tipple.  Correct?
9    A. That's correct.
10    Q. Do you know any of the track inspectors who in
11  this, who worked in this area?
12    A. No.
13    Q. Do you know anything about vegetation control in
14  this area?
15    A. I get an e-mail that they're doing the vegetation
16  control for different subdivision at various times but
17  other than that, no.
18    Q. Do all employees get e-mails regarding vegetation
19  control?
20    A. Only BLET employees.
21    Q. And how long has that been a practice?
22    A. I don't know.  I've been getting them for at
23  least the last couple years from Cordell Booke.
24    Q. Your local chairman?
25    A. My local chairman, yes.

89

1    Q. When you were working within one to two car
2  lengths south of the tipple on August 7, 2017, do you
3  know whether you were walking on the east side of the
4  track or on the west side?
5    A. No.
6    Q. Had you noticed any problems walking in that area
7  with weeds or ballast, is that something that you would
8  have informed your crew members about?
9      MR. TELLO: Compound question.  Asked and
10  answered.
11    A. If I noticed anything outside of the, the normal,
12  I may have mentioned it or not depending on how serious
13  I felt it was.
14    Q. If you thought there were any safety issues out
15  there, is it fair to say that you would have notify your
16  crew members?
17    A. If, if there was significant safety issues I
18  would have notified my crew members.
19    Q. Do you recall ever, prior to August 7, 2017
20  making any complaints regarding either Strata or the
21  Oaks branch?
22    A. I, I did mention to a Trainmaster Montgomery, I
23  believe at one point, that they should put walking
24  paths in there, but it was just a general comment in
25  passing.  It wasn't a, it was not a SIRP.  It was not a,

23 (Pages 86 to 89)

---

90

1  anything beyond that.
2     Q. And when did you make this comment?
3     A. When he was the Trainmaster in charge of that
4  area. It probably would have been maybe a year or maybe
5  two years prior to that, I suppose, as a guess. I --
6     Q. Did, did Trainmaster Montgomery say anything in
7  response to your comment in passing?
8     A. No, not that I remember.
9     Q. And it's my understanding that Strata had their
10 own locomotive to move their cars; is that correct?
11    A. I have no idea.
12    Q. Have you ever seen the shaker or the tipple in
13 use?
14    A. No.
15    Q. Do you know whether Mr. Jurgens was using a knee
16 brace prior to August 7, 2017?
17    A. I have no idea.
18    Q. Do you know whether he had ever had any surgeries
19 on his knees prior to August 7, 2017?
20    A. He mentioned the day of the incident that he had
21 a knee surgery or replacement, I don't remember which
22 word he used, previously.
23    Q. And how did that come up?
24    A. When we were talking to Trainmaster Schneider
25 about the the, slip, trip, fall incident.

---

91

1     Q. Well, as long as you brought that up, we've
2  already talked, in general, about your return to the
3  Jamestown yard Office and then that the incident was
4  reported.
5     A. Okay.
6     Q. And that was reported to Mr. Schneider. Correct?
7     A. Correct.
8     Q. Did Mr. Schneider indicate that he would be
9  coming out to the Jamestown yard Office then?
10    A. Originally he told us to, he told Mr. Jurgens to
11 seek medical treatment and, or, or I guess it's possible
12 that Mr. Jurgens said that he was going to seek medical
13 treatment, but they both agreed that that was the course
14 of action, and then he told Phil Miller and I that we
15 could go back to Mandan and tie up originally, and then
16 a few minutes later he called us back again and said
17 that we should, that Mr. Miller and I should wait there
18 for him to arrive and that he would be there within the
19 hour.
20    Q. And did he arrive within the hour?
21    A. No.
22    Q. When did he arrive?
23    A. Approximately three hours later.
24    Q. Did he come alone?
25    A. He came with two other gentlemen that I did not

---

92

1  know at the time.
2     Q. And do you know who they are now?
3     A. I know one was Tony Freidig. I do not know who
4  the other gentleman was. I have seen him in the
5  Dilworth yard Office before but I don't know his name.
6     Q. Did you ever have any conversations or
7  communications with this third gentleman?
8     A. No.
9     Q. Did you have conversations or communications with
10 Mr. Freidig when he arrived at the Jamestown yard
11 Office?
12    A. I did.
13    Q. And what did you speak to him about?
14    A. I provided him with the statement which was
15 Exhibit 2 and discussed it with him.
16    Q. And what do you recall discussing with him
17 regarding your handwritten statement?
18    A. That, specifically, not a whole lot, that that
19 was my statement, and he asked me to go through it with
20 him, so I read it to him, and that was, he asked if he
21 could call me later to follow up with any followup
22 questions, and I said if he had any followup questions
23 he could ask me now, and I told him that, I did express
24 to him that I was disappointed that I was told that it
25 would be an hour and it took three hours.

---

93

1     Q. Do you recall --
2     A. But --
3     Q. -- anything else in --
4     A. But --
5     Q. -- terms --
6     A. -- nothing, I mean, nothing else regarding the
7  statement.
8     Q. And did you have any other communication with Mr.
9  Freidig that day then?
10    A. No.
11    Q. Did you have any communications with Sean
12 Schneider that day over and above what you've already
13 indicated?
14    A. No.
15    Q. Did you ever go out to the area at Strata with
16 these three individuals, Mr. Freidig, Mr. Schneider and
17 the third individual?
18    A. No.
19    Q. And it's my understanding that, since the date of
20 the incident, you have not been back to Strata.
21 Correct?
22    A. That's correct.
23    Q. Do you recall any other communications with Mr.
24 Schneider then after his arrival in the Jamestown yard
25 that day?

---

24 (Pages 90 to 93)

94

1     **A. No.**
2     Q. And did you have any other conversations with
3     anyone that day over and above what you've already
4     indicated?
5     **A. No. One, I, it's possible that I've worked in**
6     **Jamestown since that day. I don't believe that I have.**
7     **I did pick up a windmill train off the, whatever the**
8     **branch is to the north, RRVW branch one day, but I don't**
9     **recall ever being back to, to the Strata location or on**
10    **the Oaks Branch at all for that matter.**
11          MR. SWEENEY: All right. Let's go off the
12    record.
13          (Recess taken 11:40 a.m.)
14    (Defendant's Exhibit #8 was marked for identification.)
15          MR. SWEENEY: Let's go on the record. Mr.
16    Fink, in front of you is the enlargement that I eluded
17    to earlier. It has been marked as Exhibit 8, and I'll
18    go ahead and maintain possession of this exhibit just
19    because of its size. What I'd like you to do, and
20    please feel free to stand up or do whatever you need to
21    do to look at this exhibit, but I'd like you to just
22    identify certain things starting with the Jamestown
23    yard. Could you --
24    **A. Okay.**
25    Q. -- do that.

95

1          MR. TELLO: Before you do, Counsel, No. 1,
2     I'd object to foundation, and I don't know how this was
3     put together. I don't know what the dates and times.
4     Additionally, I would request that I'd be furnished a
5     copy and not you just have possession of the only copy
6     because other, otherwise somebody else reviewing this is
7     going to have a real difficult time doing that in my
8     office when you have the only copy, so if you have an
9     explanation of how I can get a copy of it instead of you
10    having the only possession of it.
11          MR. SWEENEY: I'm fine if the court reporter
12    would like to take possession of this, and then he can
13    make a copy for you. Is that okay?
14          THE COURT REPORTER: Yep.
15          MR. SWEENEY: All right.
16          MR. TELLO: Can you make a copy of it?
17          THE COURT REPORTER: Yep.
18          MR. TELLO: Okay. Then that, that, since
19    I'm not the only attorney on this I would not like to be
20    stuck with the only copy having looked at it. Okay.
21    Thank you, Counsel.
22    Q. All right. And, for the record, I've given you a
23    blue pen; is that correct --
24    **A. Yes.**
25    Q. -- Mr. Fink? What I'd like you to do is can you

96

1     just place an exam in blue in the general area of the
2     Jamestown yard Office.
3          MR. TELLO: And it's okay to come around,
4     Counsel?
5          MR. SWEENEY: Yes.
6     **A. Well, this, yep, it looks like this is the**
7     **Jamestown yard Office here.**
8     Q. Can you place a little X next to that? I see
9     that you have done that, and then does Exhibit 8 also
10    show the location of Strata?
11          MR. TELLO: Counsel, I'm, object because
12    there's no way that somebody is going to find that X
13    again. Could we draw, would you mind having him draw a
14    line up here and down to it so we can find it again. I
15    just don't think you're going to see it again.
16          MR. SWEENEY: Yeah. I'm just getting
17    underway here.
18          MR. TELLO: That's all I'm saying. I just
19    want to make --
20          MR. SWEENEY: That is, that is fine. We can
21    do that.
22          MR. TELLO: And, and is the X on the yard
23    office, I'm assuming, that building?
24          MR. FINK: Yes.
25          MR. SWEENEY: All right.

97

1          MR. TELLO: And that's, be on the right hand
2     corner just above the sticker --
3          MR. SWEENEY: Well --
4          MR. TELLO: -- exhibit sticker.
5          MR. SWEENEY: -- yes.
6     Q. What I'm --
7          MR. TELLO: Okay.
8     Q. We will have a line drawn from that X. Will you
9     write on there Jamestown yard Office.
10          MR. TELLO: Thank you.
11    Q. And you can do that in pen. All right. I see
12    that you've done that. Thank you. Will you now go and
13    can you just identify where Strata is located, and I'm
14    just talking about the general location right now.
15    **A. Yeah. I'm having trouble finding it. Here. I**
16    **suppose that looks like that's Strata here.**
17    Q. All right. And do you see what we've described
18    as the tipple or the shaker there?
19    **A. Yes.**
20    Q. Can you place an X in the general location of the
21    tipple or shaker at Strata? All right. And I see
22    thought you've done that. We'll also have a line drawn
23    from that X, and will you then write, at the other side
24    of that line, Strata, stipple, shaker. All right. And
25    you've written "Strata shaker." Correct?

25 (Pages 94 to 97)

98

1    A.  Correct.
2    Q.  Are you able to identify how you got from the
3  Jamestown yard with the 20 cars and made your way to
4  Strata including where you may have dropped those 20
5  cars off?
6    A.  Okay.  Well, we would have started over here at
7  the Jamestown yard.  We would have come out of the yard
8  track, and somewhere in here there's some crossovers
9  from, you come out of the yard track onto Main 1 and
10  then cross, or yeah, and then cross over onto Main 2.
11    Q.  All right.  So when you were going over the
12  Jamestown River which is noted on --
13    A.  James river.
14    Q.  James River, I'm sorry.  When you were going over
15  the James River then it sounds like after that you went
16  from Main 1 to Main 2; is that correct?
17    A.  Yes.  There's, there's a crossover from the yard
18  to Main 1 and from Main 1 to Main 2.
19    Q.  All right.  And did you --
20    A.  In that general area, yes.
21    Q.  And did you see in Exhibit 3, that is the radio
22  transcript where permission was requested to make that
23  move?
24    A.  Yes.
25    Q.  All right.  And then after getting the --

99

1        MR. TELLO:  Are you going to have him mark
2  that area, Counsel?  Because this, again, it's not going
3  to show up on the transcript where he's at.
4    Q.  Are you able to show the general area where you
5  went from Main 2 to Main 1?
6    A.  From Main 1 to Main 2?
7    Q.  I, I'm sorry.  Main 1 to Main 2, yes.  If you
8  can --
9    A.  Okay.
10    Q.  -- would you put an X in that general area?
11    A.  It would have been here.
12    Q.  All right.  And then we'll have a line drawn from
13  that and can you --
14    A.  Cross over it?
15    Q.  -- write -- yeah.
16        MR. TELLO:  Thank you, Counsel.
17        MR. SWEENEY:  You're welcome.
18    Q.  And, for the record, you have placed the word
19  crossover there; is that correct?
20    A.  Yes.
21    Q.  And what does the reference to crossover mean
22  where you placed the X there?
23    A.  That's approximate location where you would cross
24  over from Main 1 to Main 2.
25    Q.  All right.

100

1    A.  Or that we crossed over from Main 1 to Main 2
2  that day.
3    Q.  And, at this time, I understand that Mr. Jurgens
4  was protecting the shove and walking it the lead of the
5  move; is that correct?
6    A.  That's correct.
7    Q.  All right.  Let's continue on then.  This appears
8  to show that there were a number of public crossings
9  that you went over; is that correct?
10    A.  Yes.
11    Q.  And Mr. Jurgens would have been protecting the
12  shove for each of those crossings; is that correct?
13    A.  Yes.
14    Q.  And Exhibit 3 actually references going over
15  those crossings.  Did you see that?
16    A.  Yes.
17    Q.  All right.  I think the crossings are pretty
18  evident.  Can, on Exhibit 8, can you show me then where
19  your train went in terms of moving further in the
20  direction of the shove?
21    A.  Okay.  We would have moved all the way down here,
22  I believe, to the Oaks branch.  I can't really tell in
23  the picture if that's --
24    Q.  That was going to be my next question.  Can you
25  identify where the Oaks Branch begins?

101

1        MR. TELLO:  If you can --
2    A.  I believe, yeah, that it --
3        MR. SWEENEY:  Let me get all this stuff out
4  of the way.
5    A.  I believe the switch for the Oaks Branch is here.
6    Q.  Can you place an X where the switch for the Oaks
7  Branch is located, and, as we did before, we draw a
8  line, and can you indicate next to that line where the
9  Oaks Branch, Oaks Branch switch is located?
10    A.  I can't, I can't tell for sure in the map if
11  that's it, but that's what I believe is the Oaks Branch
12  switch.
13    Q.  Is it in that general area?
14    A.  Yes, it would be.
15    Q.  All right.  And do you recall, as you were
16  shoving down towards Strata, who got that switch?  Would
17  that have been Mr. Jurgens?
18    A.  I don't recall but most likely yes.  He would
19  have been on the rear of the train, and I would have
20  been in the engine.
21    Q.  So as you were shoving down towards the Oaks
22  Branch switch, did you still have the 20 cars that you
23  were shoving towards Strata?
24    A.  Yes.
25    Q.  Did there come a point in time where you set out

26 (Pages 98 to 101)

102

1   or dropped off those 20 cars that you were taking to
2   Strata?
3       A. Yes.
4       Q. Can you show me where those 20 cars were set out
5   or dropped off prior to getting to Strata?
6       A. I believe that they were set off, or set out
7   here.
8       Q. Can you place an X at that location?
9           MR. TELLO: I'm, I'm going to request
10  clarification. When he's putting the X, is he putting
11  where the cars are, where the head end, the hind end of
12  the cars are, what's he signifying by that, where he
13  puts the X?
14          MR. SWEENEY: At this point, it's just the
15  general location and then we'll ask him about that.
16          MR. TELLO: Okay. Okay.
17      Q. Would you go head and place the X for the general
18  area where the cars were set out?
19          MR. SWEENEY: Thank you.
20      Q. All right. And a line has been drawn from that
21  X, and can you just describe what that X was placed
22  there for.
23      A. Okay.
24      Q. Location, where cars dropped off or something to
25  that effect. All right. The description that you chose

103

1   was set out 20 cars; is that correct?
2       A. Yes.
3       Q. And is that the general location where the lead
4   car would have been in that shove, where the end car was
5   location, or how would you describe it?
6       A. Well, the cars would have been, on that track,
7   they would have been clear of the switch here, so they
8   weren't fouling the, or the adjoining track.
9       Q. And is there a --
10      A. So it would have been --
11      Q. -- name for that switch there?
12      A. I, not that I know of.
13      Q. Okay. So, basically, you placed the 20 cars so
14  that they were not fouling the switch, nor were they
15  blocking the crossing as you proceed further south; is
16  that correct?
17          MR. TELLO: I think that's a
18  mischaracterization of the facts.
19      A. I don't know. I guess I, I wasn't on that end of
20  that train. I don't know where they were in regard to
21  the crossing, how, how far, I have a good gage of what
22  20 cars would look like on that track, so I can't really
23  answer that question.
24      Q. All right. At any rate, after you set out those
25  20 cars, what was done next with the locomotives?

104

1       A. We would have cut away, and then we would have,
2   we would have lined the, the switch, and then we would
3   have come down this adjoining track over this crossing
4   through here passed the junkyard and down to the shaker
5   or tipple.
6       Q. All right. The switch that you mentioned where
7   basically after setting the 20 cars out the locomotives
8   would have backed out of that area, someone would have
9   thrown the switch, and then you would have gone down the
10  other track. Correct?
11      A. Correct. We would have pulled forward, lined the
12  switch and then shoved all the way back through to the
13  tipple or shaker.
14      Q. Can you circle the general area of that switch
15  that you just referenced? And, in the line drawn from
16  that circle, can you just indicate switch or something
17  to that effect.
18      A. Switch.
19      Q. And it's my understanding that after that switch
20  was, was thrown that you would have gone in light
21  engines to Strata; is that correct?
22      A. Yes.
23      Q. And it would have been yourself and Mr. Miller on
24  the locomotive. Correct?
25      A. Yes.

105

1       Q. And Mr. Jurgens was still walking at that time.
2   Correct?
3       A. I don't know if he, I don't remember if he walked
4   the rest of that way. It would be possible to, or, I, I
5   guess I don't remember.
6       Q. Okay.
7       A. I wasn't protecting the shove, so I wasn't, but
8   you would have to verify additional switches here and
9   here to make sure they were lined correctly and then
10  here before you got to there, so you'd still have to
11  protect the shove.
12      Q. All right. So, so --
13          MR. TELLO: I object. This is going to be
14  impossible to understand, Counsel, but just go ahead.
15          MR. SWEENEY: I, I, I don't think that's
16  true.
17      Q. But what you're saying --
18          MR. TELLO: Here, here and there --
19      Q. -- is --
20          MR. TELLO: -- I do, don't think is going to
21  show up.
22          MR. SWEENEY: Okay. Hold on just --
23          MR. TELLO: That's all.
24          MR. SWEENEY: -- a second. Your objection
25  is noted.

27 (Pages 102 to 105)

106

1    Q. You have identified the switch that you
2  referenced where you went in light engines.  Correct?
3    **A. Correct.**
4    Q. And as you proceeded light engines towards
5  Strata, what you've indicated is that there are three
6  additional switches that would have to be properly lined
7  before you got Strata; is that correct?
8    **A. Three or more.  I, I see three on the picture.  I**
9  **guess I don't.  I don't know if there's -- but yeah I**
10  **believe there's three.  It's been a long time since I've**
11  **been out there so...**
12    Q. And do you remember who threw those --
13    **A. I don't know if there'd be --**
14    Q. -- three or more switches?
15    **A. There'd be this one as well, so there'd be four**
16  **or more.**
17    Q. And do you remember who threw those four or more
18  switches as you were going in light engines?
19    **A. I don't know if they --**
20    MR. TELLO:  Object to foundation.
21    **A. I don't know if they would have even needed to be**
22  **thrown.  They could have been lined correctly.**
23    Q. Were those hand throw switches --
24    **A. They were hand throw switches.**
25    Q. All right.  And can you show me where the 20 cars

107

1  were located that you pulled out of Strata.
2    **A. They would have been located on the, what would**
3  **be the south side of the Strata shaker.**
4    Q. Do you know how far back those 20 cars were from
5  the Strata shaker?
6    **A. I don't --**
7    MR. TELLO:  Foundation.
8    **A. -- remember.**
9    Q. And so then after you coupled onto those 20 cars
10  that you were pulling from Strata, it's my understanding
11  that you would have gone and then coupled on to the 20
12  loaded cars.  Correct?
13    MR. TELLO:  Object to form.
14    **A. These, these would have been, the ones that were**
15  **here before would be the empty cars.**
16    Q. Correct.
17    **A. So we would couple into the empty cars and, and**
18  **cut in the air and then pull all the way back up to the**
19  **switch I marked on the map, and then we would line that**
20  **switch and couple into the loaded cars, and then we**
21  **would pull ahead, and then from that point you would, he**
22  **would have had to walk all the way back down to the**
23  **Strata shaker or, or tipple with the loaded cars, and**
24  **then we would have spotted the loaded cars on the south**
25  **side of the shaker.  There's a, well, you spot, spot the**

108

1  **head one, and then the rest of them are, would be behind**
2  **it and then secured those cars and then headed back**
3  **towards Jamestown.**
4    Q. And have you fully described the moves that you
5  made on August 7, 2017 on Exhibit 8?
6    **A. To the best of my knowledge.**
7    Q. Thank you.  Let's go off the record.
8     (Recess taken 12:05 p.m.)
9    Q. Are you familiar with the BNSF safety action
10  plan?  Have you ever seen that before?
11    **A. It's possible.  I see a lot of safety related**
12  **stuff.**
13    MR. SWEENEY:  Will you mark this as
14  Exhibit 9, please.
15  (Defendant's Exhibit #9 was marked for identification.)
16    MR. SWEENEY:  And hand that to the witness.
17    Q. Please take a look at Exhibit 9 and, and just
18  tell me, to the best of your recollection, whether
19  that's a, a document you were either provided with or
20  you've seen?
21    **A. I don't believe I have ever seen this prior to**
22  **today.**
23    Q. Okay.  And, as you sit here today, are, are you
24  able to tell me on which cars you applied or took off
25  handbrakes on that day?

109

1    **A. I don't remember.**
2    Q. Are you aware of any changes to the track in the
3  area of Strata over the last five years?
4    **A. I haven't been there in about a year, so I, I**
5  **couldn't say.  In the last couple times I was there it**
6  **was the same.**
7    Q. Do you know of any other accidents or incidents
8  resulting in injury that have occurred at the Jamestown
9  Strata or in that general area?
10    **A. No.  But I, I --**
11    MR. TELLO:  Objection to times they have
12  occurred that that, since the accident, before the
13  accident --
14    MR. SWEENEY:  At any time.
15    MR. TELLO:  Thank you.
16    **A. I am not aware.  I probably wouldn't be made**
17  **aware.**
18    Q. Okay.  Do you know who Dustin Marquez?
19    **A. No.**
20    Q. Mike Zupan?
21    **A. I've heard the name but I've never, I don't know**
22  **that I've ever met him.**
23    Q. Have you ever made any complaints about the Oaks
24  Branch to any maintenance of way employees?
25    **A. No I don't, I don't know if, I guess, I don't**

28 (Pages 106 to 109)

110

1  know if we maintain the Oaks Branch or if somebody else
2  does.
3     Q. Did you ride any railcars on August 7, 2017?
4     A. Not that I remember.
5     Q. Did you ever see Mr. Jergen's personal injury
6  report on or after August 7, 2017?
7     A. No.
8     Q. Have you had any other interaction with Mr.
9  Schneider regarding the August 7, 2017 incident since
10  that day?
11    A. No.
12    Q. Do you have any criticisms or complaints of Mr.
13  Schneider?
14       MR. TELLO: Objection. Foundation.
15  Speculation. Form of the question. Argumentative.
16    Q. You can go ahead and answer it.
17    A. What's the question again?
18    Q. Do you have any criticisms or complaints of Sean
19  Schneider?
20       MR. TELLO: Same objections. Context.
21    A. He seems to be overly involved in planning
22  general things that the train crews could handle on
23  their own and typically doesn't have the experience to
24  come up with the best plan.
25    Q. And why do you say this?

111

1     A. Working with him over the time that he's been
2  with the company.
3     Q. And how much interaction have you had with Mr.
4  Schneider then in this regard?
5     A. He was a terminal trainmaster in Mandan. Had
6  various discussions with him in that capacity. He
7  became a trainmaster in Dilworth, and I've had various
8  conversations with him in that capacity as well.
9     Q. Any other critiques, criticisms or complaints of
10  him other than that?
11    A. No.
12    Q. Any criticisms or complaints of Mr. Freidig?
13    A. No.
14    Q. Do you know who Ralph Richardson is?
15    A. No.
16    Q. Do you have any criticisms or complaints of
17  anyone else at BNSF in connection with the August 7,
18  2017 incident?
19    A. No.
20    Q. Those are all the questions I have.
21       MR. TELLO: I'll have some questions. Why
22  don't we take a quick break now.
23       MR. SWEENEY: I'm sorry. I didn't hear what
24  you said. You have some questions?
25       MR. TELLO: I will.

112

1       MR. SWEENEY: Okay.
2       MR. TELLO: We'll take a quick break,
3  please.
4       MR. SWEENEY: Okay.
5       (Recess taken at 12:13 p.m.)
6  BY MR. TELLO:                    CROSS EXAMINATION
7     Q. Good afternoon.
8     A. Good afternoon.
9     Q. My name is Michael Tello. I represent Mr.
10  Jurgens in his claims against BNSF Railroad, one of
11  which is the one here in Jamestown. I want to show
12  you --
13       MR. TELLO: Going to have this marked, we'll
14  keep the same numbers. Is this, what number are we up
15  to next here, 11?
16       THE COURT REPORTER: 10, we're at 10.
17       MR. TELLO: So the next one would be 11
18  you're saying or --
19       THE COURT REPORTER: Next, this next one
20  would be 10. This one would be 10.
21       MR. TELLO: Well, so -- (inaudible) --
22  marked Exhibit 10 for you.
23       THE COURT REPORTER: Okay.
24  (Plaintiff's Exhibit #10 was marked for identification.)
25       MR. SWEENEY: Do you have a copy?

113

1       MR. TELLO: No, I do not. It's just the
2  accident report.
3       MR. SWEENEY: Let me just, I just want to
4  take a quick look at that, and I'll hand it, go ahead.
5  You can put on the sticker.
6       MR. TELLO: I can let him read it when he
7  gets around to it so --
8     Q. Would you please take a second and read that for
9  me, please.
10    A. Okay.
11    Q. And I'll, I'll just go -- let me know when you're
12  done.
13    A. Okay.
14    Q. Okay. Thank you. Now, and recalling your
15  testimony, you've indicated that you had requested that
16  over in the Strata area that you wanted to have, or
17  suggested there would be a walkway. Do you remember
18  testifying to something of that affect?
19    A. Yes.
20       MR. TELLO: Objection. Form. Foundation.
21    A. Yes.
22    Q. Okay. And you, who was that made to again?
23    A. Trainmaster Montgomery.
24    Q. Okay. And would you consider that, at that time,
25  to have, be making the complaint about the walking

29 (Pages 110 to 113)

114

1  conditions to Mr. Montgomery?
2      MR. SWEENEY: Objection. Form. Foundation.
3      **A. Yes.**
4      Q. Now, would you tell me how many pictures do you
5  recall being shown at the time that you met with the
6  other BNSF attorney?
7      **A. I didn't count them. There were a handful. I**
8  **don't, I don't know an exact number.**
9      Q. Were you given a copy of any of these pictures?
10     **A. No.**
11     Q. Do you know if that, when you spoke with them if
12 it was being recorded or not?
13     **A. Not to my knowledge.**
14     Q. Okay. Were you directed, at that time, to be at
15 a certain place and time to meet with the attorney for
16 the BNSF?
17     **A. Yes.**
18     Q. Okay. And, as it relates to today, why is it
19 that you're here? Were you, first of all, were you
20 subpoenaed?
21     **A. No.**
22     Q. No.
23     **A. I, Tony Freidig sent me a letter.**
24     Q. Do you have a copy of that letter with you per
25 chance?

115

1      **A. Yeah. I was looking to see if there was a room**
2  **number on it earlier. A letter and a note.**
3          MR. TELLO: I would offer both of those as
4  Exhibits right at this time, please.
5          THE COURT REPORTER: Do you want those both
6  11, or do you want them 11 and 12?
7          MR. TELLO: Your call. I don't care. Just
8  let me know.
9          THE COURT REPORTER: I'm going to mark them
10 11 and 12.
11         MR. TELLO: Okay.
12 (Plaintiff's Exhibits #11 and 12 were admitted into
13 evidence.)
14     Q. I'm looking at Exhibit No. 11. Would you read
15 that for me, please.
16     **A. It says, "Mike, I tried to text this to you, but**
17 **it wouldn't go through. Please call when you get this.**
18 **(701)429-1715." And the signature, "Tony Freidig."**
19     Q. Okay. And Exhibit 10, is that what he, was
20 referenced in that note?
21     **A. Yeah. That, the Exhibit 12.**
22     Q. 12. I'm sorry. Thank you.
23     **A. Exhibit 12 was in the same envelope.**
24     Q. And that's captioned, "Amended Notice of a Taking
25 Deposition of Michael Fink."

116

1      **A. Right.**
2      Q. Is that correct?
3      **A. "Defendant's Notice of Taking Deposition --**
4      Q. Yeah.
5      **A. -- of Michael Fink." Yes.**
6      Q. Now, was it your understanding that you were
7  directed to be here by the railroad?
8      **A. Yes.**
9      Q. Okay. Is it your understanding that failure to
10 show up at this deposition would potentially subject you
11 to discipline?
12         MR. SWEENEY: Objection. Form. Foundation.
13 It's leading.
14         MR. TELLO: And, first of all, Counsel, I
15 asked him if it was his --
16         MR. SWEENEY: No. I, I --
17         MR. TELLO: -- understanding.
18         MR. SWEENEY: -- don't want to argue
19 objections. Just go ahead. I'm stating --
20         MR. TELLO: No. No.
21         MR. SWEENEY: -- for the record.
22         MR. TELLO: We're not going to -- no.
23 You're not going to sit over there and just randomly
24 throw out objections that are irrelevant here for
25 purposes of just, of interfering.

117

1          MR. SWEENEY: I'm, I'm sorry --
2          MR. TELLO: I let you get --
3          MR. SWEENEY: -- Mr. Tello but --
4          MR. TELLO: -- through your examination.
5          MR. SWEENEY: -- I am -- I know. I am just
6  stating objections. I am not going to argue them with
7  you.
8          MR. TELLO: They're irrelevant objections.
9  I'm asking you for clarification.
10         MR. SWEENEY: You do not rule on objections.
11         MR. TELLO: I want a --
12         MR. SWEENEY: We --
13         MR. TELLO: -- a clarification.
14         MR. SWEENEY: We are required to state
15 objections --
16         MR. TELLO: Valid.
17         MR. SWEENEY: -- for the record. These are
18 all valid objections.
19         MR. TELLO: No, they're not, Counselor.
20         MR. SWEENEY: Oh, it's absolutely --
21         MR. TELLO: No, they're not.
22         MR. SWEENEY: -- valid objections.
23         MR. TELLO: They're, they're purposely
24 intended to interrupt my questioning. I let you get
25 through your questioning. You know.

30 (Pages 114 to 117)

118

1       MR. SWEENEY: Mr., Mr. Tello, that, that is
2    not true, and so but let's go ahead.  You can continue
3    on with your question.
4       MR. TELLO: Well, we're, we're in a really
5    good place to call the court here very shortly and get a
6    clarification on it if we need to because we're in
7    Bismarck --
8       MR. SWEENEY: If you want --
9       MR. TELLO: So I'm just putting a notice
10   that --
11      MR. SWEENEY: -- to call, if you want to
12   call --
13      MR. TELLO: I'm putting up notice that I'm,
14   I'm setting up the groundwork to have to do that as
15   preparatory to make the sanctions.  Just to let you know
16   that I have no other, other course than to get through
17   this.
18      MR. SWEENEY: On the basis of that objection
19   you think there's --
20      MR. TELLO: It's, you're starting to --
21      MR. SWEENEY: -- anything improper?
22      MR. TELLO: -- lay the foundation of what
23   you normally do.
24      MR. SWEENEY: I disagree.  I disagree but
25   let, let's continue on.

119

1       MR. TELLO: I would like uninterrupted
2    unless necessary.  Will you please read the question
3    back to me.
4       (The requested portion of the record was
5    read by the reporter.)
6    Q.  Okay.  Would you go ahead and answer, please.
7    **A.  I was not informed, I was not informed that if I**
8    **didn't show up I would be subject to discipline.**
9    Q.  Okay.  Who told you to appear here; was it
10   Freidig?
11   **A.  Yes.  Tony Freidig.**
12   Q.  Freidig, I'm sorry.  Have you ever been directed
13   to appear and make statements before the claim agents?
14      MR. SWEENEY: Objection.  Compound.  Go
15   ahead.
16   **A.  I was called by Mr. Freidig to appear to, at the**
17   **BNSF Mandan office to, in, to have a discussion or have**
18   **an interview or whatever --**
19   Q.  Okay.
20   **A.  -- one would call it to, to discuss the case.**
21   Q.  Okay.  Thank you.  Now, let's take a look very
22   briefly, go back at your statement, but before I ask you
23   any questions about your statement, when you first
24   reported for work and up to the time of the incident,
25   did you notice Mr. Jurgens having any difficulty in his

120

1    walk, in his gate in performing any of his duties?
2    **A.  No.**
3    Q.  Did Mr. Jurgens indicate to you that he was
4    having any problems with any part of his body before the
5    incident?
6    **A.  No.**
7    Q.  Did Mr. Jurgens indicate to you that he did not
8    want to walk the track for the shove because of the fact
9    that he was having any problem with his knees or any
10   other part of his body?
11   **A.  No.**
12   Q.  Okay.  Now, when we come back to, initially, when
13   you showed up for work, there was some conversation
14   about the use of a caboose; is that correct?
15   **A.  Yes.**
16   Q.  Okay.  Was there also some conversation about
17   using the van?
18   **A.  Yes.**
19   Q.  And if the Trainmaster, Sean Schneider, had
20   ordered you to wait until the van got repaired, what
21   course of action would you have taken?
22      MR. SWEENEY: Objection.  Speculation.  You
23   can go ahead and answer.
24   **A.  Well, we would have followed our instructions.**
25   **If we were instructed to wait for the utility vehicle to**

121

1    be repaired.
2    Q.  Okay.  And required, and Mr., if Sean had
3    directed you to do so, that would have been a direct
4    order, is that correct, telling you to wait?
5    **A.  Yes.**
6    Q.  Okay.
7       MR. SWEENEY: Same objection.
8    Q.  Now, concerning ordering a van in lieu of the
9    utility vehicle, would that be something that the
10   trainmaster would order or be something that the crew
11   would order on their own?
12   **A.  Trainmaster.**
13   Q.  Okay.  Now, I'm going to take you to a statement
14   and then we'll go back from that.
15   **A.  Okay.**
16   Q.  You fill, you prepared this statement when it was
17   pretty fresh in your mind, I assume, right at the time?
18   **A.  Pretty close.  I -- yeah.  My statement,**
19   **that's --**
20   Q.  Yeah.  The statement --
21   **A.  That's not mine.**
22   Q.  Okay.  What --
23   **A.  Mine was --**
24      MR. TELLO: What exhibit, his statement.
25      MR. SWEENEY: This is Exhibit 2.

31 (Pages 118 to 121)

---

122

1    MR. TELLO:  2?
2    **A. I gave it to you.**
3    Q. Oh, I thought you had it.  (Inaudible) --
4    **A. Okay.**
5    Q. Now, now, you indicate down there it says, "I was
6    in the cab of the engine and saw Brakeman Jurgens in my
7    mirror limping and walking slow.
8    **A. Nope.  That's not my statement.**
9    Q. That's not your statement.  Okay.  What does your
10   statement --
11   **A. My statement says that, "I was --**
12   Q. I got --
13   **A. -- sitting in the cab with the engineer waiting**
14   **for the brakeman to walk to the head end of the train.**
15   **As the brakeman was walking up, the engineer commented**
16   **that he was walking more slowly.  I looked out the**
17   **engineer's window and observed him walking slowly.**
18   MR. TELLO:  I think, Counselor, you handed
19   me the wrong exhibit.  That's why it didn't make sense.
20   MR. SWEENEY:  Is that --
21   **A. That must be Phill's or something.**
22   MR. SWEENEY: -- Mr. Miller's statement?
23   MR. TELLO:  Yeah.  Yeah.  That's why I was
24   wondering about that because you hand, when you, when
25   you handed it to me I was still trying to figure out who

---

123

1    said what.  Okay.
2    **A. Sorry.**
3    Q. No.  That was not your fault.  Did Mr. Jurgens,
4    at the time, appear to be in, when he got in the engine
5    appear to be in pain?
6    **A. Yes.**
7    Q. Did he appear to be in discomfort?
8    **A. Yes.**
9    Q. At any time prior to this incident, did Mr.
10   Jurgens appear to be in pain and discomfort?
11   **A. No.**
12   Q. Okay.  When Mr. Jurgens was telling you what
13   happened, did he appear to be forthright and truthful,
14   to your understanding?
15   MR. SWEENEY:  Objection.  Form and
16   foundation.
17   **A. Yes.**
18   Q. Okay.  Was there anything you were aware of
19   before, after or during that would indicate that he had
20   not fallen on that instance, on that day as he
21   indicated?
22   MR. SWEENEY:  Same objections.
23   **A. No.**
24   Q. Okay.  When you saw Mr. Jurgens get on the engine
25   on prior occasions, did he do it in the same manner that

---

124

1    you saw him get on the engine this time?
2    **A. No.**
3    MR. SWEENEY:  Objection to the form of that
4    question.
5    Q. He specifically said that he had knee pain.
6    Correct?
7    **A. He said he hurt -- yes.  Knee pain.**
8    Q. Okay.  Now, I've shown you Exhibit No. 10.
9    You've had a chance to read it.  Would you read for the
10   record what he put in there for describing illnesses or
11   injury.
12   **A. It says, "Sore knees and pain in back."**
13   Q. Okay.  Does that refresh your memory of what he
14   was complaining about at the time or not?
15   MR. SWEENEY:  Objection.  Form and
16   foundation.
17   **A. The only thing I remember is him mentioning that**
18   **his, that his knee was in pain.**
19   Q. Okay.  That's all I needed to know is what you
20   know.  Fair enough.  Now, you kind of went through a
21   description of how these events would have taken place
22   or did take place, excuse me.  Now, how would, how would
23   you have done this if in fact you would have had the
24   caboose to use if it would have been available on that
25   date?

---

125

1    **A. Okay.  Mr. Jurgens would have, we would have put**
2    **the caboose on the rear end of the cars, and Mr. Jurgens**
3    **would have ridden in the caboose and, or and shoved the**
4    **cars all the way back to the temple, or the tipple or**
5    **shaker, stopping to line any switches that needed to be**
6    **lined on the way.**
7    Q. Okay.  And he would have been controlling the
8    movement with the radio at that time?
9    **A. Right.  He would have been protecting the shove**
10   **at that time, yes.**
11   Q. Okay.  Well then am I correct then he would have,
12   you would have coupled up to the cars on the Strata
13   track which wouldn't have been just passed the tipple.
14   Correct?
15   MR. SWEENEY:  Objection to the form.
16   **A. He would have, yeah, he would have coupled up to**
17   **the cars to pull, and then we would have, we would have**
18   **cut it in the air and pulled away and spotted him on**
19   **the, probably the same track that we did before, and**
20   **then we would have shoved the loads back down to Strata**
21   **and spotted them using the caboose for that, for the**
22   **entire stretch.**
23   Q. Now, that would have meant that you wouldn't have
24   had to have walked down the track that he did when he,
25   to get to the, Strata because he would have been on the

---

32 (Pages 122 to 125)

126

1  caboose; is that correct?
2      MR. SWEENEY: Objection. Form. Foundation.
3      **A. He would not have walked that stretch, no.**
4      Q. Okay. And at, just close to that time there was
5  a big push in the Mandan yard. Isn't it true that the,
6  the BNSF did not want crews riding cars?
7      **A. They had --**
8      MR. SWEENEY: Objection. Form. Foundation.
9  Go ahead.
10     **A. Okay. They had initiative that they were doing a**
11 **trial in Mandan yard to not ride cars at all as a, as a**
12 **trial to see what, if any, effect that would have on the**
13 **operation in terms of efficiency or, and safety.**
14     Q. And is it your understanding that had to do,
15 related to safety issues because of injuries on,
16 relating to riding cars?
17     MR. SWEENEY: Same objections. Form.
18 Foundation.
19     **A. Yes.**
20     Q. Now, why was it that you couldn't use a caboose
21 on that day, to your understanding?
22     **A. The caboose was behind some maintenance**
23 **equipment, and the switch was locked out with a**
24 **maintenance lock, so we would have had to have someone**
25 **from maintenance unlock the switch, and then if the,**

127

1  **then we would have been able to move the flatbeds that**
2  **the equipment was on, out of the way so that they could,**
3  **so we could get to the caboose.**
4      Q. Did Mr. Schneider tell you to wait until they
5  could get somebody from the maintenance away, or did he
6  tell you just to go to work?
7      MR. SWEENEY: Objection. Form.
8      **A. Okay. He told us to, he, he told us he was going**
9  **to check with someone in maintenance and get somebody**
10 **out there to remove the lock, and then he called back a**
11 **few minutes later and said that he couldn't get anybody**
12 **to remove it and that, and that's when the discussion**
13 **was to walk the, the track.**
14     Q. Okay. So that decision was made by Mr.
15 Schneider. Correct?
16     **A. That's correct.**
17     Q. Now, when you first came up to the tipple, light
18 engine, you would have tied on with the light engine
19 couple, coupling onto the cars and then would have
20 knocked the brakes off; is that correct?
21     **A. Yes.**
22     Q. Do you remember whether or not, in fact, Mr.
23 Jurgens had the cars pulled up so you didn't have to
24 walk the track?
25     MR. SWEENEY: Objection. Form.

128

1      **A. I don't remember.**
2      Q. Okay. So you could have?
3      MR. SWEENEY: Same --
4      **A. Very possible.**
5      MR. SWEENEY: Same objection. Form and
6  foundation.
7      Q. So if Mr. Jurgens would have testified, do you
8  have any, to that, as far as pulling the cars up, do you
9  have any reason to disagree with that testimony?
10     MR. SWEENEY: Same objection. Form.
11 Foundation. No personal knowledge. You can go ahead.
12     **A. No.**
13     Q. Okay. And would it be one of your understandings
14 of why you'd want to pull those cars up at the tipple
15 was because of the bad walking conditions?
16     MR. SWEENEY: Objection. Form.
17     **A. I don't know how to answer that question because**
18 **I don't remember if the cars were pulled up or not.**
19     Q. Okay. Well, let's look at a couple of pictures
20 here if we can.
21     MR. TELLO: I don't have pictures, Counsel.
22 I'm sorry.
23     MR. SWEENEY: I can look over your shoulder
24 if --
25     MR. TELLO: Absolutely.

129

1      MR. SWEENEY: -- that's all right.
2      MR. TELLO: I'm not sure that this is the
3  same picture. I want to make sure we don't duplicate
4  anything.
5      THE COURT REPORTER: Should we go off the
6  record for a minute?
7      MR. TELLO: Just a second.
8      (Plaintiff's Exhibits #13, 14, 15, 16 and 17 were
9  marked for identification.)
10     Q. When walking alongside of a railroad track, are
11 you allowed to walk in the middle of the track like,
12 say, at Strata?
13     **A. No.**
14     Q. Is there a prohibition against that under any
15 GCOR rules, safety rules that you're aware of?
16     **A. Yes. You're not allowed to foul the track.**
17     Q. Okay.
18     **A. Which means you can't be close enough to the**
19 **track that you'd be able to be hit by a passing car.**
20     Q. Okay. Or something hanging from the side of a
21 car as well?
22     **A. Yep.**
23     Q. Okay. Now, if you were, do you know how wide an
24 average boxcar is?
25     **A. No.**

33 (Pages 126 to 129)

130

1  Q. Do you know if it's 10 feet wide?
2      MR. SWEENEY: Objection. Foundation.
3  Q. That ring a bell?
4  **A. That, it could be.**
5  Q. Okay. Are you allowed to walk on ties?
6  **A. No.**
7      MR. SWEENEY: Objection. Form. Foundation.
8  Q. Is that because of the rules?
9  **A. Yes. The same, same rule that you can't foul the**
10 **track.**
11 Q. Okay. So in fouling, not fouling the track, you
12 have to be a distance from the track whether or not
13 there is or is not cars on that track at that time; is
14 that correct?
15 **A. That's correct.**
16 Q. And if I show you Exhibit No. 16 can you see
17 weeds depicted in that picture between -- just, can you
18 see, is there weeds in that?
19 **A. Yes.**
20 Q. Can you see where the tipple is?
21 **A. Yes.**
22 Q. Okay. Can you see whether there's some railroad
23 ties on the left-hand side about in the middle?
24 **A. Yes.**
25 Q. Okay. And from, is there, what appears to be a

131

1  sign there next to the post of some kind next to the
2  railroad tie there?
3  **A. Yes.**
4  Q. Does that better show you in Exhibit No. 15 what
5  appears to be a sign?
6  **A. Yes.**
7  Q. Okay. Are there weeds in the walkway between
8  that sign and the tipple?
9  **A. Yes.**
10 Q. Okay.
11     MR. SWEENEY: What, what exhibit is that on
12 that you just pointed to?
13     MR. TELLO: 16, sir.
14 Q. In your experience as a brakeman and working on
15 the railroads, would you agree that weeds can constitute
16 a tripping hazard?
17     MR. SWEENEY: Objection. Form. Foundation.
18 Improper opinion.
19 **A. Yes. The, the rules say that anything in your**
20 **walking path could be considered a tripping hazard.**
21 Q. Okay. And is the area between the rails like at
22 Strata, I'll have to look at the picture, is that a
23 fairly flat, level area?
24 **A. Between the rails is typically, yes --**
25 Q. Okay.

132

1  **A. -- level.**
2  Q. Okay. And that's because you've got one tie
3  going from one end of the, one side of the rail to the
4  other side of the rail, and that's a flat surface that
5  has ballast in between it; is that correct?
6  **A. Yes.**
7  Q. Okay. There's no slope in the middle of the area
8  that you recall in, in the Strata area, is there,
9  between the rails?
10 **A. Not that I recall.**
11 Q. Okay. Would you agree with me that that is a
12 better walking surface than on the side of the track at
13 Strata that has an angled slope area?
14     MR. SWEENEY: Objection. Form. Foundation.
15 Opinion.
16 Q. In your experience?
17 **A. Yes. It's typically better walking conditions**
18 **between the rails.**
19 Q. Okay. If the BNSF elected, to your
20 understanding, could they permit crew members to walk
21 between the rails at Strata?
22     MR. SWEENEY: Objection. Form. Foundation.
23 Opinion. Speculation.
24 **A. Yes. They could issue a general order to do**
25 **that.**

133

1  Q. Was there any general order on that allowing you
2  to walk between the rails at Strata?
3  **A. No.**
4  Q. Did that, therefore, require you to walk
5  sufficiently on the side of the track at Strata to make
6  sure that you had maintained that proper clearance point
7  that you referred to?
8  **A. Yes. That would mean that you'd have to walk**
9  **sufficiently far enough away from the actual rail and**
10 **ties that you would not be fouling the track.**
11 Q. And that required you to walk both on the slope.
12 Correct, at Strata?
13     MR. SWEENEY: Objection. Form. Foundation.
14 Opinion. It's leading.
15 **A. Yes. You'd be on a slope in that case.**
16 Q. And, also, as you indicated, in the weeds.
17 Correct?
18     MR. SWEENEY: Same --
19 **A. Yes.**
20     MR. SWEENEY: Same objections.
21 **A. Yes.**
22 Q. Showing you Exhibit No. 15. Is that picture of
23 the, reference that looks like a sign?
24 **A. Yes.**
25 Q. Do you know what that sign says?

34 (Pages 130 to 133)

134

1   **A. I do not.**
2   Q. And showing you what is Exhibit No. 16 again.
3   **A. Yes. I see the sign.**
4   Q. Okay. Can you see the, the slope of the track
5   which would be on the side which would be closest to the
6   truck stop?
7       MR. SWEENEY: Objection. Form. Foundation.
8   **A. Yes.**
9   Q. Or, in other words, opposite the side where the
10  Strata industry is. Correct?
11  **A. Correct.**
12  Q. And if I were to show you Exhibit No. 14, I'll,
13  I'll represent that the thumb is Mr. Alex Nigum's, for
14  the record.
15  **A. Okay.**
16  Q. Does this appear to be the side of the
17  track that would be the same as where Strata is located
18  -- (inaudible) -- opposite of the truck stop?
19  **A. Yes. It would be the side near Strata.**
20  Q. You can say it better that way. Thank you.
21  Okay. Can you also see weeds depicted in that picture
22  as well?
23  **A. Yes.**
24  Q. Also in the same area would be the walkway;
25  that correct?

135

1   **A. Yes.**
2       MR. SWEENEY: Objection. Form. Foundation.
3   It's leading.
4   **A. Yes.**
5   Q. Also, can you see the slope depicted in that
6   picture on Exhibit No. 14?
7   **A. Yes.**
8   Q. Again, in the walkway?
9       MR. SWEENEY: Same objections.
10  Q. Clearance point?
11  **A. Yes.**
12  Q. Okay. Now, this is the same side that you said
13  that you testified to earlier that you fell on, is that
14  correct, this track?
15      MR. SWEENEY: Objection. Mischaracterizes
16  his testimony.
17  **A. I was on the other side of the shaker.**
18  Q. I understand that but my question is, is, it was
19  the side of Strata that you fell on, but it was on the
20  other side of the Shaker --
21      MR. SWEENEY: Again, objection. That
22  mischaracterizes his testimony.
23  Q. Is that correct?
24  **A. Yes.**
25  Q. Okay. -- (inaudible) -- this is the Strata side.

136

1   Correct?
2   **A. Yes.**
3   Q. That's the side of the --
4       MR. SWEENEY: When you say, this is the
5   Strata side, what are you referring to?
6   Q. Where the building is, opposite of where the
7   truck stop is. Is that okay? Where the building was
8   depicted in some of your pictures. Since I'm getting
9   all confused with east or west and north and south on
10  the railroad, etcetera, so you fell on what would be the
11  left side of this picture on this, of this track but
12  back on the other side of the, of the shaker. Correct?
13  **A. Yes.**
14  Q. Okay. Now, I'll represent to you that this
15  picture was taken about two weeks ago at a site
16  inspection that was performed at Strata where Mr. Rouser
17  was present. It's two sided. Okay. Now, in this
18  picture you can see the truck stop.
19  **A. Yes.**
20  Q. Correct? And you can see the shaker. Correct?
21  **A. Yes.**
22  Q. And if we stay in the truck stop at the shaker
23  side can you see the area adjacent to the track just
24  passed the Strata?
25  **A. Yes.**

137

1   Q. Does there appear to be a pathway?
2   **A. No.**
3   Q. Does there appear to be a pathway cut in here?
4   **A. Okay. Yes.**
5       MR. SWEENEY: Objection. Form. Foundation.
6   Q. Okay. And I want you to look closely at Exhibit
7   No. 16 and 13, okay, and tell me if you see any pathway
8   in the area next to the Strata on the --
9   **A. You mean --**
10  Q. -- side of the truck stop.
11      MR. SWEENEY: Objection. Form. Foundation.
12  Opinion.
13  **A. You mean walking path?**
14  Q. Yes.
15  **A. Okay. Exhibit 17 has a, a walking path cut in.**
16  **Exhibit 13 and 16 do not.**
17  Q. Okay. Will you look closely at Exhibit No. --
18  just a second -- 17. Do you see any weeds in the
19  walkway?
20      MR. SWEENEY: Objection. Form. Foundation.
21  **A. No.**
22  Q. Okay. What's your understanding, how do you, you
23  prevent weeds in the right of way or walkway, excuse me,
24  in the walkway --
25      MR. SWEENEY: Objection.

138

1 Q. -- in your experience?
2      MR. SWEENEY: Objection. Opinion. Form and
3 foundation.
4      **A. The, the only information I have on it is the**
5 **e-mail that I get sent that has a vegetation schedule as**
6 **to when they spray the weeds at certain lotions.**
7 Q. Okay. It's your understanding that you're
8 supposed to spray the weeds before they start to grow to
9 prevent their growth?
10      MR. SWEENEY: Same objections.
11      **A. Yes.**
12 Q. Okay. And after you -- strike that. If you
13 have, if the weeds have already grown and you spray them
14 does that generally result in the weeds dying?
15      MR. SWEENEY. Objection. Form. Foundation.
16 Opinion.
17      **A. Well, they, they die but they're still there.**
18 Q. Right. And in fact they become more brittle and
19 more difficult to walk through?
20      MR. SWEENEY: Same objections.
21 Q. Okay.
22      **A. I suppose.**
23 Q. So to remove the interference of the weeds, if
24 they've already grown up, would you agree that they need
25 to be cut and removed from the area where the walkway

139

1 is?
2      MR. SWEENEY: Objection. Form. Foundation.
3 Seeks an improper opinion.
4      **A. Yes. They'd need to be cut down.**
5 Q. To remove a tripping hazard?
6      MR. SWEENEY: Same objections.
7 Q. Potential tripping hazard?
8      **A. Yes.**
9 Q. How would you, would you describe that grade just
10 passed the tipple as being steep in the walkway?
11      MR. SWEENEY: Same objections.
12      **A. Yes. I would describe it as steep.**
13 Q. Does a steep walkway like the tipple constitute a
14 potential hazard in anyway that you're aware of?
15      MR. SWEENEY: Objection. Form. Foundation.
16 Opinion.
17      **A. Yes. When you're walking along it you typically**
18 **walk with one foot higher than the other which is an**
19 **unnatural way to walk.**
20 Q. Did you say unnatural?
21      **A. Unnatural --**
22 Q. I'm sorry.
23      **A. -- way to walk, yeah.**
24 Q. How about with the ballast itself slipping when
25 the, when the, when you're walking on a grade. Is

140

1 there, is there affect on that?
2      MR. SWEENEY: Objection. Form. Foundation.
3 Improper opinion.
4      **A. Well, I think the, the ballast can slip out from**
5 **under you, it will slip out from under you more if**
6 **there's more grade.**
7 Q. Okay. So as in Exhibit No. 17, the walkway
8 identified, is that a more stable walking platform than
9 a slope platform?
10      MR. SWEENEY: Objection. Form and
11 foundation for Exhibit 17.
12      **A. I haven't walked on it, but it looks like it'd be**
13 **more stable. It should be, because it's flat, you could**
14 **at least walk on it normally.**
15 Q. And you said to had requested in fact to have a,
16 a walkway in that area. Didn't you?
17      MR. SWEENEY: Objection. Misstates his
18 testimony.
19      **A. I'm --**
20 Q. Is that what you're referring to when you said
21 there should be a walkway in there?
22      MR. SWEENEY: Same objections.
23      **A. Yes. I mentioned, I mentioned to Trainmaster**
24 **Montgomery on a previous occasion out there that they**
25 **should put walkways in.**

141

1 Q. Okay. That was, and was that because the slope
2 was a safety hazard --
3      MR. SWEENEY: Same --
4 Q. -- in your mind?
5      MR. SWEENEY: Same objections.
6      **A. Yes.**
7 Q. Now, am I correct when you spot the cars,
8 the loads, you leave them just passed the tipple?
9      **A. Yes.**
10 Q. Okay. And when you come to pull the empties, the
11 cars are in the same place just passed the tipple?
12      MR. SWEENEY: Objection. Asked and
13 answered. Form and foundation.
14      **A. Yes.**
15 Q. Okay. Do the, to your understanding, if you
16 know, do the people working at tipple, do they basically
17 have to get on the cars after you spot them on the cars
18 on the same place just past the tipple?
19      **A. I don't know how they operate over there.**
20 Q. Okay. If you were going to tie an engine onto
21 those cars that you spotted you would have to take the
22 engine just past the tipple and make the joint at that
23 area; is that correct?
24      **A. If you put an engine on that side, yes.**
25 Q. Okay. And if you were to spot the cars with an

36 (Pages 138 to 141)

142

1  engine, you'd also have to have that engine in that same
2  spot just passed the tipple. Correct?
3  **A. Yes.**
4  Q. Okay. So that's an area that BNSF crews and
5  tipple employees are, were getting on and off; is that
6  correct?
7     MR. SWEENEY: Objection to form.
8  Q. Do you understand --
9     MR. SWEENEY: Form and foundation. Calls
10 for speculation.
11 **A. I, I don't understand the question.**
12 Q. Okay.
13 **A. Getting on or off equipment?**
14 Q. Yes. In that area. Put it this way, if you, if
15 you, if the tipple -- excuse me. If the Strata crew
16 were to tie onto the cars with an engine that you
17 spotted, you're going to have to come right up to that
18 joint, couple onto that joint and get off in that same
19 area just passed the tipple. Correct?
20    MR. SWEENEY: Objection. Form. Foundation.
21 Opinion. Incomplete hypothetical.
22 **A. If you make a joint there and you get off the**
23 **front of the engine you would get off on what would be**
24 **the north side of the, the tipple. If, you can't ride**
25 **cars under the tipple because it is a close clearance,**

143

1  **but you'd be able to ride up to it and passed it but not**
2  **through the tipple.**
3  Q. Correct. And would that basically be the area
4  that you see the walkway in Exhibit 17 is where you
5  would be coupling onto the cars and uncoupling the car
6  and spotting and pulling the tipple?
7  **A. Yes.**
8     MR. SWEENEY: Same, same objections.
9  **A. Yes.**
10 Q. In your past working with Mr. Jurgens, has he
11 been a competent brakeman/conductor?
12 **A. Yes.**
13 Q. Has he been a safe brakeman and conductor?
14 **A. Yes.**
15 Q. Has he been a conscientious brakeman and
16 conductor --
17 **A. Yes.**
18 Q. -- to your understanding?
19 **A. By conscientious I --**
20 Q. Mr. --
21 **A. And did you mean that he was aware of his**
22 **surroundings and, you know, has an understanding of the**
23 **work to be performed in that kind of general --**
24 Q. Yes. In that context --
25 **A. Okay.**

144

1  Q. -- yes. Does he try to do the work in an
2  efficient manner?
3  **A. Yes.**
4  Q. Okay. And relating back to the van that you
5  didn't use on that day, did you agree that it was a good
6  decision not to use the van because the potential safety
7  issues relating to the vehicle itself?
8     MR. SWEENEY: Objection. Form and
9  foundation.
10 **A. I didn't really express an opinion on it because**
11 **it was mutually agreed by everybody involved that that**
12 **wouldn't be the safe course.**
13 Q. Okay.
14    MR. TELLO: No more further questions.
15 BY MR. SWEENEY            REDIRECT EXAMINATION
16 Q. I'll try to be quick and get through the
17 followup --
18 **A. Okay.**
19 Q. -- question. Were you aware -- strike that. You
20 were asked questions about Mr. Jurgens and your
21 experience with him; do you recall that?
22 **A. Yes.**
23 Q. Were you aware that he failed to properly protect
24 a shove resulting in it going passed a red flag and
25 derailing in June of 2017?

145

1  **A. I wasn't aware of that until, until the day of**
2  **the incident.**
3  Q. And were you aware that that occurred in
4  Jamestown in the area of Strata?
5  **A. I did not know that.**
6  Q. Were you aware that he had been decertified as a
7  conductor?
8  **A. I learned that the day of the incident.**
9  Q. And how did you learn that on the day of the
10 incident?
11 **A. There was a general, just a general discussion**
12 **that, that he had been decertified.**
13 Q. Did he tell you he had been decertified?
14 **A. Yes.**
15 Q. And did he tell you that he had accepted that
16 discipline and acknowledged that he violated the safety
17 rules by failing to properly protect a shove resulting
18 in a derailment in the Jamestown area?
19 **A. No. Not to that level of specificity.**
20 Q. You weren't working with him at that time. Were
21 you?
22 **A. I was not.**
23 Q. And it sounds like you didn't have that much
24 experience working with him over the past few years; is
25 that fair?

37 (Pages 142 to 145)

146

1    MR. TELLO: Object as to characterization.
2    **A. I've --**
3    MR. TELLO: Asked and answered.
4    **A. I've, I've, I've worked with him in proximity to**
5    **him previously. I didn't have any concerns about him**
6    **working safely. I don't recall, maybe once or twice**
7    **we've worked together on the same crew.**
8    Q. All right.
9    **A. I don't know an exact number.**
10   Q. In addition to this derailment that he caused in
11   June of 2017, were you aware that he failed to stop at a
12   posted stop sign also in June of 2017?
13   MR. TELLO: Objection. Foundation.
14   Speculation.
15   **A. I was not aware of that, no.**
16   Q. Did he ever bring that up on the day of the
17   incident that he had been scheduled for an investigation
18   for that offense as well?
19   MR. TELLO: Asked and answered.
20   **A. No, I was not aware of that.**
21   Q. You were asked questions about fouling the track.
22   Do you recall that?
23   **A. Yes.**
24   Q. Certainly employees can cross over tracks.
25   Correct?

147

1    **A. That's correct.**
2    Q. And that's something that trainmen do everyday.
3    Don't they?
4    **A. Correct.**
5    Q. Basically, you need to look and make sure there's
6    no traffic and you can cross the tracks if you can
7    safely do it. Correct?
8    **A. That's correct.**
9    Q. If an employee wants to walk on the east side of
10   a track or a west side of a track and assuming there are
11   no cars on the track you can comply with the rules and
12   cross over from one side o the other; is that correct?
13   **A. Yes.**
14   Q. And that is not considered fouling the track in
15   violation of any rules. Isn't that true?
16   **A. That's correct.**
17   MR. TELLO: Objection. Foundation.
18   Speculation. Mischaracterization.
19   **A. That's correct. The only additional point would**
20   **be, if you're giving signals by hand then you need to be**
21   **on the engineer's side of the track so the engineer can**
22   **see you. Otherwise you'd have to give signals by radio.**
23   Q. You were asked question about the comment that
24   you made to Trainmaster Montgomery. Correct?
25   **A. Yes.**

148

1    Q. And you basically in passing said to him
2    something about walkways; is that fair?
3    **A. That's fair.**
4    Q. You didn't put in a SIRP. Did you?
5    **A. I did not.**
6    Q. You didn't put anything in writing. Did you?
7    **A. No.**
8    Q. Did you do anything to elevate that comment any
9    further than just mentioning it in passing to
10   Trainmaster Montgomery?
11   **A. No.**
12   Q. Do you know which way Mr. Jurgens was walking at
13   the time of his incident?
14   **A. I do not.**
15   Q. Do you know on which side of the tract he was?
16   **A. I do not.**
17   Q. Do you know how close he was to the ties or the
18   rail?
19   **A. No.**
20   Q. Do you know whether he was walking in weeds or
21   not?
22   **A. No.**
23   Q. Clearly from the photographs you can see that
24   there are areas in the ballast where there are no weeds.
25   Correct?

149

1    **A. Yes.**
2    Q. Can you ride a caboose through the tipple or
3    shaker, to your understanding, or do you need to get off
4    it and walk to the other side?
5    MR. TELLO: Improper hypothetical.
6    **A. I don't know the answer to that question. I'd**
7    **have to review the rule. My initial thought is because,**
8    **it's a close clearance point, but I don't know the**
9    **answer to that question.**
10   Q. Okay. Not knowing the answer to that question,
11   if you were out there, in case of doubt would you get
12   off and then walk passed the tipple?
13   MR. TELLO: Objection. Foundation.
14   Speculation.
15   **A. Yes. You could walk on the, through the temple.**
16   **There's the metal, I don't know what you'd call it, a**
17   **path, walkway, to the other side if you had questions**
18   **about it.**
19   Q. Do you have Exhibit 14 in front of you?
20   **A. Yes.**
21   Q. All right. And when Mr. Tello was asking you
22   questions about that he brought up the name of an
23   individual, Alex Nigum. Do you recall that?
24   **A. Yes.**
25   Q. And he indicated that it was Mr. Nigum's finger

150

1  that was in that photograph; do you recall that?
2  **A. Okay.**
3  Q. Who is Mr. Nigum?
4  **A. I have no idea.**
5  Q. Do you know whether he works for Mr. Tello?
6  **A. I don't.**
7  Q. Do you know whether he went out and inspected
8  this area and photographed it within about a month after
9  the accident?
10  **A. I don't.**
11  Q. Do you know whether the conditions shown in
12  Exhibit 14 are similar to the conditions that existed on
13  the day of the incident?
14  **A. They look similar.**
15  Q. Same question with regard to Exhibits 4 through
16  7. Those are dated August 9 of 2017. Do the conditions
17  depicted in those photographs appear to adequately
18  represent the conditions that existed two days earlier
19  on August 7, 2017?
20  **A. Yes.**
21  Q. All right. And I would like you to contrast
22  those then with Exhibit 17 which, according to Mr.
23  Tello, those were photographs taken about two weeks ago.
24  Do you have exhibits 17 in front of you?
25  **A. Yes.**

151

1  Q. All right. So based upon the questioning of you
2  earlier, would you agree that Exhibit 17 shows
3  conditions than are different than existed on the day of
4  the August 7, 2017 incident?
5  **A. Yes.**
6  Q. So that would not accurately represent the
7  conditions that existed in August of 2017. Agreed?
8  MR. TELLO: Objection. Calls for a legal
9  conclusion. Also leading.
10  Q. Agreed?
11  **A. Yes.**
12  Q. Do you know whether or not Mr. Jurgens stepped on
13  weeds at or about the time of the accidents?
14  **A. I don't know.**
15  MR. TELLO: I'm sorry. What was that
16  question again? I apologize.
17  Q. I said do you know whether or not Mr. Jurgens
18  stepped on --
19  MR. TELLO: Okay.
20  Q. -- any weeds at or about the time of the
21  accident?
22  MR. TELLO: Sorry about that, Pat. I just
23  couldn't hear that one.
24  Q. We have Exhibit 8 in front of us, and one thing I
25  wasn't clear on is you were asked about what would occur

152

1  if using a caboose on the day of the incident. Do you
2  recall that line the questioning?
3  **A. Yes.**
4  Q. And you had indicated that you would place it on
5  the rear of the cars; is that correct?
6  **A. Yes.**
7  Q. So in the shove from the Jamestown yard going to
8  Strata, I understand that the caboose would be in the
9  lead, if you will, of that shove; is that correct?
10  **A. That's correct.**
11  Q. And then once you got down to the area around
12  what we've marked as the switch on Exhibit 8, you would
13  have to do an extra move to set that caboose out.
14  Wouldn't you?
15  **A. If, there are two ways you could do it. You**
16  **could either, if you pull the cars first with the big**
17  **handle of, of cars you could ride the caboose all the**
18  **way back, make the joint and then pull forward to the**
19  **switch. You could let someone off at the switch, pull**
20  **the train forward, line the switch, protect the shove**
21  **back near the switch in the parts marked to set out 20**
22  **cars and then cut away those 20 cars and pull forward**
23  **again, and then you could ride the caboose all the way**
24  **back to the temple, yep, the tipple again.**
25  Q. So you, you're clearly doing extra moves because

153

1  of the caboose.
2  MR. TELLO: Objection.
3  Q. Correct?
4  MR. TELLO: Mischaracterization of
5  testimony.
6  Q. I'm asking you, isn't it true that you are doing
7  extra moves?
8  **A. Either way you're going to have to set out the 20**
9  **cars, and you're going to have to pick up the 20 cars,**
10  **so it's just the order in which you would do it.**
11  Q. As you're shoving towards Strata, does there come
12  a point when you would have to separate the caboose from
13  the 20 cars before you set them into the area marked,
14  set out 20 cars?
15  **A. No.**
16  Q. So would that be in the lead of these 20 cars as
17  you've, as you're setting those out?
18  **A. No. The empty cars that you're setting out would**
19  **be, the caboose would be between the empty cars and the**
20  **loads, so you would protect the shove back 20 cars into**
21  **the clear. You could do that. You don't have to walk**
22  **back 20 cars to do that. You can do that as long as you**
23  **can see the track going back and visually observe that**
24  **the track is clear.**
25  Q. Okay. Thank you.

39 (Pages 150 to 153)

154

1    A. Okay.
2    Q. That clears that up for me.
3    A. Okay.
4    Q. You were also talking -- strike that. You were
5  also asked about a push in the Mandan yard. Do you
6  recall that, an initiative to not ride cars in the
7  Mandan yard?
8    A. Yes.
9    Q. And was that limited, at least that initiative to
10  the Mandan yard then?
11   **A. I know there was a trial within the Mandan yard,**
12  **yes, that it was limited to, the trial went on for a**
13  **little while and then they, they ended it and went back**
14  **to the way that it was before where you could ride cars.**
15   Q. And do you know the time period over which there
16  was a trial specifically limited to the Mandan yard and
17  then the time period when they decided that you could
18  ride cars again outside of the Mandan yard?
19   **A. Outside of the Mandan car, car, outside of the**
20  **Mandan yard there was no limitation other, you know,**
21  **other than the standard limitations about when you could**
22  **ride cars. It was only within the Mandan yard that you**
23  **were not supposed, that you were not allowed to ride**
24  **cars during that trial. As far as a timeframe, I, I**
25  **don't know the exact timeframe of it. I don't know how**

155

1  **long it went on until it, they determined that it wasn't**
2  **a, it wasn't viable.**
3    Q. Do you know who determined that it was not
4  viable?
5    **A. I don't know. It just, at one of the safety**
6  **marathons they said that they had decided not to make**
7  **that the practice going forward.**
8    Q. Those are all the questions I have. Thank you.
9    A. Okay.
10  BY MR. TELLO                    RECROSS EXAMINATION
11   Q. Just a second. And you testified earlier that
12  Mr. Schneider specifically said he did not want you
13  riding cars; is that's correct?
14   **A. That's correct.**
15   Q. One last series of questions. I'll try and get
16  through it quickly. If you came out of the yard shoving
17  the caboose with your loads, correct, the move would
18  have been, if you used the caboose, you'd shove up to
19  Strata with the caboose, couple up to the, to the
20  empties, pull the empties, set them over and then shove
21  back in and spot the cars; is that correct?
22   **A. That's correct.**
23   Q. Okay. There's no extra moves in that incident
24  with the caboose?
25   **A. No.**

156

1    Q. Thank you. I have no questions.
2  BY MR. SWEENEY              REDIRECT EXAMINATION
3    Q. A trainman could not remain on the caboose once
4  you picked up and pulled the cars out of Strata.
5  Correct?
6         MR. TELLO: Objection. Foundation.
7  Mischaracterization.
8    **A. There's no reason they wouldn't be able to. Yes,**
9  **they could. They, they --**
10   Q. Would there, would there need to be someone on
11  the other end of those cars or not?
12   **A. No. We'd be pulling forward at that point, so**
13  **you'd only need someone to be able to visually protect a**
14  **shove, not a pull move, so you'd have the engineer on**
15  **the head end.**
16   Q. Okay. Fair enough.
17   **A. And, and in this case the engineer and I were**
18  **both on the head end.**
19   Q. No other questions. Thank you.
20       MR. TELLO: No other questions.
21       MR. SWEENEY: All right. You have the
22  ability to read, review this transcript and sign it to
23  make sure that it's accurate, or you can waive the right
24  to do that. I can not advise you on how to do that.
25  It's up to you so you just need to indicate whether you

157

1  want to review the transcript or not.
2         MR. FINK: I'll waive my right to review it.
3         MR. SWEENEY: All right. Thank you.
4  (This deposition was concluded at 1:26 p.m.)

158

1     NOTARY REPORTERS CERTIFICATE

2    STATE OF MINNESOTA

3     I, JESSE LEE ANDERS, a Notary Public, within and

4    for the County of Clay and State of MINNESOTA did hereby

5    certify:  That the afore-named witness was by me sworn

6    to testify the truth, the whole truth and nothing but

7    the truth.

8     That the foregoing one hundred and fifty

9    seven(157) pages contain an accurate transcription of my

10   shorthand notes then and there taken.

11    I further certify that I am neither related to

12   any of the parties or counsel, nor interested in this

13   matter directly or indirectly.

14     WITNESS my hand and seal this 29th day of

15   October, 2018.

16   _____

17   JESSE L. ANDERS

18   NOTARY PUBLIC

19

20   THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT

21   APPLY TO THE PRODUCTION OF THE SAME BY ANY MEANS, UNLESS

22   UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE

23   CERTIFYING COURT REPORTER.

24

25   My commission expires:  Jan 31, 2019

41 (Page 158)

**A**

**ability** 156:22
**able** 58:4 77:13 78:7
  81:7 98:2 99:4
  108:24 127:1
  129:19 143:1 156:8
  156:13
**absolutely** 55:6
  117:20 128:25
**accepted** 145:15
**access** 58:17
**accident** 67:16
  109:12,13 113:2
  150:9 151:21
**accidents** 109:7
  151:13
**accommodated** 9:15
**account** 15:15,16,22
**accuracy** 75:5,8
**accurate** 20:20
  156:23 158:9
**accurately** 151:6
**acknowledged**
  145:16
**action** 3:14 91:14
  108:9 120:21
**actual** 18:10 86:1
  133:9
**add** 45:8
**addition** 23:9 146:10
**additional** 13:18
  17:16,17 56:3 71:6
  105:8 106:6 147:19
**Additionally** 95:4
**address** 12:11 57:4
**addressing** 56:25
**adequately** 150:17
**adjacent** 136:23
**adjoining** 103:8
  104:3
**admitted** 115:12
**advise** 156:24
**affect** 113:18 140:1
**afford** 8:8
**afore-named** 158:5
**afternoon** 112:7,8
**agent** 6:4 7:10 66:25

67:1
**agents** 119:13
**agent's** 5:1
**ago** 5:7,12,23 6:8
  10:11 136:15
  150:23
**agree** 37:17 131:15
  132:11 138:24
  144:5 151:2
**agreed** 47:1,19 91:13
  144:11 151:7,10
**agreement** 22:14
**ahead** 29:21 40:20
  56:17 62:19 64:11
  79:11 80:1,13 94:18
  105:14 107:21
  110:16 113:4
  116:19 118:2 119:6
  119:15 120:23
  126:9 128:11
**air** 76:5,10,24 107:18
  125:18
**AKA** 57:7
**Alerus** 14:15
**Alex** 134:13 149:23
**allowed** 22:13 42:24
  43:8 129:11,16
  130:5 154:23
**allowing** 8:9 133:1
**alongside** 129:10
**alternate** 31:15
**Amended** 115:24
**ANDERS** 1:24 158:3
  158:17
**AND/OR** 3:9 158:22
**angled** 85:19 132:13
**annual** 23:6
**Anoka** 2:10
**answer** 8:9 9:1,6
  23:23 40:20 62:19
  77:16 80:1 103:23
  110:16 119:6
  120:23 128:17
  149:6,9,10
**answered** 40:19
  62:18 89:10 141:13
  146:3,19

**answering** 29:20
  85:12
**anticipate** 8:13
**anybody** 10:20 16:17
  53:10 58:23 127:11
**anymore** 53:9
**anyway** 24:10 139:14
**apologize** 64:11
  151:16
**apparently** 11:6
**appear** 79:15 85:15
  86:7 87:21 119:9,13
  119:16 123:4,5,7,10
  123:13 134:16
  137:1,3 150:17
**appeared** 69:17
**appears** 100:7 130:25
  131:5
**applied** 16:22 74:1
  108:24
**apply** 16:12,20,21
  158:21
**approach** 29:16
**approximate** 27:23
  29:22 99:23
**approximately** 18:14
  78:22 91:23
**area** 38:24 42:6,8
  47:9 55:8 71:24
  77:12 82:23,25 85:1
  85:4,23,25 86:13,16
  86:17 87:2,6,22,24
  88:2,5,11,14 89:6
  90:4 93:15 96:1
  98:20 99:2,4,10
  101:13 102:18
  104:8,14 109:3,9
  113:16 131:21,23
  132:7,8,13 134:24
  136:23 137:8
  138:25 140:16
  141:23 142:4,14,19
  143:3 145:4,18
  150:8 152:11
  153:13
**areas** 148:24
**argue** 116:18 117:6

**Argumentative**
  110:15
**arrival** 93:24
**arrive** 9:25 44:3
  91:18,20,22
**arrived** 42:25 43:5,19
  43:20,23,25 44:7,13
  92:10
**aside** 12:18
**asked** 9:22 10:18
  16:17,19 25:2,2
  38:14 40:19 51:11
  51:12 55:22 56:18
  58:15 59:17 62:17
  65:11 66:24 89:9
  92:19,20 116:15
  141:12 144:20
  146:3,19,21 147:23
  151:25 154:5
**asking** 9:24 51:13
  64:13 117:9 149:21
  153:6
**assess** 59:4
**assignment** 21:1
**assist** 54:15 55:5 75:1
**assume** 9:6 75:19
  121:17
**assuming** 96:23
  147:10
**attend** 13:11,13 20:3
**attended** 12:24 13:3
  13:16,20
**attention** 27:17,18
  32:9,15,23 33:3
  72:11
**attorney** 2:2,7 4:25
  5:4,18,20,22 6:17
  82:22 87:15 95:19
  114:6,15
**August** 6:22 7:3 10:7
  10:10 11:16,18 14:5
  18:16 26:15,23 33:9
  33:18 34:11,13,16
  34:18,21,24 35:12
  35:16 39:23 40:23
  41:10,14 42:17
  46:19 48:5,15,24

160

49:11,15,18 50:25
51:4 52:3 53:21
54:4,8 55:20 59:22
62:4 63:11,19,24
64:19 66:22 67:16
75:13 76:3,24 77:3
77:6 78:19 86:17
87:3,25 89:2,19
90:16,19 108:5
110:3,6,9 111:17
150:16,19 151:4,7
**authority** 60:14
**available** 21:21 22:4
28:25 59:13 62:16
124:24
**Avenue** 2:9
**average** 129:24
**aware** 29:4 30:9
31:18 48:1 67:20
80:18 109:2,16,17
123:18 129:15
139:14 143:21
144:19,23 145:1,3,6
146:11,15,20
**awfully** 59:7
**A-l-e-r-u-s** 14:15
**a.m** 1:16 42:15,21
43:1,4,5,9,9 74:17
94:13

**B**

**back** 8:1 34:6,19
42:16 44:14,23 46:1
51:15 52:10 53:7,23
54:1 56:24 57:19
58:4,21,22 63:6
66:5 69:15 73:6,10
73:15 74:20 91:15
91:16 93:20 94:9
104:12 107:4,18,22
108:2 119:3,22
120:12 121:14
124:12 125:4,20
127:10 136:12
144:4 152:18,21,24
153:20,22,23
154:13 155:21

**backed** 104:8
**background** 12:2
**backside** 38:12
**bad** 128:15
**ballast** 40:8,9,10,11
40:15 56:2 85:7,18
85:19,21 88:5 89:7
132:5 139:24 140:4
148:24
**Bank** 2:4 14:14
**BAPP** 25:4 26:6,11
26:14,24 28:2,10,12
28:14,17 29:3,6,10
29:23 31:6
**bar** 15:3
**base** 17:3
**based** 19:6,6 21:24
23:21 47:16 67:12
79:15 84:16 151:1
**basic** 6:19 12:1
**basically** 14:7 34:16
37:23 82:4 103:13
104:7 141:16 143:3
147:5 148:1
**basis** 23:6,14 25:12
83:1 88:5 118:18
**began** 77:19
**begins** 100:25
**behavior** 27:12
**behavioral** 25:5
**behaviors** 25:13
27:10
**believe** 15:16 17:8
28:11 30:5 31:14
34:12 42:21 44:10
45:5 46:17,25 50:1
54:22 56:19 59:19
62:10 66:16 67:25
69:1 70:22 74:8,9
82:13 83:19,23
85:11 86:19 89:23
94:6 100:22 101:2,5
101:11 102:6
106:10 108:21
**bell** 5:15 130:3
**belong** 19:2,7
**belongs** 20:14 83:19

**best** 5:23 9:10,10
14:24 20:20 25:1,23
26:12 52:5 108:6,18
110:24
**better** 70:8 131:4
132:12,17 134:20
**beyond** 78:25 90:1
**bid** 21:24 22:3
**big** 126:5 152:16
**birth** 12:3
**Bismarck** 1:23 12:10
12:14 13:14 118:7
**bit** 16:20
**BLE** 25:25 26:19
**BLET** 19:3,17,19
20:1,5 25:18 26:19
88:20
**blind** 40:4
**blocking** 103:15
**Blown** 3:14
**blue** 95:23 96:1
**BNSF** 1:7 2:6 3:14
5:4,20 14:3,9 16:12
16:16,25 18:15
20:22 27:15 31:4,18
31:24 33:4 39:8
48:15 54:6 59:24
67:9 75:12,12 82:22
87:15 108:9 111:17
112:10 114:6,16
119:17 126:6
132:19 142:4
**board** 20:25 21:2,5,7
21:9,9,11,12 34:3
**body** 120:4,10
**bonus** 16:17
**book** 22:22
**Booke** 19:20 26:22
88:23
**booted** 44:14
**boots** 32:2 38:12
**born** 12:7
**bound** 8:21
**Bowes** 15:13
**boxcar** 129:24
**brace** 90:16
**brakeman** 33:16 34:9

35:21 36:7,22 41:12
63:3,5 64:3 68:17
68:20 76:20 122:6
122:14,15 131:14
143:13,15
**brakeman/conduct...**
143:11
**brakes** 73:24 76:15
76:19,22 127:20
**branch** 89:21 94:8,8
94:10 100:22,25
101:5,7,9,9,11,22
109:24 110:1
**break** 9:13 30:17
68:10 77:20 111:22
112:2
**Brian** 31:9
**briefed** 25:13
**briefing** 24:24,25
**briefings** 23:10
**briefly** 14:6 119:22
**bring** 27:16 32:9
56:23 57:19 58:4
63:6 78:15 146:16
**bringing** 61:6 64:18
**brisk** 69:14 81:6
**brittle** 138:18
**Broadway** 1:22
**brought** 32:14,23
33:3 46:12 49:23
50:1 53:6 54:16,17
65:8 66:2 70:15,16
91:1 149:22
**buff** 45:11
**building** 2:4 83:18
96:23 136:6,7
**bulletins** 23:18
**buried** 61:18
**business** 13:10 14:2
45:13
**businesses** 15:20 16:4
**B-A-P-P** 25:4 29:7
**B-i-s-m-a-r-c-k** 12:14
**B-o-o-k-e** 19:20
**B-o-w-e-s** 15:15

**C**

**C** 2:1
**cab** 6:25 7:4 15:2
   68:16 71:16 72:18
   73:11 122:6,13
**caboose** 45:24 54:3,7
   57:7 61:24 62:15
   120:14 124:24
   125:2,3,21 126:1,20
   126:22 127:3 149:2
   152:1,8,13,17,23
   153:1,12,19 155:17
   155:18,19,24 156:3
**call** 6:10,10 16:15
   23:11 37:11 44:9,14
   44:17 45:18 46:9
   49:24 50:5 51:4
   53:2 58:14,15 92:21
   115:7,17 118:5,11
   118:12 119:20
   149:16
**called** 4:1 6:11 10:18
   22:15 28:11,15 34:2
   34:5 37:5,7 42:19
   43:6 44:23 46:1
   52:7,10 58:22 60:1
   68:12 74:7 91:16
   119:16 127:10
**caller** 60:1
**Calls** 142:9 151:8
**capacity** 21:14 111:6
   111:8
**Capitol** 16:5
**captioned** 115:24
**car** 59:2 78:22 86:20
   86:21 87:2,6 89:1
   103:4,4 129:19,21
   143:5 154:19,19
**care** 59:9 115:7
**career** 24:3 27:23
   32:12 38:24
**Cargill** 45:5 46:6
**cars** 39:15,16 53:7,10
   53:10,11,19,23 54:1
   56:21,23 60:5,10,10
   60:13 61:5,18 63:6
   63:9 64:18 65:8,9
   65:11,12,22,23,24

66:2 73:6,17,18,24
   74:2 76:21 77:5
   78:9,10 79:1,9,12
   81:10,11,14,16,21
   82:5 83:5 84:20
   85:8,14 90:10 98:3
   98:5 101:22 102:1,4
   102:11,12,18,24
   103:1,6,13,22,25
   104:7 106:25 107:4
   107:9,12,15,17,20
   107:23,24 108:2,24
   125:2,4,12,17 126:6
   126:11,16 127:19
   127:23 128:8,14,18
   130:13 141:7,11,17
   141:17,21,25
   142:16,25 143:5
   147:11 152:5,16,17
   152:22,22 153:9,9
   153:13,14,16,18,19
   153:20,22 154:6,14
   154:18,22,24
   155:13,21 156:4,11
**Cary** 1:4 2:12 33:15
   74:14
**case** 5:18 61:19 63:5
   119:20 133:15
   149:11 156:17
**catch** 41:4
**caused** 40:1 41:18
   146:10
**CBT** 23:20,24
**cellphone** 74:8
**certain** 32:19 61:5
   72:25 80:21 94:22
   114:15 138:6
**Certainly** 146:24
**certainty** 50:3
**CERTIFICATE**
   158:1
**CERTIFICATION**
   158:20
**certified** 18:22
**certify** 158:5,11
**CERTIFYING**
   158:23

**chair** 31:1
**chairman** 19:19,21
   88:24,25
**challenges** 17:17
**chance** 74:23 114:25
   124:9
**Change** 17:16
**changes** 23:12,16
   24:5,25 109:2
**characterization**
   146:1
**charge** 90:3
**check** 127:9
**children** 12:20
**chose** 102:25
**circle** 104:14,16
**circumstances** 33:24
   80:13
**City** 51:22
**Civil** 1:6
**claim** 53:9,15 119:13
**claims** 5:1 6:4 7:10
   66:25 67:1 112:10
**clarification** 35:2
   37:9 70:18 102:10
   117:9,13 118:6
**clarifications** 23:12
**clarify** 9:3 34:1
**class** 24:16 28:22
   30:1
**classes** 13:16 23:7
**classifying** 40:15
**classroom** 23:8,25
   24:6
**Clay** 158:4
**clear** 8:16 20:16
   63:24 103:7 151:25
   153:21,24
**clearance** 133:6
   135:10 142:25
   149:8
**clearly** 148:23 152:25
**clears** 154:2
**climbed** 69:20
**climbing** 69:24
**close** 121:18 126:4
   129:18 142:25

148:17 149:8
**closely** 137:6,17
**closest** 69:3 134:5
**clothing** 72:14
**Club** 15:3
**coaching** 27:11,11
**coal** 41:4
**cochair** 31:1
**college** 13:23
**colleges** 13:3
**come** 23:14 41:6
   47:17,17 51:9,18
   53:12 66:5 83:10
   90:23 91:24 96:3
   98:7,9 101:25 104:3
   110:24 120:12
   141:10 142:17
   153:11
**comes** 34:6
**coming** 91:9
**comment** 89:24 90:2
   90:7 147:23 148:8
**commented** 68:21
   122:15
**commission** 158:25
**committee** 31:2,5
**committees** 30:19
**communicated** 10:3
**communication** 51:8
   93:8
**communications**
   4:14,18 7:6 9:24
   51:24 52:2,13,21,24
   58:8 59:20 60:3
   92:7,9 93:11,23
**company** 1:7 2:6 14:4
   15:4 27:15 54:6
   111:2
**company's** 24:7
**compare** 75:6
**competent** 143:11
**complaining** 124:14
**complaint** 113:25
**complaints** 49:19
   89:20 109:23
   110:12,18 111:9,12
   111:16

**completed** 68:15
**completely** 8:7,9
**completing** 18:21
**comply** 147:11
**Compound** 89:9
 119:14
**computer** 23:21
 44:14,20,21 45:3
 52:8
**concerned** 72:12
**concerning** 121:8
**concerns** 55:24 146:5
**concluded** 157:4
**conclusion** 151:9
**condition** 32:14
 38:23 49:23
**conditions** 32:23 33:3
 85:18 114:1 128:15
 132:17 150:11,12
 150:16,18 151:3,7
**conductor** 16:22
 18:15,22 19:7 20:22
 21:18 22:2,11,13,17
 22:19 23:1,3,4 26:3
 27:2 33:15 34:8
 35:22 36:14 38:13
 41:1,8,9 63:3 64:3
 65:4,7 75:15,17
 76:21 143:13,16
 145:7
**conference** 54:12
**confused** 136:9
**connection** 39:20
 55:19 67:16 111:17
**conscientious** 143:15
 143:19
**consider** 113:24
**considered** 131:20
 147:14
**consistent** 7:2 24:2,4
**constitute** 131:15
 139:13
**Construction** 15:9
**contact** 28:1
**contacted** 10:20,22
 73:7 74:5
**contain** 158:9

**context** 110:20
 143:24
**continue** 15:12,23
 100:7 118:2,25
**continues** 69:5,20
 71:15
**contractor** 51:20
**contrast** 150:21
**control** 88:13,16,19
 158:22
**controlling** 125:7
**conversation** 6:23
 10:12 11:7 44:25
 46:7,12,24 47:6,10
 47:25 48:10 52:12
 53:12 56:12 74:12
 120:13,16
**conversations** 7:15
 57:1 92:6,9 94:2
 111:8
**coordinator** 16:8
**copy** 6:20,24 64:7,12
 66:17 95:5,5,8,9,13
 95:16,20 112:25
 114:9,24
**Cordell** 19:20 26:22
 88:23
**Corey** 31:10
**corner** 97:2
**Corporate** 15:24
**corporation** 1:7 16:5
**correct** 4:23 7:5,14
 10:1,2 17:11,12
 18:3 19:18 20:2
 21:6 22:18 23:19,25
 24:1 26:25 35:12
 36:6 44:5,6 45:16
 47:7,8,11,14,15
 49:21 52:20 53:19
 53:20 55:13,18
 57:13,17 61:7,14
 64:16,17 66:17 67:5
 68:13,18 70:19
 71:10 75:21 76:7
 77:17,18,21,22 78:3
 82:3 84:20,21,23
 88:8,9 90:10 91:6,7

93:21,22 95:23
 97:25 98:1,16 99:19
 100:5,6,9,12 103:1
 103:16 104:10,11
 104:21,24 105:2
 106:2,3,7 107:12,16
 116:2 120:14 121:4
 124:6 125:11,14
 126:1 127:15,16,20
 130:14,15 132:5
 133:12,17 134:10
 134:11,25 135:14
 135:23 136:1,12,20
 136:20 141:7,23
 142:2,6,19 143:3
 146:25 147:1,4,7,8
 147:12,16,19,24
 148:25 152:5,9,10
 153:3 155:13,14,17
 155:21,22 156:5
**correctly** 60:9 69:7
 71:17 73:8 105:9
 106:22
**counsel** 2:6,11 30:14
 35:1 37:11 64:7,9
 83:7,17 84:9 95:1
 95:21 96:4,11 99:2
 99:16 105:14
 116:14 128:21
 158:12
**Counselor** 117:19
 122:18
**count** 114:7
**County** 158:4
**couple** 5:7,23 16:4
 17:24 81:13 88:23
 107:17,20 109:5
 127:19 128:19
 142:18 155:19
**coupled** 107:9,11
 125:12,16
**coupling** 127:19
 143:5
**course** 13:18 45:13
 91:13 118:16
 120:21 144:12
**courses** 23:20

**court** 1:1 8:2,5,14
 31:12 64:4 95:11,14
 95:17 112:16,19,23
 115:5,9 118:5 129:5
 158:23
**courtesy** 8:9
**craft** 26:3
**crew** 10:6 33:13 35:6
 35:11,14 49:4,5
 54:1 55:5 60:1
 62:14 89:8,16,18
 121:10 132:20
 142:15 146:7
**crews** 30:15 110:22
 126:6 142:4
**criticisms** 110:12,18
 111:9,12,16
**critiques** 111:9
**cross** 3:3 98:10,10
 99:14,23 112:6
 146:24 147:6,12
**crossed** 100:1
**crossing** 103:15,21
 104:3
**crossings** 100:8,12,15
 100:17
**crossover** 98:17
 99:19,21
**crossovers** 98:8
**crying** 71:8,11
**CS3018972** 1:21
**currently** 12:9 19:2
 20:24
**cut** 104:1 107:18
 125:18 137:3,15
 138:25 139:4
 152:22
**C-o-r-d-e-l-l** 19:20
**C.B** 64:3

---

**D**

**D** 1:12
**daily** 23:14
**Dakota** 1:1 12:10,14
 13:4 16:18 17:1,3,6
 18:1 42:23,24
**date** 5:8 12:3 14:3

18:8,10 26:20 27:14
49:2,17 93:19
124:25
**dated** 150:16
**dates** 95:3
**day** 6:6 7:11,16 10:5
24:16 25:12,12
26:16 27:2,3,4 29:1
33:11,21 34:4,13,17
36:7,15,17,17 41:2
41:3,5 42:18 43:15
44:13,22 45:5 46:4
46:11 51:25 52:25
53:11 54:2 55:13
71:24 75:15,25
76:12 79:16 86:12
87:6 90:20 93:9,12
93:25 94:3,6,8
100:2 108:25
110:10 123:20
126:21 144:5 145:1
145:8,9 146:16
150:13 151:3 152:1
158:14
**days** 5:12 6:8 17:14
17:21 26:7 34:4
150:18
**deadhead** 42:20,22
42:24 43:7,8,11
55:14
**deadheaded** 55:12
**decertified** 145:6,12
145:13
**decided** 16:20 154:17
155:6
**decision** 127:14
144:6
**declined** 53:15
**defective** 40:17
**defects** 77:2,5
**Defendant** 1:8 2:6
4:2
**Defendant's** 64:10
66:14 74:18 94:14
108:15 116:3
**deliberate** 70:17,19
**depending** 34:5

53:24 54:1 80:21
89:12
**depicted** 130:17
134:21 135:5 136:8
150:17
**deposition** 3:16 4:9
4:12,15 6:14 7:7
9:17,25 10:19 37:10
64:5,16 66:13 77:19
115:25 116:3,10
157:4
**depositions** 84:11
**depot** 56:7
**derailing** 144:25
**derailment** 145:18
146:10
**describe** 27:5 38:8
40:13 69:10 70:8
76:9 102:21 103:5
139:9,12
**described** 80:25
82:18 97:17 108:4
**describing** 124:10
**description** 3:9
102:25 124:21
**descriptive** 40:13
81:4
**designation** 82:9
**Detach** 26:1
**detached** 25:18,25
26:1,19
**detail** 69:10
**determine** 40:4
**determined** 155:1,3
**Dickinson** 35:5,7
**die** 138:17
**different** 16:14 17:24
19:8 20:9 22:6
23:11,13 24:18 26:4
27:4 37:7 56:2
81:13 88:16 151:3
**difficult** 8:2 95:7
138:19
**difficulty** 119:25
**Dilworth** 92:5 111:7
**direct** 3:3 4:4 121:3
158:22

**directed** 32:17
114:14 116:7
119:12 121:3
**direction** 24:7 100:20
158:22
**directly** 158:13
**disagree** 118:24,24
128:9
**disappeared** 51:14
**disappointed** 92:24
**discipline** 116:11
119:8 145:16
**discomfort** 123:7,10
**discovery** 11:8 63:16
**discuss** 6:22 44:16
46:2 54:14 119:20
**discussed** 6:12,24
7:10 10:17 32:19
46:8 47:13 53:1,5
54:11 56:11 58:6,25
92:15
**discussing** 92:16
**discussion** 119:17
127:12 145:11
**discussions** 4:14,17
4:19,19 111:6
**dispatcher** 16:15
**displayed** 48:11
**distance** 59:8 60:20
61:2 80:4 86:9,10
130:12
**DISTRICT** 1:1,1
**division** 1:2 15:9 19:6
**document** 66:19
108:19
**documentation** 11:15
**documents** 4:11
**dog** 41:4
**doing** 8:15 16:14,17
21:4 25:11 26:5
45:14 57:8,22 80:22
88:15 95:7 126:10
152:25 153:6
**doubt** 149:11
**Doyle's** 15:2
**dozen** 35:20
**dramatic** 23:16

**draw** 96:13,13 101:7
**drawn** 97:8,22 99:12
102:20 104:15
**drive** 8:5 12:13 51:13
56:1,1,8
**driven** 49:7,8,9,11
51:12
**drives** 49:5
**dropped** 56:10 98:4
102:1,5,24
**drove** 15:2 43:13
49:15 55:14
**DSC00158** 3:12
**DSC00162** 3:12
**DSC00163** 3:13
**DSC00164** 3:13
**duly** 4:2
**duplicate** 129:3
**Dustin** 109:18
**duties** 120:1
**duty** 8:21 42:21 43:8
**dying** 138:14

**E**

**E** 1:12 2:1,1 84:5
**earlier** 31:22 36:13
55:12 61:12 80:25
82:18 94:17 115:2
135:13 150:18
151:2 155:11
**early** 11:12 54:15
**easily** 9:15
**east** 1:22 37:25 83:24
84:5,17 85:1 89:3
136:9 147:9
**easy** 8:4 21:22
**effect** 30:10 102:25
104:17 126:12
**efficiency** 126:13
**efficient** 144:2
**effort** 71:6
**either** 6:18 8:14 13:6
19:25 22:25 35:4
36:12 37:21 44:11
49:14 54:20 56:6,8
57:10 59:11 62:15
72:16 76:20 77:6

78:14 82:17 89:20
108:19 152:16
153:8
**elected** 132:19
**elevate** 148:8
**Elks** 15:3
**eluded** 94:16
**embankment** 41:25
**embarrassing** 38:17
**emotion** 71:12
**employee** 3:15 27:15
147:9
**employees** 28:16,17
29:10 31:25 32:8
88:18,20 109:24
142:5 146:24
**employee's** 27:16
**employment** 14:7
**empties** 66:6,8,8,9
82:2 141:10 155:20
155:20
**empty** 41:3 107:15,17
153:18,19
**ended** 154:13
**engine** 7:1 18:1 19:13
63:8 66:1 72:23
73:25 101:20 122:6
123:4,24 124:1
127:18,18 141:20
141:22,24 142:1,1
142:16,23
**engineer** 10:6 18:2,4
18:7,13 20:22 21:3
21:11,14,21 22:9,19
23:1,3,4 26:3 28:9
31:17 33:14 34:7
35:22 36:16 63:5,7
68:16,20 75:14,15
75:16,20 76:17,19
122:13,15 147:21
156:14,17
**engineers** 22:1,2
**engineer's** 21:8 22:3
69:1,6,21 122:17
147:21
**engines** 73:25 104:21
106:2,4,18

**enhance** 31:20
**enhanced** 23:9 24:12
**enlargement** 94:16
**enter** 60:14
**entered** 71:16
**entire** 60:18 125:22
**envelope** 115:23
**environment** 25:10
**equate** 81:7
**equipment** 15:4
31:25 58:13 126:23
127:2 142:13
**errors** 75:22
**estimate** 5:24 9:10
80:3,17 86:5
**etcetera** 136:10
**evening** 13:16
**event** 38:9,20 64:25
67:16
**eventful** 36:3 39:20
**events** 11:16 33:9
124:21
**eventually** 16:23
**everybody** 26:18
144:11
**everyday** 147:2
**evidence** 72:14
115:13
**evident** 100:18
**Ex** 3:9,10,11,11,12,12
3:13,13,14,14,15,16
3:16,17,17,18,18,19
**exact** 5:8 16:2 114:8
146:9 154:25
**exactly** 5:4 13:12,17
14:21 17:21 18:10
19:11 25:5 44:23
53:14
**exam** 3:3,3,4,4,5 96:1
**examination** 4:4
112:6 117:4 144:15
155:10 156:2
**example** 80:23
**excuse** 10:22 124:22
137:23 142:15
**exert** 71:5
**exerting** 71:5

**exhibit** 63:16,17 64:5
64:10,15 65:8,15
66:13,14,16 74:22
76:1,2 77:9,23 78:2
78:8,13 82:15 84:16
84:23 85:4,15 87:11
87:17,21 92:15
94:14,17,18,21 96:9
97:4 98:21 100:14
100:18 108:5,14,15
108:17 112:22,24
115:14,19,21,23
121:24,25 122:19
124:8 130:16 131:4
131:11 133:22
134:2,12 135:6
137:6,15,16,17
140:7,11 143:4
149:19 150:12,22
151:2,24 152:12
**exhibits** 3:9,9 74:18
87:24 115:4,12
129:8 150:15,24
**existed** 150:12,18
151:3,7
**experience** 53:21
56:4 67:13 79:15,23
110:23 131:14
132:16 138:1
144:21 145:24
**expires** 158:25
**explained** 56:19
**explanation** 95:9
**express** 92:23 144:10
**extensive** 29:14
**extent** 61:23 76:4
**extra** 20:25 21:9 34:3
64:12 152:13,25
153:7 155:23
**e-mail** 88:15 138:5
**e-mails** 88:18

_____

**F**

**F** 2:7 3:3,4
**face** 70:23
**facilitator** 28:10,13
28:15

**facility** 42:11 51:12
**fact** 62:22 81:17
120:8 124:23
127:22 138:18
140:15
**facts** 103:18
**failed** 144:23 146:11
**failing** 145:17
**failure** 116:9
**fair** 8:11,12 9:8 19:14
20:8 34:16 77:16
79:20,23 82:6 84:15
89:15 124:20
145:25 148:2,3
156:16
**fairly** 54:15 69:13
72:25 131:23
**faith** 40:5
**fall** 41:18 81:1 90:25
**fallen** 38:17 71:16,19
71:22,25 72:15
123:20
**familiar** 42:11 77:10
80:8 108:9
**far** 30:7 31:19 48:3
86:4 103:21 107:4
128:8 133:9 154:24
**Fargo** 13:1,16 15:3
15:10,11,25
**fast** 80:9
**fault** 123:3
**feel** 94:20
**feet** 85:22 130:1
**fell** 36:8 38:21 41:20
41:22,24 71:25 72:3
72:5 84:17 135:13
135:19 136:10
**felt** 89:13
**fifty** 158:8
**figure** 122:25
**fill** 32:6,8 39:4
121:16
**finance** 15:8
**Financial** 14:15
**find** 96:12,14
**finding** 97:15
**fine** 75:10 83:13

95:11 96:20
**fines** 40:12
**finger** 149:25
**Fink** 1:14 3:2 4:1,7
5:17,20 29:7 30:12
37:4 47:4 64:2
75:14 84:12 94:16
95:25 96:24 115:25
116:5 157:2
**Fink's** 3:11,16 66:13
**Firm** 2:3,8
**first** 2:4 4:2,23 14:13
43:24 50:14 60:6
65:22,23,24 72:20
114:19 116:14
119:23 127:17
152:16
**five** 34:4 109:3
**fixed** 47:21
**flag** 144:24
**flat** 80:24 131:23
132:4 140:13
**flatbeds** 127:1
**focus** 33:7 42:17
**follow** 92:21
**followed** 32:22 33:5
120:24
**following** 23:24
**follows** 4:3
**followup** 92:21,22
144:17
**foot** 70:2,3,5,13,13,13
70:13,14,15,16
85:20,23 139:18
**foregoing** 158:8,20
**foreign** 8:4
**forgetting** 16:7
**forgot** 4:25
**form** 32:7,13 39:4,5
78:16 79:24 107:13
110:15 113:20
114:2 116:12
123:15 124:3,15
125:15 126:2,8,17
127:7,25 128:5,10
128:16 130:7
131:17 132:14,22

133:13 134:7 135:2
137:5,11,20 138:2
138:15 139:2,15
140:2,10 141:13
142:7,9,20 144:8
**forthright** 123:13
**forward** 24:7 104:11
152:18,20,22 155:7
156:12
**foul** 129:16 130:9
**fouling** 103:8,14
130:11,11 133:10
146:21 147:14
**foundation** 20:12
50:7 75:3 80:20
86:15 95:2 106:20
107:7 110:14
113:20 114:2
116:12 118:22
123:16 124:16
126:2,8,18 128:6,11
130:2,7 131:17
132:14,22 133:13
134:7 135:2 137:5
137:11,20 138:3,15
139:2,15 140:2,11
141:13 142:9,20
144:9 146:13
147:17 149:13
156:6
**four** 14:20 18:14
106:15,17
**free** 94:20
**Freidig** 3:16 6:3 7:10
10:22,22 67:2 82:22
87:16 92:3,10 93:9
93:16 111:12
114:23 115:18
119:10,11,12,16
**frequency** 22:23
33:20 40:25
**fresh** 121:17
**Friday** 46:15,23 47:1
47:13,18,20,23,24
48:18
**front** 58:13 81:18
94:16 142:23

149:19 150:24
151:24
**full** 4:5
**fully** 108:4
**furnished** 95:4
**further** 13:21 42:5
100:19 103:15
144:14 148:9
158:11
**F-i-n-k** 4:8
**F-r-i-e-d-i-g** 67:4

---

## G

**gage** 103:21
**Galesburg** 11:1,1
17:9,11 22:12
**gate** 120:1
**GCOR** 129:15
**general** 23:13,15,18
32:8 44:22 53:6,18
65:21 72:12 73:25
78:8 80:8,10 82:25
85:23 87:21 88:5
89:24 91:2 96:1
97:14,20 98:20 99:4
99:10 101:13
102:15,17 103:3
104:14 109:9
110:22 132:24
133:1 143:23
145:11,11
**generally** 33:24
55:21 58:10 83:22
138:14
**gentleman** 92:4,7
**gentlemen** 91:25
**George** 36:16 39:11
**George's** 36:18
**getting** 88:22 96:16
98:25 102:5 136:8
142:5,13
**give** 29:22 64:13 81:4
147:22
**given** 7:12 11:8 27:14
66:21 67:15 95:22
114:9
**giving** 147:20

**go** 7:24 18:15 29:21
40:20 42:14,16
56:17,23 62:19 64:5
66:5 68:9 70:13
71:1,24 74:16,20
80:1,13 91:15 92:19
93:15 94:11,15,18
97:12 102:17
105:14 108:7
110:16 113:4,11
115:17 116:19
118:2 119:6,14,22
120:23 121:14
126:9 127:6 128:11
129:5
**goes** 24:16
**going** 9:6 11:12 24:6
24:6,17 25:2 30:1
33:7 40:4 42:5 51:9
54:24 58:11 59:2,3
59:4 60:5 61:19
62:17 64:4 70:19
78:9 82:15 83:22
84:4 87:10 91:12
95:7 96:12,15 98:11
98:14 99:1,2 100:14
100:24 102:9
105:13,20 106:18
112:13 115:9
116:22,23 117:6
121:13 127:8 132:3
141:20 142:17
144:24 152:7 153:8
153:9,23 155:7
**good** 11:5 24:8 44:22
103:21 112:7,8
118:5 144:5
**Goodson** 16:15
**Google** 77:12,20
**gotten** 43:6 53:15
**grade** 139:9,25 140:6
**graduate** 12:22 13:6
**graduated** 12:25 13:1
14:14
**graduating** 13:2
**graduation** 14:8
**grand** 21:12

166

**ground** 7:24 8:19
9:23 20:17 41:22
53:25 63:4,5 73:14
76:20 80:24
**groundwork** 118:14
**group** 24:24,24 25:6
25:7,15 28:15,18
**grow** 138:8
**grown** 138:13,24
**growth** 138:9
**GTBs** 23:16,18
**guess** 6:17 14:21
23:11,15,17 24:20
24:24 25:2,23 26:12
28:5 38:19 40:14
46:7,14 51:15 53:10
54:19 60:1,21,24
64:25 74:8 76:11
79:3,3 86:1 90:5
91:11 103:19 105:5
106:9 109:25
**guessed** 46:23
**guessing** 53:16
**guidelines** 6:15 27:4
27:5
**guy** 5:21 50:23
**G-a-l-e-s-b-u-r-g**
17:9

**H**

**half** 13:19 35:20 43:7
60:22
**hammerhead** 44:20
45:2,7 63:15 64:20
64:21,24 65:1,16
**hand** 83:18 97:1
106:23,24 108:16
113:4 122:24
147:20 158:14
**handbrakes** 74:1
108:25
**handed** 66:16 122:18
122:25
**handful** 54:10 114:7
**handle** 25:1 66:9
110:22 152:17
**handled** 32:25

**hands** 85:7
**handwritten** 66:17
67:10,15,24 68:5,9
74:6 92:17
**hanging** 129:20
**happen** 26:5
**happened** 7:1 38:9
39:5 44:19 72:21
78:24 79:8,13,14
82:24 123:13
**Harve** 17:7,18 22:16
**hazard** 32:6 131:16
131:20 139:5,7,14
141:2
**hazards** 56:4
**head** 16:10 31:21
64:5 68:17 82:11
102:11,17 108:1
122:14 156:15,18
**headed** 73:5 108:2
**hear** 50:10 111:23
151:23
**heard** 37:7 47:16
48:10 63:10 109:21
**hearing** 29:6
**Hebron** 41:5
**held** 18:25 19:25
20:21 25:3
**help** 25:14 76:2 84:11
**helping** 25:10 27:9
**helps** 29:25
**high** 12:22,24 13:1,2
14:8,14,18
**higher** 85:20 139:18
**hiking** 80:23,24
**hill** 80:23
**hind** 102:11
**hire** 16:25
**hired** 18:16 19:9
**hit** 129:19
**hold** 7:21 17:25
21:23 40:4 58:23
66:5 105:22
**holding** 22:2 79:1
**home** 29:15
**honest** 5:25 20:21
**hopping** 70:6

**hot** 46:4 62:23
**Hotel** 1:22
**hour** 42:24 43:3,7,9
44:8,24 46:2 53:2
54:13 56:13 57:2
80:15 81:3,8 91:19
91:20 92:25
**hours** 42:18 43:8
91:23 92:25
**hundred** 17:14 50:2
158:8
**hurry** 79:16
**hurt** 38:15 124:7
**hypothetical** 142:21
149:5
**H-a-r-v-e** 17:7

**I**

**idea** 31:3 41:15 54:15
55:10 57:22 90:11
90:17 150:4
**identification** 64:10
66:14 74:19 94:14
108:15 112:24
129:9
**identified** 106:1
140:8
**identify** 37:15 77:13
94:22 97:13 98:2
100:25
**Ihringer** 31:11
**Illinois** 11:1 12:8
17:9
**Illness** 3:15
**illnesses** 124:10
**imagine** 55:9,23 56:9
68:6 76:12
**immediately** 13:22
44:8
**impossible** 105:14
**improper** 118:21
131:18 139:3 140:3
149:5
**inaccuracies** 75:23
**inaudible** 112:21
122:3 134:18
135:25

**incident** 3:11 6:22
7:1,3,11 10:5,10
39:4,23 41:17 42:2
52:25 59:21 62:9
66:22 73:2 78:20,23
79:5,8,13,14 81:12
82:24 83:4,15 84:25
85:15 86:13 90:20
90:25 91:3 93:20
110:9 111:18
119:24 120:5 123:9
145:2,8,10 146:17
148:13 150:13
151:4 152:1 155:23
**incidents** 28:16 109:7
**include** 32:2
**including** 63:7 78:8
98:4
**Incomplete** 142:21
**INDEX** 3:1
**indicate** 50:25 51:17
59:10 62:14 65:8
71:19 91:8 101:8
104:16 120:3,7
122:5 123:19
156:25
**indicated** 7:8 10:24
13:24 17:22 46:15
48:3 55:12 56:14
64:2 74:6 93:13
94:4 106:5 113:15
123:21 133:16
149:25 152:4
**indicates** 73:5
**indicating** 46:10
**indication** 51:9
**indifferent** 24:9
**indirectly** 158:13
**individual** 93:17
149:23
**individuals** 33:4
93:16
**industries** 45:4
**industry** 134:10
**information** 12:2
14:11 26:21 46:22
47:16 48:2 51:3

67:20 71:22 81:4
138:4
**informed** 89:8 119:7
119:7
**initial** 22:5 46:7
149:7
**initially** 52:7 120:12
**initiative** 126:10
154:6,9
**injured** 36:9,23
**injuries** 126:15
**injury** 39:5 109:8
110:5 124:11
**Injury/Occupational**
3:15
**inspected** 150:7
**inspection** 136:16
**inspectors** 88:10
**instance** 76:5 80:16
123:20
**institutions** 13:7
**instructed** 120:25
**instructions** 120:24
**insurance** 16:3,3
**Integra** 15:18
**intended** 117:24
**interaction** 110:8
111:3
**interested** 158:12
**interference** 138:23
**interfering** 116:25
**internet** 15:19
**interrogatories** 11:10
**interrupt** 84:8
117:24
**interrupted** 29:20
**interview** 4:24,25
10:23 82:21 87:15
119:18
**investigation** 146:17
**involved** 26:11,14
29:23 110:21
144:11
**irrelevant** 116:24
117:8
**issue** 47:2,4,22
132:24

**issues** 32:19 46:18
76:24 85:3 89:14,17
126:15 144:7
**Ithica** 12:13
**it'd** 18:11 37:25
54:19 140:12
**I-r-i-n-g-e-e-r** 31:11
**I-t-h-i-c-a** 12:13

_____

**J**

**J** 2:2 3:3,4,5
**James** 35:7 98:13,14
98:15
**Jamestown** 11:21,24
33:17 35:2,5,17
36:1 38:1,2,6,24
39:21 42:20,23 43:1
43:12,22 45:14
50:19 51:23 55:7,8
55:9,13 56:7 60:15
61:2,7,13,22,25
63:1,18 66:2 67:8
73:6,10 74:2 76:6
76:10 78:2 79:18
80:4 91:3,9 92:10
93:24 94:6,22 96:2
96:7 97:9 98:3,7,12
108:3 109:8 112:11
145:4,18 152:7
**Jan** 158:25
**Jergen's** 110:5
**JESSE** 1:24 158:3,17
**job** 1:21 16:12,18,19
16:21 20:24 24:24
26:3 33:11,18,25
34:3,10,13,17,20
35:7,8 36:14 41:11
43:4,14 46:6 53:7
54:2,4,8,10 55:4
57:8 60:2 63:18
64:20,24 65:1
**jobs** 21:21 45:12
**join** 28:21
**joint** 141:22 142:18
142:18,22 152:18
**June** 18:9,11 144:25
146:11,12

**junkyard** 104:4
**Jurgens** 1:4 2:12 7:15
9:24 20:9 33:15
34:23 41:10,13,18
42:3 44:2 46:25
47:9,13,17 48:14
50:1,4,12,21 52:25
56:6,25 57:10 60:15
61:6 62:6,8,25 64:3
68:4,24 71:15 72:21
73:10,15 74:14
78:23 79:11,18 80:4
80:25 81:19 83:15
84:17 90:15 91:10
91:12 100:3,11
101:17 105:1
112:10 119:25
120:3,7 122:6 123:3
123:10,12,24 125:1
125:2 127:23 128:7
143:10 144:20
148:12 151:12,17

_____

**K**

**Kazurik** 31:9
**keep** 23:14 24:9
64:13 112:14
**kind** 6:4,14,19,21
27:15 40:11 86:7
124:20 131:1
143:23
**kinds** 37:7
**knee** 71:16 72:9,10
72:11 90:15,21
124:5,7,18
**knees** 72:10 90:19
120:9 124:12
**knew** 16:17
**knocked** 127:20
**know** 5:8,22 6:5,16
19:5 20:8,13,14,17
20:18 24:5 25:4,18
26:4,20,21 27:4,10
28:5 29:14,24 31:1
31:7,9,13,14 32:5
33:2 36:20 37:5
39:1,11,13,13 40:11

41:9,13,17,20,22,24
42:2,7,18 43:3
44:12 47:23,24
48:11,13,14,16,17
48:20 49:8,16 50:4
50:8,12,16,18 54:6
54:9 55:2,7,21,25
56:2,3,8,10,20
57:22 60:20 61:2,17
61:18,22 62:2,3,8
67:23 68:4,6,25
69:13,14 72:2,5,7
72:12 73:22,23 74:1
75:4,5 77:23 78:22
78:25 79:5,8,11,14
80:22 81:10,17,20
81:24 82:8,10,23
83:4,14 84:16 86:1
86:6 88:10,13,22
89:3 90:15,18 92:1
92:2,3,3,5 95:2,3
103:12,19,20 105:3
106:9,13,19,21
107:4 109:7,18,21
109:25 110:1
111:14 113:11
114:8,11 115:8
117:5,25 118:15
124:19,20 128:17
129:23 130:1
133:25 141:16,19
143:22 145:5 146:9
148:12,15,17,20
149:6,8,16 150:5,7
150:11 151:12,14
151:17 154:11,15
154:20,25,25 155:3
155:5
**knowing** 149:10
**knowledge** 29:2
30:20 65:13 72:2,20
81:15 108:6 114:13
128:11
**known** 23:20 47:2,4,5
**Kyle** 36:14 38:13

_____

**L**

**L** 1:24 158:17
**lace** 32:2
**landed** 38:12 72:7
**large** 40:12 77:20,23
  78:2,7
**lastly** 87:20
**late** 25:22
**law** 2:2,3,7,8 12:20
**lay** 118:22
**layoff** 34:7
**lead** 100:4 103:3
  152:9 153:16
**leading** 85:17 116:13
  133:14 135:3 151:9
**learn** 145:9
**learned** 145:8
**leave** 56:22 57:18
  141:8
**led** 16:12 23:8 70:22
**LEE** 158:3
**left** 15:8,18,24 70:13
  70:13 84:9 136:11
**left-hand** 130:23
**leg** 69:25,25 70:1
**legal** 4:5 151:8
**lengths** 78:22 89:2
**Les** 31:14,16
**letter** 11:8 114:23,24
  115:2
**let's** 14:15 29:16
  42:14,16,17 68:9
  74:16,20 94:11,15
  100:7 108:7 118:2
  118:25 119:21
  128:19
**level** 131:23 132:1
  145:19
**Liberty** 16:6
**license** 16:3
**lieu** 121:8
**lifting** 71:6
**light** 66:1 72:25
  104:20 106:2,4,18
  127:17,18
**lights** 46:14 48:9,11
**limitation** 154:20
**limitations** 154:21

**limited** 154:9,12,16
**limping** 122:7
**line** 49:6 60:14 75:16
  96:14 97:8,22,24
  99:12 101:8,8
  102:20 104:15
  107:19 125:5 152:2
  152:20
**lined** 104:2,11 105:9
  106:6,22 125:6
**lines** 15:19 59:6
**list** 29:14,15
**listed** 75:12,14
**listening** 47:10
**literally** 58:23
**little** 16:20 57:23
  96:8 154:13
**lived** 16:19
**lives** 12:18
**LLC** 16:5
**load** 41:4
**loaded** 44:20 107:12
  107:20,23,24
**loads** 66:3,6,7,9,10
  82:1 125:20 141:8
  153:20 155:17
**local** 19:4,5,19,21
  28:15 35:7 88:24,25
**located** 38:4 97:13
  101:7,9 107:1,2
  134:17
**location** 66:10 80:13
  94:9 96:10 97:14,20
  99:23 102:8,15,24
  103:3,5
**lock** 126:24 127:10
**locked** 126:23
**locks** 58:16
**loco** 75:13
**locomotive** 7:4 10:6
  18:2,4,7 20:22
  21:14,21 22:8,19
  23:1 72:18 73:11
  75:13 76:18 78:19
  90:10 104:24
**locomotives** 77:3
  79:2 103:25 104:7

**logistics** 16:8
**long** 10:13 14:13,17
  17:13 21:4,5 24:4
  26:11 59:7,8,9,17
  80:3 88:21 91:1
  106:10 153:22
  155:1
**longer** 25:19 79:22
**look** 5:8 34:19 39:25
  40:3 45:21,24 46:16
  46:19 48:6 51:9,18
  58:12,20 61:24 62:2
  65:1 70:23,25 71:24
  72:16 74:24 77:25
  94:21 103:22
  108:17 113:4
  119:21 128:19,23
  131:22 137:6,17
  147:5 150:14
**looked** 25:12 44:21
  50:9,12,16 62:3,15
  69:6 70:25 95:20
  122:16
**looking** 16:13,18
  20:20 39:13 87:22
  115:1,14
**looks** 45:8 63:20
  86:10 87:13 96:6
  97:16 133:23
  140:12
**lot** 11:12 79:22 92:18
  108:11
**lotions** 138:6
**lower** 22:1

**M**

**M** 64:2
**Magnum** 16:7
**main** 60:14 98:9,10
  98:16,16,18,18,18
  99:5,5,6,6,7,7,24,24
  100:1,1
**mainline** 40:12 69:4
**maintain** 24:19 94:18
  110:1
**maintained** 133:6
**maintenance** 50:23

  58:13,16 109:24
  126:22,24,25 127:5
  127:9
**majority** 22:10
**making** 11:13 89:20
  113:25
**manager** 15:8,16,22
**Mandan** 10:23 17:1,2
  17:25 18:16 19:4,6
  21:2,8,11 28:16
  29:10 31:2,7 32:7
  42:23 43:11 55:13
  91:15 111:5 119:17
  126:5,11 154:5,7,10
  154:11,16,18,19,20
  154:22
**manner** 123:25 144:2
**manners** 25:15
**map** 77:21 101:10
  107:19
**marathon** 24:23
  32:10
**marathons** 23:10
  24:21 155:6
**Marie** 13:15
**mark** 16:15 64:4
  66:12 99:1 108:13
  115:9
**marked** 64:10 66:14
  74:18,22 94:14,17
  107:19 108:15
  112:13,22,24 129:9
  152:12,21 153:13
**Marquart** 31:14,16
**Marquez** 109:18
**Mary** 13:5,14 14:1
**matter** 7:13 32:18
  94:10 158:13
**McGelky** 28:3,7
**mean** 24:9 25:24 27:1
  30:16 32:7 35:13
  38:16 40:3 45:17
  48:9 56:9 58:1 63:2
  64:23 81:5 86:2
  87:8 93:6 99:21
  133:8 137:9,13
  143:21

**means** 46:4 129:18
158:21
**meant** 125:23
**medical** 91:11,12
**meet** 114:15
**meeting** 5:3
**meetings** 20:3,5
**member** 19:10 31:4
53:25,25
**members** 30:24 31:7
32:20,24 33:13 49:5
89:8,16,18 132:20
**memory** 124:13
**mention** 89:22
**mentioned** 5:9 24:12
24:21 39:22 48:8
52:7 53:18 58:9
61:12 88:7 89:12
90:20 104:6 140:23
140:23
**mentioning** 124:17
148:9
**mentor** 30:2
**Merit** 28:10,15,16,18
**met** 4:23 5:23 63:23
109:22 114:5
**metal** 149:16
**mftello@tellolegal....**
2:10
**Michael** 1:14 2:7 3:2
3:3,4,11,16 4:1,7
112:9 115:25 116:5
**middle** 129:11
130:23 132:7
**Mike** 28:3,7 64:12
75:14 109:20
115:16
**miles** 60:22 80:14
81:3,7
**Miller** 10:8,9 29:2
33:14 40:22 44:2
47:9 50:16,20 51:12
56:6,19 57:5,10,15
60:7 67:23 74:13
75:20 78:19 91:14
91:17 104:23
**Miller's** 122:22

**mind** 35:24 41:7 75:7
83:9 88:4 96:13
121:17 141:4
**mine** 121:21,23
**Minnesota** 2:5 158:2
158:4
**Minot** 17:6,23,24
18:1
**minute** 44:8 58:21,23
129:6
**minutes** 43:5 44:15
44:23 46:1 50:14
52:10 54:13 56:13
57:1 91:16 127:11
**mirror** 122:7
**mischaracterization**
103:18 147:18
153:4 156:7
**mischaracterizes**
135:15,22
**Misstates** 140:17
**Mm-hmm** 52:9,11
**MN** 2:10
**moment** 78:12
**Monday** 21:7 46:17
**Montana** 17:7,18
**Montgomery** 89:22
90:6 113:23 114:1
140:24 147:24
148:10
**month** 26:7 28:23
150:8
**monthly** 24:23
**months** 10:11 22:12
28:23
**morning** 4:23 7:17,20
9:25 10:4 42:19
45:1,7 46:16 50:20
59:11,25 61:13
62:14,24 63:13
**mornings** 44:22
**mother** 12:20
**move** 9:18 12:15 46:4
46:4,10,11 60:6
62:23 79:19 90:10
98:23 100:5 127:1
152:13 155:17

156:14
**moved** 100:21
**movement** 125:8
**moves** 76:3 78:8
108:4 152:25 153:7
155:23
**moving** 100:19
**mutually** 144:11
**M-i-c-h-a-e-l** 4:7

## N

**N** 1:12 2:1,9
**name** 4:5,25 5:22
28:4 31:10 36:18,19
75:19 92:5 103:11
109:21 112:9
149:22
**names** 29:9,15,25
**Naperville** 12:8
**National** 2:4 14:14
16:4
**ND** 1:23
**NDSU** 13:9,11,20
**near** 51:23 134:19
152:21
**necessary** 6:18 27:17
119:2
**need** 8:14 9:13 14:21
14:22 21:23 58:5
66:6 77:16 94:20
118:6 138:24 139:4
147:5,20 149:3
156:10,13,25
**needed** 6:20 60:11
62:23 106:21
124:19 125:5
**neither** 158:11
**never** 19:25 26:9
32:13 40:14 55:22
73:1 109:21
**night** 35:7
**Nigum** 149:23 150:3
**Nigum's** 134:13
149:25
**nixed** 54:15,18,21,23
**Nope** 122:8
**normal** 26:3 44:22

70:25 89:11
**normally** 79:23
118:23 140:14
**north** 1:1 12:10,14
13:4 16:18 17:1,2,6
18:1 37:23 42:23,23
88:8 94:8 136:9
142:24
**Notary** 158:1,3,18
**note** 3:16 115:2,20
**noted** 75:11 98:12
105:25
**notes** 52:2 158:10
**noteworthy** 78:14
**notice** 1:25 3:16
25:11 27:12 69:16
75:22 87:5 115:24
116:3 118:9,13
119:25
**noticed** 85:3 89:6,11
**notices** 23:13
**notified** 89:18
**notify** 9:14 39:8
89:15
**number** 3:9 19:5
29:22 63:8 81:25
100:8 112:14 114:8
115:2 146:9
**numbers** 29:15
112:14
**nuts** 8:6

## O

**o** 1:12,12 147:12
**Oaks** 89:21 94:10
100:22,25 101:5,6,9
101:9,11,21 109:23
110:1
**oath** 4:2 8:20
**object** 61:1 62:17
75:3 79:24 95:2
96:11 105:13
106:20 107:13
146:1
**objection** 30:11 50:7
75:9,10 78:16 80:12
83:7 85:17 86:15

105:24 109:11
110:14 113:20
114:2 116:12
118:18 119:14
120:22 121:7
123:15 124:3,15
125:15 126:2,8
127:7,25 128:5,10
128:16 130:2,7
131:17 132:14,22
133:13 134:7 135:2
135:15,21 137:5,11
137:20,25 138:2,15
139:2,15 140:2,10
140:17 141:12
142:7,20 144:8
146:13 147:17
149:13 151:8 153:2
156:6
**objections** 110:20
116:19,24 117:6,8
117:10,15,18,22
123:22 126:17
133:20 135:9
138:10,20 139:6,11
140:22 141:5 143:8
**observations** 67:12
**observe** 26:7 69:23
153:23
**observed** 26:9 28:23
69:6 72:22 122:17
**observer** 25:7 26:16
26:24 27:3,6,7,14
27:22 28:22,24 30:2
**observers** 29:1,23
**observing** 25:9,14
27:10
**obtained** 51:3
**obviously** 41:7 44:2
**occasion** 140:24
**Occasionally** 33:22
**occasions** 32:16
35:19,25 41:2 52:6
53:24 67:19 123:25
**occur** 151:25
**occurred** 11:16 36:3
39:9,20 59:16 67:21

78:20 79:6 83:15
109:8,12 145:3
**occurrence** 39:12
**October** 1:15 158:15
**offense** 146:18
**offer** 115:3
**office** 5:1,1 10:23
43:1,22 50:20 67:8
74:7,10 82:21 91:3
91:9 92:5,11 95:8
96:2,7,23 97:9
119:17
**Oh** 5:3,20 64:25
117:20 122:3
**okay** 4:22 5:3 6:2
7:21,25 9:1,2,5,16
14:10,25 15:2,12,23
20:19 22:7 26:1,23
28:9 29:17 30:8,18
33:8,10 34:1 37:14
37:24 38:3,11,15
39:3 40:21 47:5
53:4,18 59:8 62:20
63:21 64:4 68:9,11
74:15 75:18 76:1
78:12 81:7 82:15,16
83:9 84:1,3,6,12,14
84:14 87:19 91:5
94:24 95:13,18,20
96:3 97:7 98:6 99:9
100:21 102:16,16
102:23 103:13
105:6,22 108:23
109:18 112:1,4,23
113:10,13,14,22,24
114:14,18 115:11
115:19 116:9 119:6
119:9,19,21 120:12
120:16 121:2,6,13
121:15,22 122:4,9
123:1,12,18,24
124:8,13,19 125:1,7
125:11 126:4,10
127:8,14 128:2,13
128:19 129:17,20
129:23 130:5,11,22
130:25 131:7,10,21

131:25 132:2,7,11
132:19 134:4,15,16
134:21 135:12,25
136:7,14,17 137:4,6
137:7,15,17,22
138:7,12,21 140:7
141:1,10,15,20,25
142:4,12 143:25
144:4,13,18 149:10
150:2 151:19
153:25 154:1,3
155:9,23 156:16
**old** 12:5,6
**once** 35:13 146:6
152:11 156:3
**ones** 31:13 66:5,5
107:14
**online** 23:7,20,24
**operate** 141:19
**operating** 75:13
**operation** 126:13
**opinion** 131:18
132:15,23 133:14
137:12 138:2,16
139:3,16 140:3
142:21 144:10
**opposite** 62:22 134:9
134:18 136:6
**order** 4:21 24:19
54:24 59:5 121:4,10
121:11 132:24
133:1 153:10
**ordered** 55:1,2,4
120:20
**ordering** 54:14 121:8
**orders** 3:10 63:13,14
63:17,24
**original** 75:6
**originally** 19:9 91:10
91:15
**outcome** 58:8
**outlining** 26:8
**outlying** 26:9
**outside** 26:2 89:11
154:18,19,19
**overall** 72:13
**overhead** 77:12,14,20

**overly** 110:21
**overview** 6:19
**O'clock** 1:16

**P**

**P** 1:12 2:1,1 15:15
**pace** 17:16 69:14
80:7,8,21,24,25
81:6
**page** 3:2,9 65:1,10
84:7
**pages** 158:9
**paid** 17:17
**pain** 71:17 72:9
123:5,10 124:5,7,12
124:18
**paperwork** 43:17
**parked** 58:13 85:6
**part** 22:11 25:4,17
26:6 28:17,20 29:2
29:10 31:15 65:19
120:4,10
**participate** 25:19
**particular** 29:1
**parties** 158:12
**parts** 152:21
**pass** 22:25
**passed** 86:19,20,21
104:4 125:13
136:24 139:10
141:8,11 142:2,19
143:1 144:24
149:12
**passenger** 49:9
**passing** 18:22 89:25
90:7 129:19 148:1,9
**Pat** 151:22
**path** 131:20 137:13
137:15 149:17
**paths** 89:24
**pathway** 137:1,3,7
**PATRICK** 2:2 3:3,4
3:5
**Paul** 2:5
**pay** 53:9 72:11
**peer** 25:6,6
**peers** 25:9

pen 95:23 97:11
people 10:19 25:1,14
  26:7 27:9 29:22
  80:21 141:16
percent 50:2
perform 27:9
performed 65:3,5
  76:6,10,24 136:16
  143:23
performing 27:8
  120:1
period 27:24 41:14
  58:24 154:15,17
permission 60:13
  98:22
permit 132:20
person 7:9 27:16 34:5
personal 3:15 31:25
  55:23 56:1,5 110:5
  128:11
personally 48:6
  49:20
perspective 24:18
pertains 7:12 52:20
Phil 10:8,9 29:2
  33:14 40:22 50:16
  74:13 75:20 91:14
Phill's 122:21
phone 15:19 29:15
  46:3 47:7,10,25
  50:5 53:2 58:14,15
  74:7,10
phones 74:9
Photo 3:12,12,13,13
  3:14
photograph 3:17,17
  3:18,18,19 82:20,23
  83:12 87:12,13,20
  150:1
photographed 150:8
photographs 11:18
  11:20,23 87:11,22
  148:23 150:17,23
pick 56:3,23 66:6
  94:7 153:9
picked 41:4 81:14,16
  156:4

picking 39:16,16,17
picture 37:13 70:9
  100:23 106:8 129:3
  130:17 131:22
  133:22 134:21
  135:6 136:11,15,18
pictures 114:4,9
  128:19,21 136:8
pinpoint 36:15
Pitney 15:13
place 24:19 55:10
  80:13 96:1,8 97:20
  101:6 102:8,17
  114:15 118:5
  124:21,22 141:11
  141:18 152:4
placed 8:20 28:25
  99:18,22 102:21
  103:13
places 17:5
Plaintiff 1:5 2:11,13
Plaintiff's 112:24
  115:12 129:8
plan 3:14 44:12 59:9
  108:10 110:24
planned 60:5
planning 110:21
plans 12:15
platform 54:3,7
  56:15 57:8 58:2,12
  58:18 59:3,12 61:25
  140:8,9
please 4:5 9:1,3,10,14
  12:12 15:12,23
  20:18 28:4 53:3,3
  94:20 108:14,17
  112:3 113:8,9 115:4
  115:15,17 119:2,6
point 25:19 27:22
  28:24 45:17 48:5
  58:1,20 59:10 71:21
  75:12 89:23 101:25
  102:14 107:21
  133:6 135:10
  147:19 149:8
  153:12 156:12
pointed 131:12

points 26:9,9
pool 21:3,12
portion 119:4
position 10:25 16:22
  16:23 18:25 19:25
  21:23,25 28:7
positions 20:21 25:3
possession 94:18 95:5
  95:10,12
possible 8:17 11:7
  35:4,13 41:5 49:9
  55:19 56:9 91:11
  94:5 105:4 108:11
  128:4
post 131:1
posted 146:12
potential 139:7,14
  144:6
potentially 26:8
  116:10
power 60:7,8,12
  61:20
practice 53:7,18
  55:21 73:25 88:21
  155:7
predictive 21:12
preparatory 118:15
prepare 4:11 66:24
prepared 66:19 67:6
  67:23 68:4 121:16
present 2:12 6:17
  32:7 50:19 74:11
  136:17
pretty 6:19 29:14
  100:17 121:17,18
prevent 137:23 138:9
prevented 57:25
previous 53:24
  140:24
previously 35:5
  53:15 88:7 90:22
  146:5
pride 38:15
primarily 22:8
print 45:8
printed 63:14 65:15
prints 65:19

prior 10:4 21:8,10
  33:18 34:21,23
  35:12,16,25 41:14
  43:6,7 48:15,17,23
  49:15,19 50:5 52:25
  53:21 54:4,8 59:21
  61:19 67:16 80:25
  84:10,25 86:13
  87:25 89:19 90:5,16
  90:19 102:5 108:21
  123:9,25
priority 46:5,6,11
probably 10:11,21
  13:18 14:19 33:22
  34:19 36:12 60:22
  63:20,21 74:10
  77:15 86:8 90:4
  109:16 125:19
problem 120:9
problems 76:23 85:3
  86:12 87:1,5,9 88:2
  89:6 120:4
procedure 25:6
proceed 75:8 103:15
proceeded 106:4
process 8:4 9:18 25:4
  26:11,14 28:2 65:19
  79:9
PRODUCTION
  158:21
program 18:1,16,19
  19:13 25:20 26:6
  29:3,11,23
programs 30:7,9
  31:18
prohibition 129:14
proper 51:23 133:6
properly 106:6
  144:23 145:17
protect 49:6 105:11
  144:23 145:17
  152:20 153:20
  156:13
protected 62:25
protecting 60:18,18
  63:2,3,4,6,8,9 100:4
  100:11 105:7 125:9

**protective** 31:25
**provide** 8:8 9:10
  12:11,11 14:11,12
  15:1,19 29:9 67:19
  71:22
**provided** 43:17 92:14
  108:19
**provider** 15:25
**providing** 26:2
**proximity** 146:4
**PTI** 54:14 55:5,7,15
  59:5
**public** 100:8 158:3
  158:18
**pull** 65:11,22,25
  68:13,15 78:9 82:4
  107:18,21 125:17
  128:14 141:10
  152:16,18,19,22
  155:20 156:14
**pulled** 25:18,25
  26:18,18 51:15 65:9
  65:24 66:8 73:18
  77:6 81:20 104:11
  107:1 125:18
  127:23 128:18
  156:4
**pulling** 81:11 82:2
  84:19 107:10 128:8
  143:6 156:12
**purposely** 117:23
**purposes** 116:25
**PURSUANT** 1:25
**push** 126:5 154:5
**put** 32:11 45:11,12
  56:20 60:5 66:9
  73:6,17 74:2 75:16
  82:1 84:4 85:21
  89:23 95:3 99:10
  113:5 124:10 125:1
  140:25 141:24
  142:14 148:4,6
**puts** 102:13
**putting** 102:10,10
  118:9,13
**P-i-t-n-e-y** 15:15
**P.A** 2:3

**p.m** 108:8 112:5
  157:4

**Q**
**qualified** 22:20 23:6
**question** 8:7,10,10
  9:4,7,21 20:18 22:5
  22:6 29:21 41:2
  51:14 53:6 55:22
  59:1,17 81:14 89:9
  100:24 103:23
  110:15,17 118:3
  119:2 124:4 128:17
  135:18 142:11
  144:19 147:23
  149:6,9,10 150:15
  151:16
**questioning** 42:5
  117:24,25 151:1
  152:2
**questions** 8:25 9:17
  21:22 25:10 37:20
  92:22,22 111:20,21
  111:24 119:23
  144:14,20 146:21
  149:17,21 155:8,15
  156:1,19,20
**quick** 111:22 112:2
  113:4 144:16
**quickly** 155:16
**quite** 16:10

**R**
**R** 2:1
**radio** 3:11 38:14 62:4
  62:6,9 63:7,10
  72:18 73:4 74:22
  98:21 125:8 147:22
**radioed** 73:1
**Radisson** 1:22
**rail** 41:24 132:3,4
  133:9 148:18
**railcars** 110:3
**railroad** 24:3,5,17
  26:2 28:8,9 30:14
  31:17 37:24 38:22
  112:10 116:7

129:10 130:22
  131:2 136:10
**railroads** 131:15
**rails** 131:21,24 132:9
  132:18,21 133:2
**Railway** 1:7 2:6 14:4
  27:15 54:6
**raised** 59:1
**Ralph** 111:14
**random** 14:22
**randomly** 116:23
**Rarely** 41:1
**rate** 103:24
**Rauser** 5:15 11:9
**RDO** 15:4,6
**read** 69:7 71:17 73:7
  92:20 113:6,8
  115:14 119:2,5
  124:9,9 156:22
**real** 5:21 95:7
**realize** 6:17
**really** 8:4 27:11 32:8
  53:17 69:11 100:22
  103:22 118:4
  144:10
**rear** 56:21 81:19
  101:19 125:2 152:5
**reason** 22:5,11 49:1
  55:2 75:7 128:9
  156:8
**recall** 4:10 6:5 16:9
  25:21 34:14,20 35:5
  35:11 39:15 43:2,10
  44:18 46:8 50:22
  52:1,15 54:11 56:11
  56:25 59:20 60:12
  62:20 68:22 71:13
  71:14 72:9 73:3,13
  81:1 89:19 92:16
  93:1,23 94:9 101:15
  101:18 114:5 132:8
  132:10 144:21
  146:6,22 149:23
  150:1 152:2 154:6
**recalling** 113:14
**Recess** 42:15 74:17
  94:13 108:8 112:5

**recollection** 7:2 9:11
  14:24 30:4 36:4
  42:25 51:19 52:5
  56:7 62:13 75:1
  76:2,23 77:2 86:18
  87:3 108:18
**record** 4:6 5:14 8:16
  11:11,13 42:14,16
  74:16,21,23 83:17
  94:12,15 95:22
  99:18 108:7 116:21
  117:17 119:4
  124:10 129:6
  134:14
**recorded** 47:19
  114:12
**recording** 75:6
**Recross** 3:4 155:10
**red** 83:19 144:24
**Redirect** 3:4,5 144:15
  156:2
**Reducing** 28:16
**refer** 42:10
**reference** 77:9 83:20
  99:21 133:23
**referenced** 104:15
  106:2 115:20
**references** 76:5 84:9
  100:14
**referencing** 11:9
**referral** 16:17
**referred** 133:7
**REFERRED-TO** 3:9
**referring** 35:17 40:7
  42:6 136:5 140:20
**refresh** 76:2 124:13
**refreshing** 75:1
**regard** 25:8 69:23
  70:24 83:2 103:20
  111:4 150:15
**regarding** 4:15 5:5
  7:7 11:15 48:18
  49:19 51:5,25 66:22
  67:20 88:18 89:20
  92:17 93:6 110:9
**regular** 20:25 41:11
**regularly** 20:3 24:10

**related** 108:11
126:15 158:11
**relates** 114:18
**relating** 126:16 144:4
144:7
**remain** 156:3
**remedied** 33:4
**remember** 6:12 8:7
10:14,16 13:12
14:12,20 16:2 17:20
18:10 19:11 22:5
34:11 35:14 39:18
43:4,10 44:1 45:6
51:21 53:13,14,17
54:17,19 57:6,22
58:14 60:10 61:17
61:22 62:12 66:4,4
70:4,14 73:12 74:4
75:24 76:11 77:4
78:11 87:4 90:8,21
105:3,5 106:12,17
107:8 109:1 110:4
113:17 124:17
127:22 128:1,18
**remind** 8:14
**remove** 127:10,12
138:23 139:5
**removed** 138:25
**renegade** 64:21 65:3
65:5,16
**Rennick** 36:16 39:11
**Rental** 16:5
**rep** 16:2
**repair** 51:12
**repaired** 120:20
121:1
**repeat** 63:7
**rephrase** 9:3 83:9
**replacement** 90:21
**replacing** 34:6
**report** 3:15 38:20
43:20 65:3,5 110:6
113:2
**reported** 38:21,23
39:2 46:15,23,25
47:13,18,23 48:17
62:8 91:4,6 119:24

**reporter** 1:24 8:2,6
8:14 31:12 64:4
95:11,14,17 112:16
112:19,23 115:5,9
119:5 129:5 158:23
**REPORTERS** 158:1
**reporting** 65:7 72:18
**represent** 112:9
134:13 136:14
150:18 151:6
**representative** 15:17
**representatives**
32:21
**reps** 32:24
**request** 28:21 95:4
102:9
**requested** 98:22
113:15 119:4
140:15
**requesting** 11:9
**require** 133:4
**required** 18:22 22:20
22:25 31:24 76:13
117:14 121:2
133:11
**requirement** 23:5
**reside** 12:9
**residence** 12:16
**respond** 57:21
**responded** 57:15
**response** 8:8 11:10
20:17,21 59:6 90:7
**rest** 105:4 108:1
**result** 138:14
**resulting** 109:8
144:24 145:17
**retired** 16:16 36:17
**return** 91:2
**review** 4:11 24:10
149:7 156:22 157:1
157:2
**reviewing** 95:6
**Richardson** 111:14
**ridden** 53:23 54:1
125:3
**ride** 53:7,9,10,11,19
59:2 110:3 126:11

142:24 143:1 149:2
152:17,23 154:6,14
154:18,22,23
**riding** 126:6,16
155:13
**right** 5:6 7:20 13:19
17:14,22 27:11 30:6
40:22 42:10,13,17
44:12 47:6 51:3
58:21 62:23 64:15
65:2,15 70:13,13
72:17 73:5 74:20
75:22 77:9,18 79:5
83:18,20 87:17
94:11 95:15,22
96:25 97:1,11,14,17
97:21,24 98:11,19
98:25 99:12,25
100:7,17 101:15
102:20,25 103:24
104:6 105:12
106:25 115:4 116:1
121:17 125:9 129:1
137:23 138:18
142:17 146:8
149:21 150:21
151:1 156:21,23
157:2,3
**ring** 5:15 130:3
**risk** 25:12 27:12
85:21
**river** 98:12,13,14,15
**road** 26:8 33:11,17
35:8 63:18
**Robinson** 36:14
38:13
**rock** 40:3,18
**rocks** 36:8,22 38:10
38:11 39:22,24 40:2
40:7,17,21
**rode** 49:14
**roof** 83:19
**room** 50:24 63:6
115:1
**Ross** 31:10
**roughly** 19:16 24:23
**Round** 60:25

**Rouser** 136:16
**RRVW** 94:8
**RTWI8291-07I** 64:2
**RTWI829107I** 68:12
**rule** 117:10 130:9
149:7
**rules** 7:24 8:19 9:23
20:17 22:20,22 23:2
23:6,12,12 24:10,10
24:25 129:15,15
130:8 131:19
145:17 147:11,15
**run** 61:20
**running** 52:8
**runs** 37:23,25
**rush** 79:16
**R-e-n-n-i-c-k** 36:19

**S**

**S** 1:12 2:1
**safe** 24:19 25:12,15
143:13 144:12
**safely** 146:6 147:7
**safety** 3:14 23:9,10
23:10 24:12,18,21
24:23,24 25:6 30:6
30:9,19,22,24 31:2
31:4,7,18,20 32:6
32:10,10,19,20,24
89:14,17 108:9,11
126:13,15 129:15
141:2 144:6 145:16
155:5
**sales** 16:2
**sanctions** 118:15
**sands** 32:5
**saw** 27:14 39:11 76:6
78:13 122:6 123:24
124:1
**saying** 35:10 62:20
70:11 73:3 96:18
105:17 112:18
**says** 65:2 68:12
115:16 122:5,11
124:12 133:25
**scale** 77:10,13,24
86:1

174

scenario 61:20
schedule 21:12 138:5
scheduled 146:17
Schneider 44:9,17,23
  45:1,18 46:1,10,15
  46:24 47:12,17,20
  48:1 49:25 50:6
  51:4,11,17,25 52:6
  52:22 53:8 54:12,20
  54:22,25 56:12,18
  57:12 58:6,15 59:10
  59:21,25 62:14
  90:24 91:6,8 93:12
  93:16,24 110:9,13
  110:19 111:4
  120:19 127:4,15
  155:12
school 12:22,24 13:1
  13:2,24 14:8,14,18
  14:18
schools 13:3
scope 30:11
Scott 5:15
se 26:10
seal 158:14
Sean 44:9,17 52:22
  62:13 93:11 110:18
  120:19 121:2
seasoned 28:24
second 7:21 29:5 45:1
  45:18 66:5 105:24
  113:8 129:7 137:18
  155:11
secured 73:6,21,23
  108:2
see 7:21 9:25 14:15
  17:16 32:22 39:25
  41:17 61:10 64:8
  70:21,24 72:14
  75:25 77:17,24 85:6
  85:24 87:18 96:8,15
  97:11,17,21 98:21
  100:15 106:8
  108:11 110:5 115:1
  126:12 130:16,18
  130:20,22 134:3,4
  134:21 135:5

136:18,20,23 137:7
  137:18 143:4
  147:22 148:23
  153:23
seek 91:11,12
Seeks 139:3
seen 25:1 50:4 82:20
  87:11,14,14 90:12
  92:4 108:10,20,21
senior 15:16
seniority 21:24 22:1
sense 8:17 122:19
sent 46:16 114:23
  138:5
separate 20:6 58:14
  153:12
separately 68:2,3
September 21:15,15
series 155:15
serious 89:12
SERPs 32:8
service 14:3 15:25
  16:6 25:18,25 26:1
  26:1,19 27:8,9 45:4
  46:13 55:9 59:18
serviced 59:12
set 10:22 27:4 56:22
  66:7 70:12 76:16,19
  76:22 78:9 101:25
  102:4,6,6,18 103:1
  103:24 152:13,21
  153:8,13,14 155:20
setting 104:7 118:14
  153:17,18
seven(157) 158:9
shaker 37:1,6,21 38:2
  38:4,5 39:6 82:17
  83:6 84:22 86:18
  88:3 90:12 97:18,21
  97:24,25 104:4,13
  107:3,5,23,25 125:5
  135:17,20 136:12
  136:20,22 149:3
sheets 29:24
shift 42:18 43:6
short 58:24 68:10
shorthand 158:10

shortly 118:5
shoulder 128:23
shove 49:6 56:21 58:2
  60:14,19 63:1,2,3,4
  63:8,9 100:4,12,20
  103:4 105:7,11
  120:8 125:9 144:24
  145:17 152:7,9,20
  153:20 155:18,20
  156:14
shoved 104:12 125:3
  125:20
shoving 54:3,7 56:15
  57:8 58:1,12,18
  59:3,12 61:24 79:9
  82:5 84:20 101:16
  101:21,23 153:11
  155:16
show 37:13 63:16
  78:2,5,7 82:15,17
  83:8 85:15 87:10,17
  87:21 96:10 99:3,4
  100:8,18 102:4
  105:21 106:25
  112:11 116:10
  119:8 130:16 131:4
  134:12
showed 120:13
showing 45:6 71:12
  133:22 134:2
shown 45:2 77:12,14
  77:20 84:22 85:4
  87:24 114:5 124:8
  150:11
shows 64:2 65:10
  82:23 151:25
side 38:5 39:5 50:23
  68:24 69:1,2,3
  81:18 83:5,7,14,18
  83:24 84:2,10,10,17
  85:1,24 86:3,7,11
  86:24 87:2 88:8
  89:3,4 97:23 107:3
  107:25 129:20
  130:23 132:3,4,12
  133:5 134:5,9,16,19
  135:12,17,19,20,25

136:3,5,11,12,23
  137:10 141:24
  142:24 147:9,10,12
  147:21 148:15
  149:4,17
sided 136:17
sides 85:5
sign 131:1,5,8 133:23
  133:25 134:3
  146:12 156:22
signals 147:20,22
signature 115:18
significant 89:17
signifying 102:12
sill 46:17
similar 19:11 87:13
  150:12,14
simply 21:20
sir 131:13
SIRP 32:4,6,12,14
  89:25 148:4
SIRPs 32:11
sit 33:2 41:16 52:5
  73:13 108:23
  116:23
site 30:22,24 31:7
  32:20 136:15
sitting 68:16 122:13
situation 40:18 53:25
size 94:19
slid 38:12
slide 88:6
slip 40:1,2 90:25
  140:4,5
slipped 36:8,22 38:10
  39:24 40:17,18
slipping 39:22 88:7
  139:24
slips 85:22
slope 132:7,13 133:11
  133:15 134:4 135:5
  140:9 141:1
slow 122:7
slower 80:24
slowly 68:21 69:7,9
  69:15,18 72:22
  122:16,17

small 15:19 40:12
SMART 19:10,15
   20:1,5
sneak 24:11
sold 16:3
solely 57:4
Solutions 16:5,5
somebody 32:9 46:16
   47:20 51:20 58:11
   58:16 95:6 96:12
   110:1 127:5,9
somewhat 8:13
Sore 124:12
sorry 10:15 29:18
   47:3,5 98:14 99:7
   111:23 115:22
   117:1 119:12 123:2
   128:22 139:22
   151:15,22
sort 73:1
sounds 79:19,22
   98:15 145:23
source 46:22
south 37:23 86:23,24
   87:2,7 88:3 89:2
   103:15 107:3,24
   136:9
Southwest 15:9
speak 50:5 92:13
speaker 46:3 47:7,10
   47:25 74:11
speakerphone 52:12
   54:13 56:12 57:1
   74:10
speaking 8:15 58:10
specific 39:2 60:11
specifically 35:6 49:4
   57:3 77:25 92:18
   124:5 154:16
   155:12
specificity 145:19
specifics 7:11 72:13
specified 59:19
speculation 61:1
   79:25 80:12 110:15
   120:22 132:23
   142:10 146:14

147:18 149:14
spell 15:5 28:4,6
   31:13 36:18
spelling 29:6
spikes 56:2
Spiritwood 41:3
spoke 5:9,10 6:7 10:9
   52:6 114:11
spoken 59:24 75:24
spot 22:3 53:7,19,23
   56:22 65:12,22 66:6
   66:10 68:13,15
   82:13 107:25,25
   141:7,17,25 142:2
   155:21
spots 22:2
spotted 77:6 107:24
   125:18,21 141:21
   142:17
spotting 39:15,17
   58:3 81:11 143:6
spray 138:6,8,13
spreadsheet 29:25
spur 66:7
St 2:5
stable 140:8,13
stairs 69:21,24,25
   70:12,19 71:1 72:23
stand 49:10 94:20
standard 154:21
stands 25:5 88:4
start 8:10 43:6,10
   138:8
started 14:9,18 43:5
   98:6
starting 94:22 118:20
state 4:5 13:4 117:14
   158:2,4
stated 43:4 71:16
statement 3:11 6:5,20
   6:25 7:12 11:6,7,9
   66:17,21,24 67:7,10
   67:15,24 68:5,10
   69:5,20 71:15 74:6
   92:14,17,19 93:7
   119:22,23 121:13
   121:16,18,20,24

122:8,9,10,11,22
statements 11:13
   68:1 119:13
STATES 1:1
stating 116:19 117:6
stay 136:22
stayed 14:19 19:12
steel 32:2
steep 85:5,7,18,19
   88:6 139:10,12,13
step 38:11
Stephen 4:7
stepped 70:14,16
   151:12,18
stick 35:24
sticker 97:2,4 113:5
sticking 86:9
stipple 97:24
stop 42:6,7 84:10
   87:18 134:6,18
   136:7,18,22 137:10
   146:11,12
stopping 125:5
strained 70:23
straining 69:21 70:22
   71:1
Strata 11:20 35:16,17
   35:25 36:22 37:22
   38:4,24 39:21 42:10
   45:5 46:4,10 49:5
   53:8,19,23 54:8
   58:3 60:6,16 61:3,6
   61:7 62:23 63:1
   64:19 65:9,9,11,12
   65:21,22 68:13 69:2
   73:19 77:6 78:5,9
   79:9,12,19 80:5
   81:15,23,24 82:8,14
   83:19,23 84:20
   89:20 90:9 93:15,20
   94:9 96:10 97:13,16
   97:21,24,25 98:4
   101:16,23 102:2,5
   104:21 106:5,7
   107:1,3,5,10,23
   109:3,9 113:16
   125:12,20,25

129:12 131:22
   132:8,13,21 133:2,5
   133:12 134:10,17
   134:19 135:19,25
   136:5,16,24 137:8
   142:15 145:4 152:8
   153:11 155:19
   156:4
stretch 125:22 126:3
strike 40:6 76:1 80:7
   85:11 138:12
   144:19 154:4
stuck 95:20
study 13:9 14:1
stuff 11:12 46:6
   101:3 108:12
Sub 55:9
subdivision 88:16
subject 116:10 119:8
submitted 32:12,13
subpoenaed 114:20
sufficiently 133:5,9
suggest 67:9
suggested 113:17
suggestion 56:15
   57:7,9,11
Suite 2:4,9
summary 64:25
   65:10
summer 11:2,3,4
   12:21 17:11,20
   25:22 36:13
supervisor 28:1
   32:15 39:8
supervisors 59:24
supervisor's 27:17
suppose 5:17 30:16
   33:5 90:5 97:16
   138:22
supposed 47:21
   138:8 154:23
sure 5:4 12:13 16:7
   19:24 30:18 34:19
   36:20 52:18 54:22
   60:8 63:23 76:21
   82:10 101:10 105:9
   129:2,3 133:6 147:5

156:23
**surface** 132:4,12
**surgeries** 90:18
**surgery** 90:21
**surroundings** 143:22
**Sweeney** 2:2,3 3:3,4,5
4:4 5:19 9:21 11:6
29:5 30:15 35:3
42:14,16 64:8,11
66:12 74:16,20
75:10 83:21 84:13
84:15 94:11,15
95:11,15 96:5,16,20
96:25 97:3,5 99:17
101:3 102:14,19
105:15,22,24
108:13,16 109:14
111:23 112:1,4,25
113:3 114:2 116:12
116:16,18,21 117:1
117:3,5,10,12,14,17
117:20,22 118:1,8
118:11,18,21,24
119:14 120:22
121:7,25 122:20,22
123:15,22 124:3,15
125:15 126:2,8,17
127:7,25 128:3,5,10
128:16,23 129:1
130:2,7 131:11,17
132:14,22 133:13
133:18,20 134:7
135:2,9,15,21 136:4
137:5,11,20,25
138:2,10,15,20
139:2,6,11,15 140:2
140:10,17,22 141:3
141:5,12 142:7,9,20
143:8 144:8,15
156:2,21 157:3
**sweeney@slfirm.net**
2:5
**switch** 33:7,11,17
35:8 60:10 61:18
63:18 77:10,10,13
77:24 101:5,6,9,12
101:16,22 103:7,11

103:14 104:2,6,9,12
104:14,16,18,19
106:1 107:19,20
126:23,25 152:12
152:19,19,20,21
**switches** 49:6 73:14
105:8 106:6,14,18
106:23,24 125:5
**sworn** 4:2 158:5
**S-c-h-n-e-i-d-e-r**
44:10
**S-t-e-p-h-e-n** 4:8
**S-t-r-a-t-a** 11:21
42:11

---

**T**

**T** 1:12
**take** 4:21 9:13 11:18
22:22 23:7 52:2
59:7,18 60:6 68:10
75:16 95:12 108:17
111:22 112:2 113:4
113:8 119:21
121:13 124:22
141:21
**taken** 1:22 4:9 11:20
11:23 42:15 45:21
45:24 74:17 79:19
94:13 108:8 112:5
120:21 124:21
136:15 150:23
158:10
**talk** 8:2 10:15 23:11
31:22 72:17
**talked** 6:14 7:9 30:6
31:19 91:2
**talking** 8:5,19 37:17
39:1 53:14 80:14
90:24 97:14 154:4
**tall** 5:21,21
**Tax** 16:6
**taxes** 16:6
**taxi** 15:2
**TD** 19:10,15 20:1,5
**team** 30:24 31:8
32:10,20 70:6
**teams** 30:22

**Technologies** 15:25
**Telecommunications**
15:18
**telephone** 5:10 6:23
45:18 46:9 54:12
74:11
**tell** 8:21 12:2,24
13:17 20:18 26:17
50:2,8 53:3 60:2
63:4 64:1,18 100:22
101:10 108:18,24
114:4 127:4,6 137:7
145:13,15
**telling** 121:4 123:12
**Tello** 2:7,8 3:3,4 4:20
5:9,10,14,18,21 6:7
11:5 20:12 29:5,8
30:11,13 35:1 37:3
37:9,17 40:19 47:3
47:5 50:7 61:1
62:17 64:7,9 66:15
75:3 78:16 79:24
80:12,20 83:7,17,23
84:8,14 85:17 86:15
89:9 95:1,16,18
96:3,11,18,22 97:1
97:4,7,10 99:1,16
101:1 102:9,16
103:17 105:13,18
105:20,23 106:20
107:7,13 109:11,15
110:14,20 111:21
111:25 112:2,6,9,13
112:17,21 113:1,6
113:20 115:3,7,11
116:14,17,20,22
117:2,3,4,8,11,13
117:16,19,21,23
118:1,4,9,13,20,22
119:1 121:24 122:1
122:18,23 128:21
128:25 129:2,7
131:13 144:14
146:1,3,13,19
147:17 149:5,13,21
150:5,23 151:8,15
151:19,22 153:2,4

155:10 156:6,20
**temple** 125:4 149:15
152:24
**temporary** 10:25
17:7,8,8,10,18
22:14
**ten** 43:5
**tenancy** 88:6
**tended** 15:3
**tends** 85:21
**terminal** 111:5
**terms** 14:7 20:17
28:7 38:9 39:24
57:8 73:14,17 76:2
76:9 80:7 81:3 93:5
100:19 126:13
**test** 22:22 23:2 30:5
76:6,10,12
**testified** 4:2 128:7
135:13 155:11
**testify** 158:6
**testifying** 113:18
**testimony** 113:15
128:9 135:16,22
140:18 153:5
**testing** 18:23 30:3
**tests** 76:24
**Texas** 16:19
**text** 115:16
**Thank** 6:7 25:24 29:8
66:11,15 69:5 70:18
95:21 97:10,12
99:16 102:19 108:7
109:15 113:14
115:22 119:21
134:20 153:25
155:8 156:1,19
157:3
**They'd** 139:4
**thing** 5:5 24:8 37:18
53:1 124:17 151:24
**things** 11:13 23:13
24:17,18,25 25:11
25:13 26:5 37:8
56:3 59:16 94:22
110:22
**think** 6:18 18:9,9,10

21:10 22:4 30:13
31:10,21 34:25
37:17 39:1,19 40:16
42:19 45:11 53:13
58:10 96:15 100:17
103:17 105:15,20
118:19 122:18
140:4
**third** 2:9 92:7 93:17
**thought** 5:25 6:1
40:15 89:14 97:22
122:3 149:7
**three** 12:20 14:19
22:12 28:23 29:24
31:14 33:23,25 34:2
41:6 60:22,22 91:23
92:25 93:16 106:5,8
106:8,10,14
**threw** 106:12,17
**throw** 106:23,24
116:24
**thrown** 104:9,20
106:22
**thumb** 134:13
**ticket** 55:14
**tie** 41:25 86:9 91:15
131:2 132:2 141:20
142:16
**tied** 73:24 127:18
**ties** 85:24 86:4,8
130:5,23 133:10
148:17
**time** 6:13 7:3 8:3
9:13 10:3,9,17,20
10:24 11:5 14:8
16:13,16 18:5,5
19:8,9 21:13,18
22:10 27:23 28:10
34:4,10,11 36:11,13
38:8,21 39:14,16
40:2 41:14 42:21,24
43:7,10,18 45:17
48:5 49:14,16 50:24
58:24,25 59:7,11,21
64:11 68:25 69:17
70:2 71:21 72:13
77:25 78:19,23 79:5

79:12,14,20 80:13
81:12 83:4,15 85:14
92:1 95:7 100:3
101:25 105:1
106:10 109:14
111:1 113:24 114:5
114:14,15 115:4
119:24 121:17
123:4,9 124:1,14
125:8,10 126:4
130:13 145:20
148:13 151:13,20
154:15,17
**timeframe** 14:13
19:11 35:9 59:19
154:24,25
**timeline** 14:22
**times** 17:24 21:25
33:23,25 34:2 41:6
54:10 88:16 95:3
109:5,11
**timing** 10:24
**tipple** 37:3,6,10,21
38:1,4,6 39:6 82:18
83:6 84:22 86:18,20
86:21 87:2,7 88:3,8
89:2 90:12 97:18,21
104:5,13 107:23
125:4,13 127:17
128:14 130:20
131:8 139:10,13
141:8,11,16,18,22
142:2,5,15,19,24,25
143:2,6 149:2,12
152:24
**title** 15:16 16:3
**today** 8:20 9:11 12:5
31:9 33:2 41:16
52:6 72:2 73:13
108:22,23 114:18
**toed** 32:2
**told** 6:15 10:20 17:10
38:15 41:16 43:14
44:13 47:6 48:20
52:21 57:11 91:10
91:10,14 92:23,24
119:9 127:8,8

**Tony** 3:16 6:3 7:9
10:22 87:15 92:3
114:23 115:18
119:11
**top** 16:10 31:21 43:9
82:11
**totally** 16:13
**tower** 36:24
**town** 20:4
**track** 3:14 17:16
23:18 37:22 58:3,5
60:11 66:7 68:24
69:2 74:2 77:10,13
77:24 81:11,20,24
82:1,5,8,12 83:14
83:24 84:17,19 85:1
85:6,9,14,24 86:3
88:10 89:4 98:8,9
103:6,8,22 104:3,10
109:2 120:8 125:13
125:19,24 127:13
127:24 129:10,11
129:16,19 130:10
130:11,12,13
132:12 133:5,10
134:4,17 135:14
136:11,23 146:21
147:10,10,11,14,21
153:23,24
**tracks** 74:2 81:13
146:24 147:6
**tract** 148:15
**trade** 13:3,23
**traffic** 147:6
**train** 10:12 27:8
28:22 45:12 49:4
68:17 73:6,21,23
81:18,18,19 83:3
85:5 94:7 100:19
101:19 103:20
110:22 122:14
152:20
**training** 18:15 23:5,9
23:10,21,24,25 24:6
24:12 26:3 30:3
**trainman** 85:16
156:3

**trainmaster** 44:9,16
44:23 51:11 52:22
62:13 66:25 73:7
74:5 89:22 90:3,6
90:24 111:5,7
113:23 120:19
121:10,12 140:23
147:24 148:10
**trainmasters** 32:20
32:24 66:25
**trainmen** 147:2
**transcript** 3:11 74:22
83:8 98:22 99:3
156:22 157:1
158:20
**transcription** 75:4
158:9
**transfer** 10:25 17:7,8
17:9,11,18 22:14
76:12
**transmissions** 63:10
**transport** 49:3
**Transportation** 16:8
**treadmill** 80:17
**treatment** 91:11,13
**trial** 126:11,12
154:11,12,16,24
**tried** 115:16
**trip** 36:4 71:21 90:25
**tripping** 131:16,20
139:5,7
**trips** 36:5
**trouble** 97:15
**truck** 42:6,7 84:10
87:18 134:6,18
136:7,18,22 137:10
**true** 19:24 38:6,7
52:16,17 68:22
72:20 105:16 118:2
126:5 147:15 153:6
**trust** 75:7
**truth** 8:21 158:6,6,7
**truthful** 123:13
**try** 8:6 24:9 58:11
144:1,16 155:15
**trying** 8:16 122:25
**turn** 45:12

178

**twice** 35:14 62:18
  146:6
**two** 10:16 13:6,18
  26:7 28:23,23 29:1
  33:22,25 34:2 42:24
  43:8 46:2 48:15
  58:21,23 68:1,7
  74:9 85:23 86:20,21
  87:2,7 89:1 90:5
  91:25 136:15,17
  150:18,23 152:15
**type** 23:5 45:2 48:11
  71:12
**typically** 32:11 40:14
  45:11 46:6 49:5
  56:4 69:13 70:12
  81:5,5 110:23
  131:24 132:17
  139:17
**TY&E** 30:15 31:24

───────────
  **U**

**un** 11:11
**unassigned** 21:3
**unaware** 11:11
**uncle** 16:15
**uncoupling** 143:5
**underneath** 38:11
**understand** 8:3,20,25
  9:4 23:23 100:3
  105:14 135:18
  142:8,11 152:8
**understanding** 35:10
  37:22 61:11 78:18
  80:11 83:1 90:9
  93:19 104:19
  107:10 116:6,9,17
  123:14 126:14,21
  132:20 137:22
  138:7 141:15
  143:18,22 149:3
**understandings**
  128:13
**understood** 9:7
**underway** 96:17
**uninterrupted** 119:1
**union** 18:25 19:2,8

  19:12,25 20:3,5,14
  25:18 30:14,14
  32:20,24
**unions** 20:9
**UNITED** 1:1
**universities** 13:3
**university** 13:4,5,13
  13:15,23 14:1
**unlock** 58:16 126:25
**unnatural** 139:19,20
  139:21
**unrealistic** 57:23
**unsafe** 51:13
**unusual** 8:13 39:19
  46:5 78:14
**urgent** 46:5
**use** 36:25 55:19,23
  56:18 57:7,12,25
  59:3 62:16 65:2
  84:9 90:13 120:14
  124:24 126:20
  144:5,6
**usual** 45:13
**usually** 23:16 28:25
  49:3
**utility** 46:13 48:2,12
  48:18,21,23 49:1,3
  49:15,19,24 50:5,13
  50:17 51:1,5,7,25
  52:14,20 59:4
  120:25 121:9
**utilized** 58:5
**UTU** 19:10,14 20:1,5

───────────
  **V**

**V** 1:6
**vacation** 41:14
**valid** 117:16,18,22
**Valley** 51:22
**van** 54:14,24 55:1,2,4
  55:15 59:5 120:17
  120:20 121:8 144:4
  144:6
**vans** 55:7,11
**various** 26:4 88:16
  111:6,7
**vegetation** 88:13,15

  88:18 138:5
**vehicle** 45:21 46:13
  46:19 48:2,6,8,12
  48:18,21,23 49:1,3
  49:7,11,15,19,24
  50:5,13,17 51:1,6,7
  51:10,11,13,18,21
  51:25 52:14,21
  55:17,19,23 56:1,5
  56:7 59:4,12,18
  62:15 120:25 121:9
  144:7
**verify** 105:8
**verifying** 76:15
**versus** 73:15
**viable** 155:2,4
**violated** 145:16
**violation** 147:15
**visibly** 69:21 70:22
  70:23
**visually** 153:23
  156:13

───────────
  **W**

**W** 84:4
**wait** 8:7 59:11,15
  62:15,21,21 91:17
  120:20,25 121:4
  127:4
**waiting** 68:16 122:13
**waive** 156:23 157:2
**walk** 59:5 68:17
  70:12 76:21 80:4,21
  80:23 85:16 86:16
  86:17 107:22 120:1
  120:8 122:14
  127:13,24 129:11
  130:5 132:20 133:2
  133:4,8,11 138:19
  139:18,19,23
  140:14 147:9 149:4
  149:12,15 153:21
**walked** 60:7,15 61:6
  63:1 69:17 79:18
  81:3 84:25 86:19
  87:6,24 105:3
  125:24 126:3

  140:12
**walking** 38:3,5 68:20
  68:21,25 69:7,9,15
  69:15,18 72:22,22
  80:8 83:15 85:18,20
  86:12 87:1 88:5
  89:3,6,23 100:4
  105:1 113:25 122:7
  122:15,16,17
  128:15 129:10
  131:20 132:12,17
  137:13,15 139:17
  139:25 140:8
  148:12,20
**walks** 69:13 81:6
**walkway** 113:17
  131:7 134:24 135:8
  137:19,23,24
  138:25 139:10,13
  140:7,16,21 143:4
  149:17
**walkways** 85:16
  140:25 148:2
**want** 19:24 37:12,18
  40:13 42:6 45:8
  51:15 52:18 53:8,9
  55:25 57:18 96:19
  112:11 113:3 115:5
  115:6 116:18
  117:11 118:8,11
  120:8 126:6 128:14
  129:3 137:6 155:12
  157:1
**wanted** 6:16 59:1
  113:16
**Wanting** 44:12
**wants** 147:9
**warning** 46:14 48:8
**wasn't** 13:21 26:16
  53:1 54:24 55:1,15
  57:9 59:4,18 71:2,4
  71:8 81:15,17 89:25
  103:19 105:7,7
  145:1 151:25 155:1
  155:2
**watching** 27:8
**way** 29:16 38:12 40:3

40:13 54:9 57:19
60:16,17,18,22 61:7
69:16,17 73:10,15
79:18 96:12 98:3
100:21 101:4
104:12 105:4
107:18,22 109:24
125:4,6 127:2
134:20 137:23
139:19,23 142:14
148:12 152:18,23
153:8 154:14
ways 25:1 152:15
wear 31:25
weeds 85:24 86:2,6
86:10 87:5,8 89:7
130:17,18 131:7,15
133:16 134:21
137:18,23 138:6,8
138:13,14,23
148:20,24 151:13
151:20
week 10:21 18:19
21:10
weeks 5:7,23 48:15
136:15 150:23
weights 71:6
welcome 99:17
wellbeing 72:13
went 6:4 9:23 13:4,5
15:18 19:12,17
22:12 28:22 41:25
58:11 60:7 65:21,25
69:24 70:1 98:15
99:5 100:9,19 106:2
124:20 150:7
154:12,13 155:1
weren't 4:24,24
37:11 38:3 55:25
59:2,3 103:8 145:20
west 13:1 36:24 37:21
37:24,25 60:13
61:21 84:2,4,17
85:1,24 86:11 89:4
136:9 147:10
WESTERN 1:2
we'll 37:13 65:2

68:10 75:8 78:12,12
97:22 99:12 102:15
112:2,13 121:14
we're 8:15,19 20:16
37:17 39:1 42:24
63:23 84:5 112:16
116:22 118:4,4,6
we've 30:6 31:19 41:5
74:22 87:22 91:1
97:17 146:7 152:12
white 83:18
wide 129:23 130:1
wife 12:20
windmill 94:7
window 69:6 122:17
witness 3:2 4:1
108:16 158:5,14
witnessed 42:2
wondering 122:24
word 27:11 28:12
90:22 99:18
words 75:24 134:9
work 3:10 14:22 18:4
21:12,18 22:13
24:19 25:15 27:8
33:22,25 34:6 35:6
39:20 41:7 43:21
44:21 45:2,14,19
48:14 51:21 55:20
59:2 61:13,16,21,23
62:21 63:13,14,17
63:24 64:25 65:3,5
65:7,10 68:1,7,12
69:14 73:13 119:24
120:13 127:6
143:23 144:1
worked 10:11 15:4
15:13,24 16:7 17:2
17:5,6,23,24 21:13
22:8,10 27:22 33:17
33:20 34:7,8,8,10
34:12,13,17,20,23
35:4,25 36:16 40:22
41:1,3,4,5 49:16
88:11 94:5 146:4,7
working 14:13 20:24
20:25 21:3 22:2

25:9 27:2,3,13 30:2
33:11,14,15 34:11
35:8,11 36:7,21
38:13 41:8,9,11
43:15 54:2 60:9
63:18 89:1 111:1
131:14 141:16
143:10 145:20,24
146:6
works 150:5
worst 61:19
worth 29:25
wouldn't 54:9 56:4
58:4 66:3 109:16
115:17 125:13,23
144:12 152:14
156:8
write 67:10 97:9,23
99:15
writing 148:6
written 97:25
wrong 40:1,16
122:19
wrote 11:8

X

X 96:8,12,22 97:8,20
97:23 99:10,22
101:6 102:8,10,13
102:17,21,21

Y

yard 11:24 26:8 38:1
38:2,6 40:12 43:1
43:22 45:14,19,22
50:20 56:1 58:12
60:15 61:3,7,13,25
63:1 66:2 67:8 74:3
76:6,10 78:2 80:5
81:22 82:21 91:3,9
92:5,10 93:24 94:23
96:2,7,22 97:9 98:3
98:7,7,9,17 126:5
126:11 152:7 154:5
154:7,10,11,16,18
154:20,22 155:16
yeah 5:21 19:5 30:12

37:2,4 45:9 53:17
63:20 66:6 75:4
80:16 83:21 84:13
96:16 97:15 98:10
99:15 101:2 106:9
115:1,21 116:4
121:18,20 122:23
122:23 125:16
139:23
year 13:17,19 16:6
18:12 19:15 22:24
23:8,8,23,25 24:6
26:13 27:24 33:23
33:25 34:2 36:13
90:4 109:4
years 12:6 13:18
14:19,20 15:4 16:11
18:14 19:22 20:10
88:23 90:5 109:3
145:24
yep 7:23 8:12 21:2
29:19 37:16 52:19
83:11 95:14,17 96:6
129:22 152:24
yesterday 21:8

Z

Zupan 109:20

#

#1 64:10
#10 112:24
#11 115:12
#13 129:8
#2 66:14
#3 74:18
#8 94:14
#9 108:15

1

1 3:10 64:5,15 65:8
65:15 78:25 79:4
95:1 98:9,16,18,18
99:5,6,7,24 100:1
1:17-cv-00179-DL...
1:6
1:26 157:4

**10** 2:9 3:15 15:4
  112:16,16,20,20,22
  115:19 124:8 130:1
**10:16** 42:15
**108** 3:14
**11** 3:16 112:15,17
  115:6,6,10,14
**11:00** 74:17
**11:40** 94:13
**112** 3:3,15
**115** 3:16,16
**12** 3:16 115:6,10,12
  115:21,22,23
**12:05** 108:8
**12:13** 112:5
**129** 3:17,17,18,18,19
**13** 3:17 137:7,16
**133** 63:16
**14** 3:17 18:11 129:8
  134:12 135:6
  149:19 150:12
**1410** 2:4
**144** 3:4
**15** 3:18 18:19 44:15
  44:23 46:1 50:14
  52:10 53:2 54:13
  56:13 57:1 129:8
  131:4 133:22
**155** 3:4
**156** 3:5
**16** 3:18 18:19 129:8
  130:16 131:13
  134:2 137:7,16
**1687** 75:13
**17** 3:19 39:23 129:8
  137:15,18 140:7,11
  143:4 150:22,24
  151:2
**1788** 75:12
**19** 14:5 18:16
**1994** 13:1

**2**
**2** 3:11 66:13,16 92:15
  98:10,16,18 99:5,6
  99:7,24 100:1
  121:25 122:1

**2:30** 42:19
**20** 65:8,9,11,12 73:18
  73:18 78:25 79:1
  81:14,21 82:1,2
  98:3,4 101:22 102:1
  102:4 103:1,13,22
  103:25 104:7
  106:25 107:4,9,11
  152:21,22 153:8,9
  153:13,14,16,20,22
**201** 21:2
**2013** 14:5 18:17
**2014** 18:13
**2017** 6:22 7:3 10:7,10
  11:16,18 17:17,19
  25:17,22 26:15,23
  27:24 29:11 30:10
  31:2,24 33:9,18
  34:12,14,17,18,21
  34:24 35:12,17
  40:23 41:10,14
  42:17 46:20 48:5,15
  48:24 49:12,15,18
  50:25 51:4 52:3
  53:22 54:4,8 55:20
  59:22 62:4 63:11,19
  63:24 64:19 66:22
  67:17 75:13 76:3,25
  77:3,7 78:20 86:17
  87:3,25 89:2,19
  90:16,19 108:5
  110:3,6,9 111:18
  144:25 146:11,12
  150:16,19 151:4,7
**2018** 1:15 11:3 17:11
  21:16 22:8,11
  158:15
**2019** 158:25
**21** 15:3
**2150** 2:9
**24** 65:2,11
**2636** 12:13
**29th** 158:14

**3**
**3** 3:11 74:22 76:2
  77:9 78:13 98:21

**100:14**
**3-17-1976** 12:4
**30** 17:21 21:9
**31** 158:25

**4**
**4** 3:3,12 74:18 82:15
  84:16,23 85:4,15
  87:25 150:15
**4:00** 42:21
**40** 79:4
**42** 12:6

**5**
**5** 3:12 74:18 87:11
**50** 63:6
**55101** 2:5
**55303** 2:10
**58501** 1:23
**58503** 12:14

**6**
**6** 3:13 74:18 87:17
**6:00** 42:20,21 43:1,4
  43:9
**6:01** 44:11
**601** 21:11
**605** 1:22
**64** 3:10
**66** 3:11

**7**
**7** 3:13 6:22 7:3 10:7
  10:10 11:16,18
  26:15,23 33:9,18
  34:13,18,21,24
  35:12,16 40:23
  41:10,14 42:17
  46:19 48:5,15,24
  49:11,15,18 50:25
  51:4 52:3 53:21
  54:4,8 55:20 59:22
  62:4 63:11,19,24
  64:19 66:22 67:16
  74:18 75:13 76:3,24
  77:3,6 78:19 86:17
  87:3,21,25,25 89:2
  89:19 90:16,19

**108:5** 110:3,6,9
  111:17 150:16,19
  151:4
**7:00** 43:5,9
**7:01** 44:11
**701)429-1715** 115:18
**74** 3:11,12,12,13,13

**8**
**8** 3:14 65:10 94:17
  96:9 100:18 108:5
  151:24 152:12

**9**
**9** 1:15 3:14 65:1
  108:14,17 150:16
**9:00** 1:16
**90** 17:14
**94** 3:14
**95** 13:12
**97** 13:12